## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| SIERRA CLUB, | ) | |
| 85 Second Street, 2nd Floor | ) | |
| San Francisco, CA 94105 | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Civil Action No.  10-CV-303 |
| DAIRYLAND POWER | ) | |
| COOPERATIVE, | ) | |
| 3200 E. Avenue South | ) | |
| La Crosse, WI 54602-0817 | ) | |
| | ) | |
| Defendant. | ) | |

---

## COMPLAINT
---

Plaintiff, Sierra Club, by its undersigned attorneys, alleges as follows:

### INTRODUCTION

1.     This is a civil action for civil penalties, declaratory and injunctive relief, with costs and fees, under the Clean Air Act ("the Act" or "CAA"), 42 U.S.C. §§ 7401, *et seq*.

2.     Sierra Club seeks an order requiring the Defendant, Dairyland Power Cooperative ("DPC"), to comply with the requirements of the Act at the power plants located at S4651 State Highway 35, Genoa, Wisconsin ("Genoa"), and 500 Old State Road 35, Alma, Wisconsin ("Alma" or "Alma/Madgett") which are owned and operated by DPC and to forfeit penalties for violations of the CAA at the plants.

3.      The Genoa Station is a coal-fired power plant consisting of one boiler installed in 1969 (known as Genoa Station #3 or "G3") as well as various associated equipment.  The Genoa Station is capable of generating approximately 379 megawatts (MW) of electricity.

4.      Great River Energy, of Maple Grove, Minnesota, has an agreement with Dairyland Power to share in the output of the Genoa Station #3 but Dairyland owns and operates the plant.

5.      The Alma/Madgett Station was built in 1947 and currently consists of six coal-fired boilers and one auxiliary boiler.  These boilers are known as Alma #1, #2, #3, #4 and #5 and John P. (or JP) Madgett.  Alma #1 and #2 were constructed first, in 1947, are each wall-fired dry bottom boilers rated at 338.8 million British Thermal Units (MMBtu) per hour of heat input, and are each capable of generating approximately 20 MW.  Alma #3 was constructed in 1950, is a wall-fired dry bottom boiler rated at 340 MMBtu per hour, and is capable of generating approximately 20 MW.  Alma #4 was constructed in 1957, is a wall-fired dry bottom boiler rated at 633.3 MMBtu per hour, and is capable of generating approximately 50 MW.  Alma #5 was constructed in 1960, is a wall-fired dry bottom boiler rated at 939.8 MMBtu/hour, and is capable of generating approximately 80 MW.  The Madgett unit is located in a separate structure, but on the same property as the other five Alma units.  It was constructed in the late 1970s and began operation in November, 1979.  The JP Madgett unit consists of a wall-fired dry bottom boiler rated at 4055.8 MMBtu/hour capable of generating approximately 400 MW, an auxiliary oil-fired boiler, and associated equipment.

6.      The various coal and oil-fired boilers owned and operated by Dairyland emit thousands of tons of carbon dioxide, nitrogen oxides, sulfur oxides, particulate matter and carbon

2

monoxide each year. Those pollutants contribute to climate change, respiratory distress, cardiovascular disease, and premature mortality. Nitrogen oxides and sulfur oxides in the air also contribute to acid rain, which sterilizes lakes and damages property. The presence of those pollutants in the atmosphere is also associated with increased hospital admissions and emergency room visits.

7.    The Alma/Madgett and Genoa Generating Stations, individually, have the "potential to emit," as that term is defined in Wis. Admin. Code § NR 405.02(25), in excess of 100 tons per year of each of the following pollutants: carbon monoxide, particulate matter, nitrogen oxides, and sulfur dioxide.

8.    Each of the Alma/Madgett and Genoa Generating Stations is a "major emitting facility," as that term is used in 42 U.S.C. § 7475(a).

9.    Each of the Alma/Madgett and Genoa Generating Stations is a "major stationary source," as that term is used in Wis. Admin. Code § NR 405.07(1).

10.    On one or more occasions, DPC modified and thereafter operated each of the eight boilers at the Alma and Genoa stations without first obtaining appropriate permits authorizing that construction, without meeting emission limits that are "best available control technology," and without installing appropriate technology to control emissions of nitrogen oxides, sulfur dioxides, particulate matter, and other pollutants as required by the Act and its implementing regulations. Additionally, DPC installed a new "package boiler" and rebuilt the existing auxiliary boiler connected to the JP Madgett unit without first obtaining appropriate permits authorizing that construction, without meeting emission limits that are "best available

3

control technology," and without installing appropriate technology to control emissions as required by the Act and its implementing regulations.

11.     Air pollution emitted from Dairyland's plants has also violated limits established in enforceable permits and regulations issued by the Wisconsin Department of Natural Resources and United States Environmental Protection Agency.

12.     As a result of the DPC's operation of the plants in violation of the law and applicable permits and in absence of appropriate controls and without certain permits required by law, unlawful amounts of various pollutants have been, and continue to be, released into the atmosphere, aggravating air pollution locally and far downwind from this plant.

13.     An order from this Court directing DPC to comply with applicable pollution limits, obtain the required permits, install modern pollution controls and demonstrate to the appropriate regulatory agencies that emissions from the facility will not result in unlawful amounts of air pollution, will improve air quality for thousands of  Wisconsin residents, including Sierra Club's members.  It will also reduce illness and protect lakes and streams from further degradation due to the fallout from acid rain and mercury deposition.

14.     If DPC complies with the Act, including applicable emission limits and the Prevention of Significant Deterioration ("PSD") program, 42 U.S.C. §§ 7470-7479, the plant will significantly decrease its annual air pollution emissions.

## PARTIES

15.     Plaintiff Sierra Club is an incorporated, not-for-profit organization with its headquarters at 85 Second Street, 2nd Floor, San Francisco, California, and its Wisconsin Chapter Office at 222 S. Hamilton St., Suite 1, Madison, WI 53703-3201. Its purpose is to

preserve, protect, and enhance the natural environment. Its mission includes reducing and eliminating pollution from the mining, combustion, and waste disposal of coal, which negatively affects Sierra Club's members as well as members of the public. Sierra Club has over a million members and supporters nationwide, including over 10,000 members and supporters in Wisconsin.

16.     DPC is a cooperative association organized under the laws of Wisconsin and Minnesota.  DPC is a generation and transmission cooperative that generates and transmits electricity at wholesale to twenty-five (25) electric distribution cooperatives and sixteen (16) municipal utilities that, collectively, have a service territory of approximately 500,000 people. Dairyland Power Cooperative was formed in 1941 and has its headquarters and principal place of business in La Crosse, Wisconsin.

17.     Laurie Engen, 320 E Avenue South, La Crosse, Wisconsin, is the Registered Agent for Dairyland Power Cooperative, registered with the Wisconsin Department of Financial Institutions.

18.     DPC is a "person" within the meaning of Sections 302(e) and 304(a)(3) of the Act, 42 U.S.C. § 7602(e), 7604(a)(3).

## STANDING

19.    Sierra Club has members who live, work, and recreate downwind from the Genoa and Alma plants.  These members are impacted negatively by air pollution emissions from the plant.  The health and welfare of Sierra Club's members, as well as their enjoyment of outdoor activities, has been and continues to be harmed by air pollution from the plants.

20.    An order of this Court enjoining DPC from operating the plants, requiring it to comply with applicable pollution limits, and requiring DPC to procure a PSD permit with current best available control technology standards for the major modifications that have been made at the plants, will redress the injuries to Sierra Club's members because of the significant decreases in air pollution that will be required under a new permit.  Sierra Club members' injuries would also be redressed by any civil penalties awarded pursuant to 42 U.S.C. § 7604(a) and (g), including a beneficial mitigation project, and other required mitigation measures.

## JURISDICTION AND VENUE

21.    This Court has subject matter jurisdiction over the claims set forth in this complaint pursuant to 42 U.S.C. § 7604(a), 28 U.S.C. §§ 1331, 1355, and 2201.  The relief requested by the Plaintiff is authorized by statute in 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. § 7604.

22.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the Defendant resides in, and all or a substantial part of the events or omissions giving rise to the claims herein occurred in, the Western District of Wisconsin.  Venue is also proper pursuant to 42 U.S.C. § 7604(c)(1) because this action is for violations at the Genoa and Alma plants, which are located within the Western District of Wisconsin.

23.    No prior notice is required for the claims set forth below.  42 U.S.C. §
7604(a)(3).  However, Sierra Club provided notice pursuant to 42 U.S.C. § 7604(b) on October
2, 2009 and December 21, 2009.  Those notices are attached hereto as Exhibits 1 and 2,
respectively.

## GENERAL ALLEGATIONS

24.    The Act requires that the United States Environmental Protection Agency (EPA)
promulgate National Ambient Air Quality Standards (NAAQS), which are upper limits on air
pollution, to protect public health and welfare, 42 U.S.C. § 7409.

25.    The Act also requires each state to designate those areas within its boundaries
where the air quality meets or exceeds NAAQS for each pollutant.  An area that meets the
NAAQS for a particular pollutant is termed an "attainment" area, whereas an area that exceeds
the NAAQS is a "nonattainment" area.  Areas for which there is insufficient information to
determine compliance with NAAQS are "unclassifiable," 42 U.S.C. § 7407(d).

26.    The Genoa Station is located in Vernon County, Wisconsin, and the Alma Station
is located in Buffalo County, Wisconsin.

27.    At the times relevant to this complaint, Vernon and Buffalo Counties were
classified as either "attainment" or "unclassifiable" for all pollutants.

28.    Defendant is a legally recognized cooperative association that owns and is
responsible for the operations of the Genoa and Alma plants.

29.    Coal is the predominant fuel for the main boilers at the Genoa and Alma plants.

30.    The Genoa and Alma plants each have the potential to emit in excess of 100 tons per year of the following pollutants: carbon dioxide, nitrogen oxides, sulfur dioxide, carbon monoxide, and particulate matter.

31.    The Genoa and Alma/Madgett plants are each a "major emitting facility" or "major stationary source" as those terms are used in 42 U.S.C. § 7475(a), 40 C.F.R. §§ 52.21(a)(2), (b)(1) and Wis. Admin. Code § NR 405.02(22).

32.    Any major stationary source in an attainment or unclassifiable area that intends to construct a "major modification" must first obtain a PSD permit.  42 U.S.C. § 7475(a), 40 C.F.R. § 52.21, Wis. Stat. § 285.60 and Wis. Admin. Code §§ NR 405.01, 405.07.

**Permits Issued to DPC's Plants**

33.    The Wisconsin Department of Natural Resources issued the following permits for DPC's Alma/Madgett Generating Station:

    a.  Permit 06-SDD-011 on June 15, 2006;
    b.  Permit 07-POY-093 on September 27, 2007;
    c.  Permit 08-SDD-147 on October 3, 2008;
    d.  Permit 606034110-P10 on November 7, 2003;
    e.  Permit 606034110-P20 on December 5, 2008; and
    f.  Permit 60603410-P21 on September 25, 2009.

34.    The Wisconsin Department of Natural Resources issued the following permits for DPC's Genoa Generating Station:

    a.  Permit 06-SDD-010 on June 15, 2006;
    b.  Permit 07-SDD-272 on April 1, 2008;
    c.  Permit 663020930-P10 on November 7, 2002;
    d.  Permit 663020930-P12 on September 10, 2007; and
    e.  Permit 663020930-P20 on January 23, 2009.

35. Permits 60603410-P10, 60603410-P20, and 60603410-P21 limit visible emissions from Alma Units 1 through 5 to forty percent (40%) opacity, except during startup and shutdown if DPC complies with a startup and shutdown plan approved by Wisconsin DNR.

36. Permit 08-SDD-147 limits visible emissions from Alma Units 4 and 5 to twenty percent (20%) opacity, except during startup and shutdown if DPC complies with a startup and shutdown plan approved by Wisconsin DNR.

37. Permits 60603410-P10, 60603410-P20, 60603410-P21, and 07-POY-093 limit visible emissions from Alma's Madgett Unit to twenty percent (20%) opacity, except during startup and shutdown if DPC complies with a startup and shutdown plan approved by Wisconsin DNR.

38. Each of the permits issued for the Alma Generating Station requires DPC to continuously monitor visible emissions by continuously operating a continuous opacity monitor that records opacity in six-minute increments.

39. Permits 07-SDD-272 and 663020930-P20 limit visible emissions from Genoa Unit 3 to twenty percent (20%) opacity with no exceptions.

40. Permit 663020930-P10 and Permit 663020930-P12 limit visible emissions from Genoa Unit 3 to forty percent (40%) opacity, except during periods of normal startup and shutdown if DPC follows a startup and shutdown plant approved by Wisconsin DNR.

41. Each of the permits issued for the Genoa Generating Station requires DPC to continuously monitor visible emissions by continuously operating a continuous opacity monitor that records opacity in six-minute increments.

42.     Permit 07-POY-097 issued for Alma's Madgett Unit prohibits emissions of carbon monoxide (CO) at rates greater than 400 parts per million (ppm) based on any 1-hour average or greater than 225 ppm based on any 24-hour average.  The 400 ppm limit applies at all times and the 225 ppm limit applies at all times except for periods of startup and shutdown, provided that during startup and shutdown times DPC complies with a startup and shutdown plan approved by the Wisconsin DNR.  This limit was established pursuant to 42 U.S.C. §§ 7475(a)(4) and 7479(3) and Wis. Admin. Code §§ NR 405.02(7) and NR 405.08 and was also incorporated into Permit 606034110-P20.

**The Wisconsin State Implementation Plan**

43.      The Wisconsin State Implementation Plan (SIP) has been approved by the United States Environmental Protection Agency (EPA) pursuant to the Clean Air Act and is incorporated into federal law by publication in the Federal Register and Code of Federal Regulations.  *See e.g.*, 40 C.F.R. § 52.2569, *et seq.*

44.     Wis. Admin. Code § 154.11 (1981) was adopted into the Wisconsin SIP in 1983 and prohibits any person, including DPC, from causing, suffering, allowing or permitting emissions into the air from any direct or portable source in excess of the following relevant limits:

> a.  Twenty percent (20%) opacity on direct and portable emission sources on which construction or modification is commenced after April 1, 1972, except for up to three times per day when a new fire is being started or when combustion equipment is being cleaned, during which times emissions may not exceed eighty percent (80%) opacity for more than 5 minutes.  *See also* Wis. Admin. Code § NR 431.05.
>
> b.  Forty percent (40%) opacity for direct and portable sources on which construction or modification last commenced on or before April 1, 1972, except for up to three times per day when a new fire is being started or when combustion equipment is being cleaned, during which times emissions may

10

not exceed eighty percent (80%) opacity for more than 5 minutes.  *See also* Wis. Admin. Code § NR 431.04(1).

45.    The Wisconsin SIP requires DPC to continuously monitor visible emissions from its boilers by operating a continuous opacity monitor.  *See* Wis. Admin. Code § NR 439.095(1)(a) and (f), (5)(a)1.

46.    The Wisconsin SIP also contains, and at all relevant times hereto contained, provisions implementing the Clean Air Act's Prevention of Significant Deterioration (PSD) Program.  Different regulations were adopted and applied at different times pursuant to the Wisconsin SIP.  On June 19, 1978, EPA approved the Federal PSD program, 40 CFR 52.21 (b) through (v), into the Wisconsin SIP at 40 C.F.R. § 52.2581 because Wisconsin had not submitted an approvable PSD program.  43 Fed. Reg. 26,410.  On August 19, 1980, EPA gave Wisconsin partial delegation to run the Federal PSD program, and on November 13, 1987, gave Wisconsin full delegation of the program, except for sources in Indian country.  Pursuant to these delegations, the PSD program that applied in Wisconsin was the federal program at 40 C.F.R. § 52.21 and EPA was the ultimate permitting agency.  However, the Wisconsin DNR had authority to issue permits on behalf of the EPA, subject to EPA's oversight.

47.    On May 27, 1999, EPA promulgated a final rule adopting Wisconsin's PSD program in Wis. Admin. Code ch. NR 405 in place of the federal rules in 40 C.F.R. § 52.21.  64 Fed. Reg. 28,745 (May 27, 1999).  That rulemaking was effective on June 28, 1999.  *Id.*  On December 17, 2008, EPA promulgated a rule accepting certain revisions to the Wisconsin PSD program.  73 Fed. Reg. 76,560 (December 17, 2008).  Those revisions were effective January 16, 2009.  *Id.*[1]

---

[1] Sierra Club and Natural Resources Defense Council filed a petition for judicial review of EPA's December 17, 2008, action within the time provided by the Clean Air Act.  The petition for judicial review

48.     In addition to the Prevention of Significant Deterioration program in Wis. Admin. Code ch. NR 405, the Wisconsin SIP requires sources to obtain a permit from the Wisconsin DNR prior to any modification.  Wis. Stat. § 285.60(1)(a)1.; Wis. Admin. Code § NR 406.03. The term "modification" for this program is defined as "any physical change in, or change in the method of operation of, a stationary source that increases the amount of emissions of an air contaminant or that results in the emission of an air contaminant not previously emitted."  Wis. Admin. Code § NR 400.02(99).

## The New Source Performance Standards

49.     The United States Environmental Protection Agency has promulgated standards for new sources of air pollution known as New Source Performance Standards or "NSPS." Those standards apply to any plant that is constructed or modified after the relevant date set forth in the standard.

50.     The relevant NSPS standard in this case, 40 C.F.R. § 60.42Da(b), limits visible emissions from Alma's Madgett Unit to twenty percent (20%) opacity, except for one 6-minute period per hour, during which opacity may exceed twenty percent (20%) but may not exceed twenty-seven percent (27%).

## The Prevention of Significant Deterioration Program

51.     Under the Clean Air Act's PSD program and Wisconsin's SIP, a new major source of air pollution cannot be constructed, and an existing major source of air pollution cannot undergo a "major modification," without a permit.  *See* 42 U.S.C. §§ 7475(a) (prohibiting the construction of a major emitting facility without PSD review, issuance of a PSD permit, and

has been stayed.  If the Seventh Circuit reverses and/or remands the December 2008 EPA action, the 1999 version of Wis. Admin. Code ch. NR 405 will apply.

imposition of BACT limits), 7479(2)(C) ("construction" includes the "modification" of a source or facility); 40 C.F.R. § 52.21; Wis. Admin. Code §§ NR 405.07(1) (prohibiting the construction or major modification of a major stationary source without PSD review and permitting), NR 405.08 (requiring best available control technology for any new or modified source).

52.     A "major modification" is "any physical change in or change in the method of operation of a major stationary source that would result in a significant emissions increase" of a regulated air contaminant. 40 C.F.R. § 52.21; Wis. Admin. Code § NR 405.02(21). Included in the definition of "major source" are fossil fuel fired steam electric plants and fossil fuel fired boilers. 40 C.F.R. § 52.21; Wis. Admin. Code § NR 405.02(22)(a)(1).

53.     Pursuant to the PSD regulations applicable to pollution sources in Wisconsin for projects occurring prior to January 16, 2009, emissions increases are measured as the difference between the annual average emissions during the 24 months prior to the project and the plant's post-project "actual emissions." 40 C.F.R. § 52.21(b)(2), (3)(i), and (21) (1993); Wis. Admin. Code §§ NR 405.02(1), 405.02(24)(a) (1999). Post-project "actual emissions" are the emission source's potential to emit unless the source is an electric utility steam generating unit that meets certain monitoring and reporting requirements. 40 C.F.R. § 52.21(b)(21) (1993); Wis. Admin. Code § NR 405.02 (1) (1999).

54.     Alma Units 1 through 3 and the auxiliary boiler at the Madgett site are not electric utility steam generating units because they are not "constructed for the purpose of supplying more than one third of its potential electric output capacity and more than 25 MW electrical output to any utility power distribution system for sale." 40 C.F.R. §52.21(b)(31); Wis. Admin.

Code § NR 405.02(11m).  Therefore, for projects occurring prior to January 16, 2009, on these units, post-project "actual emissions" are the units' potential to emit.

55.    Prior to January 16, 2009, an electric utility steam generating unit, such as Alma Units 4 and 5, the Madgett Unit, and Genoa Unit 3, can determine emission increases by comparing its pre-project annual "actual emissions" to its "representative actual annual emissions… *provided* the source owner or operator maintains and submits to the department, on an annual basis for a period of 5 years from the date the unit resumes regular operation, information demonstrating that the physical or operational change did not result in an emissions increase."  Wis. Admin. Code § NR 405.02(1)(d) (1999) (emphasis added); 40 C.F.R. § 52.21(b)(21)(v) (1993).  This alternative "actual-to-projected-actual" test, however, is conditional and only applies when the owner or operator complies with the monitoring and reporting requirements.

56.    For modifications that occurred after January 16, 2009, the method for calculating an emission increase is set forth in Wis. Admin. Code § NR 405.025 as the difference between the "projected actual emissions" and the "baseline actual emissions." "Baseline actual emissions" are defined in Wis. Admin. Code § NR 405.02(2m) and "projected actual emissions" are defined in Wis. Admin. Code § NR 405.02(25f), which requires a specific methodology to be followed, and NR 405.16(3), which requires the owner to document and maintain certain records and submit certain reports to the Wisconsin DNR.  Alternatively, if the methodology required by Wis. Admin. Code § NR 405.02(25f) is not followed and/or the documentation and reporting required by Wis. Admin. Code § NR 405.16(3) is not followed, the projected actual emissions

are equal to the emission unit's potential to emit after the project.  Wis. Admin. Code § NR 405.02(25f)(c).

57.    DPC did not conduct the monitoring and reporting required under the regulations in effect before or after January 16, 2009, for DPC to take advantage of the "actual-to-projected-actual" test for any of the projects below.  Therefore, DPC's projects default to the actual-to-potential test to calculate emission increases from the projects.

**The Operating Permit Program**

58.    Pursuant to Section 502(a) of the Clean Air Act, 42 U.S.C. § 7661(a), it is unlawful to operate without, or in violation of, a permit issued pursuant to Clean Air Act subchapter five ("Title V"), 42 U.S.C. §§ 7661, *et seq*.

59.    Wisconsin's major source operating permit program, known as Wisconsin's Part 70 or Title V program, was approved on March 6, 1995 and became effective on an interim basis on April 5, 1995. *See* 60 Fed. Reg. 12,128 (Mar. 6, 1995) (to be codified at 40 C.F.R. pt. 70). US EPA later granted full approval of Wisconsin's Title V program on December 4, 2001.  *See* 66 Fed. Reg. 62,951 (Dec. 4, 2001).

60.    Wisconsin's Title V program requires an owner or operator to file an application to modify an existing Title V permit when the source makes modifications not authorized by the existing permit. Wis. Stat. §§ 285.60, 285.62; Wis. Admin. Code §§ NR 407.04(1)(b), 407.13. An application to modify a Title V permit must be filed prior to making the modification, Wis. Admin. Code § NR 407.04(1)(b), and must include sufficient information to allow the permitting agency and the public to determine whether the source is in compliance with all applicable Clean Air Act requirements.  Wis. Admin. Code § NR 407.05(4)(e) and (i)1.  All material statements in

15

the application must be true.  Wis. Admin. Code § NR 407.05(10).  An incorrect or incomplete application must be revised "promptly" by the applicant.  Wis. Admin. Code § NR 407.05(9).  Moreover, pursuant to Wis. Stat. § 285.60(1)(b)1., no person may operate a modified source without an operating permit issued pursuant to Wis. Stat. § 285.62.  Each day of operation since a modification undertaken without a required PSD permit also constitutes a violation of the requirements to apply for a revised Title V operating permit.

61.    Pursuant to Wis. Admin. Code § NR 407.05(4)(i), each Title V operating permit application must contain a certification by the owner or operator that the source is currently in compliance with all applicable requirements, including PSD, NSPS and Clean Air Act section 112, 42 U.S.C. § 7412, requirements.  Where a source is not in compliance with all requirements, the application must contain a narrative description of how the source will achieve compliance.  Wis. Admin. Code § NR 407.05(4)(h)2.c.  Additionally, for such sources that are not in compliance, the source must propose a compliance schedule that meets certain minimum requirements, including "a series of remedial measures, including an enforceable sequence of actions with milestones, leading to compliance with any applicable requirements for which the source will be in noncompliance at the time of permit issuance."  Wis. Admin. Code § NR 407.05(4)(h)3.  There is an ongoing obligation to correct or supplement any pending application.  Wis. Admin. Code § NR 407.05(9).

62.    Wisconsin Administrative Code §§ NR 407.05(4)(i)3 and 439.03(1)(c), (9), (10), Permit 606034220-P10 §§ I.W.3.a.2 and II.N, Permit 606034220-P20 §§ I.YYY.3.a.2 and II.N, Permit 663020930-P10 §§ I.M.3.a.(2) and II.N, Permit 663020930-P12 §§ I.ZZX.3.a.(2) and II.N, and Permit 663020930-P20 §§ I.ZZX.3.a.(2) and II.N require DPC to submit certifications

of compliance annually to the Department of Natural Resources and U.S. EPA.  Such certifications must be signed by a responsible official, based on information and belief formed after reasonable inquiry, and must be truthful.  Wis. Admin. Code §§ NR 439.03(9), (10).

63.    DPC's plants' operating permits further provide, in section II.B. of each permit, that: "no person may cause, allow, or permit emissions of any air contaminant into the ambient air in excess of the limits set in chs. NR 400 to 499, Wis. Adm. Code."  Any violation of any provision of Wis. Admin. Code chs. NR 400 through 499 therefore constitutes a violation of the applicable operating permit.

**Modifications Made to DPC's Boilers**

**A.  The Auxiliary Boilers At Alma/Madgett**

64.    In or about June, 2009, DPC replaced the boiler tubing in an auxiliary boiler located adjacent to the Madgett Unit that is designated as "Boiler B27" in DPC's permits.  The project replaced all of the tubes in the auxiliary boiler.

65.    At approximately the same time, DPC installed a "rental package boiler" rated at 30 million British Thermal Units per hour (MMBtu/hr) to provide auxiliary steam while the existing auxiliary boiler was being retubed.

66.    DPC had never previously replaced all of the tubes in the auxiliary boiler, or in any boiler, during a single boiler outage.

67.    DPC did not submit any analysis to the Wisconsin DNR prior to beginning construction of the auxiliary boiler retubing or installing the rental package boiler in 2009.  Additionally, DPC did not satisfy the analysis, recordkeeping and reporting required under Wis. Admin. Code § NR 405.16(3) for the project to retube the auxiliary boiler and install a rental

17

package boiler. Therefore, DPC defaulted into an actual-to-potential test for calculating emission increases pursuant to Wis. Admin. Code § NR 405.02(25f)(c).

68.      On July 27, 2009, Mr. Steven Dunn from the DNR wrote a letter to Mr. Steve Hynek of DPC. In its July 27th letter, the DNR denied DPC an exemption from the Prevention of Significant Deterioration ("PSD") program (NR 405), and the construction permit requirements in Wis. Admin. Code ch. NR 406.

69.      On September 24, 2009 DPC applied for an "after-the-fact" permit for the project to replace the tubes on the auxiliary boiler at the Alma/Madgett plant.

70.      The Wisconsin DNR initially proposed to issue an "after-the-fact" permit for the project on December 24, 2009 and solicited public comments. DNR's preliminary determination document states that DPC was required to obtain permits prior to the retubing and rental package boiler project.

71.      As of the date of this Complaint, the Wisconsin DNR has not issued any permit for the project.

**B.  The Coal-Fired Boilers At Alma 1-5.**

72.      Beginning on or about August 1, 1993 and continuing through approximately January 1, 1994, DPC replaced Feedwater Heater 4 at the Alma plant. The project cost approximately $132,146.46 and was treated as a capital expenditure pursuant to Generally Accepted Accounting Principles (GAAP).

73.      Beginning on or about December 1, 1998 and continuing through approximately April 1, 1999, DPC replaced the sootblower drives and controls on Alma Unit 4 and Alma Unit

5.  The project cost approximately $233,814.04 for Unit 4 and $160.152.28 for Unit 5 and was treated as a capital expenditure pursuant to GAAP.

74.    Beginning on or about March 1, 2000 and continuing through approximately May 15, 2000, DPC rehabilitated the seals on Alma Unit 2 and 3.  The project cost approximately $158,583.83 for Unit 2 and $160,744.72 for Unit 3 and was treated as a capital expenditure pursuant to GAAP.

75.    Beginning on or about May 1, 2001 and continuing through approximately October 1, 2001, DPC rehabilitated the seal on Alma Unit 1.  The project cost approximately $200,470.00 and was treated as a capital expenditure pursuant to GAAP.

76.    Beginning on or about May 30, 2001 DPC installed Air Heater Basket 4 pursuant to Work Order W6412.  The project was budgeted for $117,700 and was treated as a capital expenditure pursuant to GAAP.

77.    Beginning on or about August 14, 2001 and continuing through approximately April 1, 2002, DPC replaced the high pressure #5 feedwater heater pursuant to Work Order W6582.  The project cost approximately $157,183.61 and was treated as a capital expenditure pursuant to GAAP.

78.    Beginning on or about September 1, 2002 and continuing through approximately April 1, 2003, DPC replaced Feedwater Heater 5 pursuant to Work Order W6915.  The project cost approximately $123,543.99 and was treated as a capital expenditure pursuant to GAAP.

79.    Beginning on or about April 1, 2002 and continuing through approximately June 30, 2002, DPC upgraded the sootblowers and boiler controls on Alma units 1, 2 and 3 pursuant to Work Orders W6723 and W6738.  The project cost approximately $123,543.99 for the

19

sootblowers and $309.764.79 for the controls and was treated as a capital expenditure pursuant to GAAP.

**C. The Madgett Unit**

80.     Beginning on or about January 1, 1996 and continuing through approximately July 1, 1997, DPC replaced the economizer headers and superheater welds on the Madgett Unit pursuant to Work Orders W4489, W4924 and W4927. The project cost approximately $246,237.35 and $236,821.31 for the economizer headers and $537,941.06 for the superheater welds and was treated as a capital expenditure pursuant to GAAP.

81.     Beginning on or about February 1, 1998 and continuing through approximately December 1, 1998, DPC upgraded the sootblowers on the Madgett Unit pursuant to Work Order W5322.  The project cost approximately $382,737.42 and was treated as a capital expenditure pursuant to GAAP.

82.     Beginning on or about March 15, 1999 and continuing through approximately January 1, 2001, DPC installed a neural network optimization system upgrade on the Madgett Unit pursuant to Work Order W6010.  The project cost approximately $420,620.56 and was treated as a capital expenditure pursuant to GAAP.

83.     Beginning on or about May 12, 2001 and continuing through approximately October 28, 2005, DPC upgraded the boiler controls on the Madgett Unit pursuant to Work Order W6158.  The project cost approximately $11,286,295.33 and was treated as a capital expenditure pursuant to GAAP.

84.     Beginning on or about February 1, 2003 and continuing through approximately April 1, 2003, DPC replaced the heater basket on the Madgett Unit pursuant to Work Order

20

W6541.  The project cost approximately $975,329.75 and was treated as a capital expenditure pursuant to GAAP.

### D.  Genoa Unit 3

85.     Beginning on or about May 15, 1994 and continuing through approximately November 1, 1996, DPC undertook a project involving numerous changes to Genoa Unit 3 to allow the boiler to burn Powder River Basin subbituminous coal and natural gas pursuant to Work Order W3069.  The project cost approximately $5,968,310.78 and was treated as a capital expenditure pursuant to GAAP.

86.     Beginning on or about January 1, 1996 and continuing through approximately January 1, 1999, DPC upgraded the boiler controls on Genoa Unit 3 pursuant to Work Order W4413.  The project cost approximately $5,960,910.40 and was treated as a capital expenditure pursuant to GAAP.

87.     Beginning on or about December 1, 1997 and continuing through approximately July 1, 1999, DPC upgraded the coal mills #3 and #4 on the Genoa Unit 3 pursuant to Work Order W5271.  The project cost approximately $125,051.14 and was treated as a capital expenditure pursuant to GAAP.

88.     Beginning on or about September 1, 2001 and continuing through approximately September 30, 2001, DPC rebuilt the burner corners on Genoa Unit 3 pursuant to Work Order W6469.  The project cost approximately $228,852.42 and was treated as a capital expenditure pursuant to GAAP.

89.     Beginning on or about November 11, 2000 and continuing through approximately September 1, 2001, DPC replaced the feedwater heater on the Genoa Unit 3 pursuant to Work

Order W6314.  The project cost approximately $447,551.58 and was treated as a capital expenditure pursuant to GAAP.

90.     Beginning on or about October 1, 2003 and continuing through approximately October 30, 2003, DPC replaced the oil guns on the Genoa Unit 3 boiler pursuant to Work Order W6621.  The project cost approximately $240,624.98 and was treated as a capital expenditure pursuant to GAAP.

91.     Beginning on or about January 1, 2004 DPC replaced the heater #5 on the Genoa Unit 3 pursuant to Work Order W7370.  The project was budgeted to cost approximately $823,480.00 and was treated as a capital expenditure pursuant to GAAP.

92.     Beginning on or about January 1, 2006 DPC replaced the vertical high temperature reheat section of the Genoa Unit 3 boiler pursuant to Work Order 7751.  The project was budgeted to cost approximately $2,518,060.00 and was treated as a capital expenditure pursuant to GAAP.

**E.  Lack of Permits, Monitoring, and Reporting and Failure to Comply With Emission Limits for Modifications to Plants.**

93.     DPC did not conduct the monitoring, recordkeeping and reporting provided for in 40 C.F.R. § 52.21(b)(21)(v) (1993) and Wis. Admin. Code § NR 405.02(1)(d) (1999) to demonstrate "on an annual basis for a period of 5 years from the date the unit resumes regular operation" that none of the projects identified above occurring prior to January 16, 2009, at the Alma/Madgett and Genoa plants "result[ed] in an emissions increase."

94.     Therefore, DPC is not entitled to use the post-project definition of "actual emissions" in 40 C.F.R. § 52.21(b)(21)(v) (1993) and Wis. Admin. Code § NR 405.02(1)(d) and

22

must, instead, calculate emission increases for each of the projects above occurring prior to January 16, 2009, pursuant to the "actual-to-potential" test.

95.    DPC failed to obtain a permit pursuant to the PSD program, 42 U.S.C. § 7470 *et seq*, 40 C.F.R. § 52.21 and Wis. Admin. Code ch. NR 405, for any of the projects identified above.

96.    DPC failed to obtain a permit pursuant to Wis. Admin. Code ch. NR 406 for any of the projects identified above.

97.    DPC failed to comply with best available control technology limits required by 42 U.S.C. § 7475(a)(4), 40 C.F.R. § 52.21(j) and Wis. Admin. Code § NR 405.08 on and after the date of each of the modifications identified above.

98.    DPC failed to conduct the analysis required by 40 C.F.R. §§ 52.21(k), (m) and (o) and Wis. Admin. Code §§ NR 405.11 and 405.13 of the impact from the modifications and the DPC plants' emissions for any of the projects identified above.

99.    DPC failed to submit the information required to be submitted for major modifications pursuant to 40 C.F.R. § 52.21(n) and Wis. Admin. Code § NR 405.12 for any of the major modifications identified above.

## FIRST CLAIM

### (Violations of Visible Emission Limits)

100.    Paragraphs 1 through 99 are realleged and incorporated herein by reference.

101.    On thousands of occasions since 2002 the smoke emitted from the stacks at the Alma/Madgett and Genoa plants violated limits on visible emissions—expressed as limits on opacity—set forth in the applicable permits, 40 C.F.R. § 60.42Da(b), and the Wisconsin SIP.

102.    Each six-minute period where the average opacity exceeded any applicable limit for that time and boiler constitutes a separate and distinct violation.  One such six-minute period simultaneously constitutes a violation of each applicable permit, of the Wisconsin SIP, and of 40 C.F.R. § 60.42Da(b).

103.    Sierra Club has a claim for each such violation pursuant to 42 U.S.C. § 7604(a)(1) and (3).

## SECOND CLAIM

(Violations of Limits on Carbon Monoxide)

104.    Paragraphs 1 through 63 are realleged and incorporated herein by reference.

105.    On at least thirteen (13) different occasions, and likely many more, DPC's emissions from the Madgett Unit violated the applicable Carbon Monoxide (CO) limit set forth in Permits 07-POY-093 and 606034110-P20.

106.    Each period of excess CO emissions constitutes a separate and distinct violation of each permit, Wis. Admin. Code § NR 405.08, and Wis. Admin. Code § NR 406.10.

107.    Sierra Club has a claim for each such violation pursuant to 42 U.S.C. § 7604(a)(1) and (3).

## THIRD CLAIM

(Commencing Construction of a Major Modification Without a PSD Permit)

108.    Paragraphs 1 through 99 are realleged and incorporated herein by reference.

109.    At various times, DPC commenced construction of one or more major modifications, each affecting one or more of the boilers and associated equipment at the Alma/Madgett and Genoa plants.  Each such major modification was a physical change or

24

change in method of operation which resulted in significant net emission increases, as defined by 40 C.F.R. § 52.21(b)(3)(i) and Wis. Admin. Code §§ NR 405.02(24), (27), of one or more pollutants.

110.    DPC continues to violate Section 165(a) of the Act, 42 U.S.C. § 7475(a), and the PSD regulations set forth in the Wisconsin State Implementation Plan, Wis. Stat. § 285.60, *et seq.*, and Wis. Admin. Code ch. NR 405, by, *inter alia*, its ongoing failure to obtain the required PSD permit for major modifications to the Alma/Madgett and Genoa plants.

111.    Based upon the foregoing, DPC has violated and continues to violate Section 165(a) of the Act, 42 U.S.C. § 7475(a), 40 C.F.R. § 52.21, Wis. Stat. § 285.60 and Wis. Admin. Code ch. NR 405.  Unless restrained by an order of this Court, these and similar violations of the PSD provisions of the Act are ongoing.

112.    Sierra Club has a claim for each such violation pursuant to 42 U.S.C. § 7604(a)(1) and (3).

## FOURTH CLAIM

### (Failure to Comply With Best Available Control Technology)

113.    Paragraphs 1 through 99 and 109 through 112 are incorporated herein by reference.

114.    Each of the projects identified above constitutes a major modification which triggered emission limits known as "best available control technology" applicable to the modified boiler.

115.    Best available control technology is an emission limit that applies to emission sources that have undergone a major modification.  Such limits are unit-specific, but are at least

as stringent as the limits set forth in 40 C.F.R. parts 60 and 61.  Typically, best available control technology limits are significantly more stringent than the limits in 40 C.F.R. parts 60 and 61.

116.    Beginning with the first day that the first major modification was completed and returned to service, the Alma/Madgett and Genoa Generating Stations have emitted one or more pollutants, including particulate matter (PM, PM10 and PM2.5), nitrogen oxides, sulfur dioxide, carbon monoxide and sulfuric acid mist, at rates greater than the best available control technology limit for each such pollutant.

117.    DPC is in continuing violation of the ongoing requirement to comply with best available control technology for each major modification, including those set forth above, as required by 42 U.S.C. § 7475(a)(4), 40 C.F.R. § 52.21(j) and Wis. Admin. Code § NR 405.08.

118.    Sierra Club has a claim for each such violation pursuant to 42 U.S.C. § 7604(a)(1).

## FIFTH CLAIM

(Failure to Make Demonstrations and Submit Information)

119.     Paragraphs 1 through 99 and 109 through 112 are incorporated here by reference.

120.    Beginning with the first day that the first major modification was completed at each plant, DPC has failed to demonstrate that the emissions from the Alma/Madgett and Genoa Generating Stations do not cause or contribute to a violation of either national ambient air quality standards, or applicable maximum allowable increases over the baseline concentration, as required by 42 U.S.C. § 7475(a)(3), 40 C.F.R. § 52.21(k) and Wis. Admin. Code § NR 405.09.

121.    On information and belief, even if DPC had attempted to make such showing, it could not because the emission rates from the plants, when used in an approved ambient air impact model, show violations of applicable standards.

122.    Beginning with the first day that the first major modification was completed, DPC has failed to submit an analysis of air quality in the area of the Alma/Madgett and Genoa Generating Stations, as required by 40 C.F.R. § 52.21(m) and Wis. Admin. Code §§ NR 405.11-405.12.

123.    Beginning with the first day that the first major modification was completed at each plant, Defendants have failed to submit all information necessary to perform any analysis or make any determination required under 40 C.F.R. § 52.21(k), (m) and (o) and Wis. Admin. Code ch. NR 405, including the information necessary to determine air quality impacts resulting from the major modifications to the Alma/Madgett and Genoa Generating Stations and to determine best available control technology, in violation of 40 C.F.R. § 52.21(n) and Wis. Admin. Code § NR 405.12.

124.    Sierra Club has a claim for each such violation pursuant to 42 U.S.C. § 7604(a)(1).

## SIXTH CLAIM

(Violations of the Clean Air Act Title V Program and Wis. Admin. Code ch. NR 407)

125.    Paragraphs 1 through 99 and 108 through 124 are incorporated herein by reference.

126.    Defendants have violated 42 U.S.C. § 7661a(a), 40 C.F.R. §§ 70.5(a) and (c), Wis. Admin. Code §§ NR 407.04 and 407.05, and the Title V permits issued for the

Alma/Madgett and Genoa Generating Stations by failing to apply for and obtain a revised Title V permit for each of the modifications above, failing to apply for a Title V permit that contained all of the applicable requirements for the plant, and by failing to provide other specific information that may be necessary to implement and enforce applicable requirements, including but not limited to the requirement to comply with best available control technology limits for particulate matter (PM, PM10 and PM2.5), nitrogen oxides, sulfur dioxide, carbon monoxide and sulfuric acid mist.

127.    Defendants have also violated 42 U.S.C. §§ 7661a(a), 7661b(b)(2), 7661c(a) and (c), 40 C.F.R. §§ 70.5(c)(4)(i), 70.5(c)(8)(i), 70.5(c)(8)(ii)(C) and (iii)(C), and 70.5(9), Wis. Admin. Code § NR 407.05(4), and the Title V permits issued for the Alma/Madgett and Genoa plants by submitting Title V permit applications pursuant to Clean Air Act Title V, 40 C.F.R. pt. 70, and Wis. Admin. Code ch. NR 407 that: (i) contained a false certification of compliance with applicable air pollution requirements; (ii) failed to identify 42 U.S.C. § 7475, 40 C.F.R. §§ 52.21(i) through (n), and Wis. Admin. Code §§ NR 405.07 through 405.09, and 405.11 through 405.13  as applicable requirements for the existing boilers; (iii) failed to identify the Alma/Madgett and Genoa Generating Stations as not complying with 42 U.S.C. § 7475, 40 C.F.R. §§ 52.21(i) through (n) and Wis. Admin. Code ch. NR 405; and (iv) failed to provide a schedule of compliance to bring the Alma/Madgett and Genoa Generating Station boilers into compliance with 42 U.S.C. § 7475, 40 C.F.R. §§ 52.21(i) through (n), and Wis. Admin. Code ch. NR 405.

28

128.     DPC also violated 40 C.F.R. § 70.5(b) and Wis. Admin. Code § NR 407.05(9), by continuously failing to supplement or otherwise correct information submitted with the Title V permit application that was incorrect.

129.     DPC also violated Wisconsin Administrative Code §§ NR 407.05(4)(i)3 and 439.03(1)(c), (9), (10), Permit 606034220-P10 §§ I.W.3.a.2 and II.N, Permit 606034220-P20 §§ I.YYY.3.a.2 and II.N, Permit 663020930-P10 §§ I.M.3.a.(2) and II.N, Permit 663020930-P12 §§ I.ZZX.3.a.(2) and II.N, and Permit 663020930-P20 §§ I.ZZX.3.a.(2) and II.N by submitting certifications of compliance annually to the Department of Natural Resources and U.S. EPA that were not truthful by failing to disclose the violations set forth herein.

130.     Each violation set forth in this Complaint also constitutes a violation of section II.B. of each of the permits issued by Wisconsin DNR to DPC.

131.     Sierra Club has a claim for each such violation pursuant to 42 U.S.C. § 7604(a)(1).

## SEVENTH CLAIM

(Failure to Obtain a Construction Permit Pursuant to Wis. Stat. § 285.60 and Wis. Admin. Code ch. NR 406)

132.     Paragraphs 1 through 99 and 108 through 124 are incorporated herein by reference.

133.     In addition to the PSD preconstruction permit requirements, the Clean Air Act also adopts Wisconsin's State Implementation Plan, which includes non-PSD pre-construction permitting requirements. Wis. Stat. § 285.60(1)(a)1.; Wis. Admin. Code § NR 406.03.

134.     Pursuant to Wisconsin's pre-construction permitting program, each source must obtain a permit prior to undertaking any non-exempt modification.  The term "modification" for

this program is defined as "any physical change in, or change in the method of operation of, a stationary source that increases the amount of emissions of an air contaminant or that results in the emission of an air contaminant not previously emitted." Wis. Admin. Code § NR 400.02(99). This construction permit requirement is in addition to any PSD permit required.

135.    The changes made to the Alma/Madgett and Genoa Generating Stations above required a preconstruction permit pursuant to Wis. Admin. Code ch. NR 406.

136.    DPC failed to obtain a preconstruction permit pursuant to Wis. Admin. Code ch. NR 406 for any of the modifications set forth above, in violation of the Clean Air Act.

137.    Sierra Club has a claim for each such violation pursuant to 42 U.S.C. § 7604(a)(1).

## EIGHTH CLAIM

(Failure to Continuously Monitor Visible Emissions)

138.    On thousands of occasions DPC failed to monitor the visible emissions from the boilers at the Alma/Madgett and Genoa Generating Stations for each 6-minute period.

139.    Each such failure constitutes a separate and distinct violation of Permit Nos. 606034110-P10 and 606034110-P20 at Parts I.A.3.b., I.B.3.b., I.C.3.b., I.D.3.b., and I.E.3.b.; Permit Nos. 663020930-P10, 663020930-P12, and 663020930-P20 at Part I.A.3.b and Wis. Admin. Code § NR 439.095(1)(a) and (f), (5)(a)1.

140.    Sierra Club has a claim for each such violation pursuant to 42 U.S.C. § 7604(a)(1).

**NINTH CLAIM**

(Declaratory Relief)

141.    Paragraphs 1 through 140 are realleged and incorporated herein by reference.

142.    Pursuant to 28 U.S.C. §§ 2201 and 2202, Sierra Club is entitled to a declaration that DPC violated the Act by exceeding permit limits, commencing one or more major modifications of the Alma/Madgett and Genoa plants without first obtaining the required permits, that each of the units at the Alma/Madgett and Genoa plants is a modified source for purposes of the PSD programs, and such further necessary or proper relief as may be granted by the Court.

**PRAYER FOR RELIEF**

WHEREFORE, based upon the foregoing, the Sierra Club requests that this Court:

1.    Permanently enjoin DPC from operating the Alma/Madgett and Genoa Generating Stations, including the construction of future modifications, except in accordance with the Clean Air Act and any applicable regulatory requirements;

2.    Order DPC to apply for permits that are in conformity with the requirements of the PSD provisions of the Clean Air Act for each modification which DPC commenced without first obtaining a PSD permit;

3.    Order DPC to remedy its past violations by, *inter alia,* requiring DPC to install, as appropriate, the necessary pollution controls to meet best available control technology emission limits;

4.      Order DPC to take other appropriate actions to remedy, mitigate, and offset the harm to public health and the environment caused by the violations of the Clean Air Act alleged above;

5.      Order DPC to conduct audits of its operations to determine if any additional modifications have occurred which would require it to meet the requirements of PSD and to report the results of these audits to Sierra Club, the United States Environmental Protection Agency, and the Wisconsin Department of Natural Resources;

6.      Order DPC to pay civil penalties of $25,000 to $37,500.00 per day for each separate violation of the Clean Air Act, 42 U.S.C. § 7604(g); 40 C.F.R. § 19.4; 74 Fed. Reg. 626 (Jan. 7, 2009), including a beneficial mitigation project pursuant to 42 U.S.C. § 7604(g)(2);

7.      Order DPC to pay Sierra Club's costs of this case, including reasonable attorneys fees;

8.      Declare that DPC was required to obtain a PSD permit for major modifications to the Alma/Madgett and Genoa Generating Stations;

9.      Declare that the Alma/Madgett and Genoa Generating Stations are modified sources for purposes of the Clean Air Act PSD program;

10.     Declare that the boilers at Alma/Madgett and Genoa are subject to best available control technology limits; and

11.     Award any other relief that the Court finds just and equitable.

Dated: June 8, 2010

MCGILLIVRAY WESTERBERG & BENDER LLC

  /s/ David C. Bender

David C. Bender
Christa O. Westerberg
Pamela R. McGillivray
305 S. Paterson Street
Madison, WI 53703
Tel. 608.310.3560
Fax 608.310.3561
Email: bender@mwbattorneys.com
        westerberg@mwbattorneys.com
        mcgillivray@mwbattorneys.com


MIDWEST ENVIRONMENTAL ADVOCATES, INC.

/s/ Elizabeth R. Lawton
Elizabeth R. Lawton
Wis. Bar No. 1050374
551 W. Main Street, Suite 200
Madison, WI 53703
Tel: (608) 251-5047
Fax: (608) 268-0205
blawton@midwestadvocates.org


*Attorneys for the Plaintiff Sierra Club*

33