IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

SIERRA CLUB,                                                    OPINION and ORDER

                Plaintiff,                                    10-cv-303-bbc

    v.

DAIRYLAND POWER COOPERATIVE,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff Sierra Club brings this action for declaratory and injunctive relief and civil penalties under the citizen suit provision of the Clean Air Act, 42 U.S.C. § 7604. Plaintiff contends that defendant Dairyland Power Cooperative violated certain provisions of the Act involving the prevention of significant deterioration, 42 U.S.C. §§ 7470-92, as well as Title V of the Clean Air Act and Wisconsin's clean air regulations, at power plants located in Genoa, Wisconsin and Alma, Wisconsin. Plaintiff contends that defendant has modified the Genoa and Alma power plants without obtaining the necessary permits and without complying subsequently with various of the Act's emission standards.

The case is before the court on defendant's motion to dismiss the third, fourth, fifth, sixth and ninth claims of plaintiff's complaint. Defendant contends that, with respect to 20

1

out of 22 alleged maintenance projects undertaken at the power plants, plaintiff's third, fourth and fifth claims for civil penalties are barred by the applicable statute of limitations and plaintiff's claims for declaratory and equitable relief are barred by the concurrent remedy doctrine. Also, defendant contends that plaintiff's sixth claim, based on Title V, should be dismissed for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted.

I conclude that plaintiff's claims arising from defendant's failure to obtain a preconstruction permit, failure to apply best available control technology and failure to submit air quality demonstrations are not barred by the statute of limitations because it is impossible to determine from the complaint when plaintiff's claims accrued, and more important, because plaintiff alleges that defendant's violations are ongoing. In addition, I conclude that plaintiff's claims arising from defendant's failure to apply best available control technology and failure to submit air quality demonstrations may be asserted independently of plaintiff's permit claim. Therefore, defendant's motion will be denied with respect to plaintiff's third, fourth and fifth claims.

With respect to plaintiff's sixth claim regarding alleged violations of Title V and its implementing regulations, I conclude that this court has jurisdiction over plaintiff's claim based on defendant's alleged violations of terms in its Title V permit and its alleged failure to submit amendments and modifications required by the Clean Air Act and Wisconsin's

2

regulations.  However, jurisdiction does not exist over plaintiff's claim that defendant violated the Act or Wisconsin's plan by submitting incomplete applications that led to defective Title V permits.  Therefore, I will deny defendant's motion to dismiss in part and grant it in part with respect to plaintiff's sixth claim.

Also before the court are motions for leave to file supplemental authority filed by plaintiff, dkt. #15, and defendant, dkt. #9.  These motions will be granted.

## FACTS

### A.  Background on the Statutory and Regulatory Scheme

The Clean Air Act governs air quality and emissions standards throughout the United States.  Congress created the Act "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare."  42 U.S.C. § 7401(b)(1).  Under the Act, the United States Environmental Protection Agency (EPA) identifies air pollutants that endanger public health or welfare, determines what concentrations of those pollutants are safe and prescribes "national ambient air quality standards," national emissions standards for "hazardous air pollutants" and "new source performance standards."  42 U.S.C. §§ 7408, 7409, 7411, 7412.

Each state must insure that its ambient air meets the appropriate standards, 42 U.S.C. § 7407(a), and must develop a "state implementation plan" to achieve the standards

3

established by the EPA.  42 U.S.C. § 7410(a).  The state implementation plans must include "enforceable emission limitations and other control measures, means, or techniques . . ., as well as schedules and timetables for compliance" to meet the national ambient air quality standards.  42 U.S.C. § 7410(a)(2)(A).  The Act also requires each state to designate those areas within its boundaries in which the air quality meets or exceeds ambient air quality standards for each pollutant.  An area that meets the standards for a particular pollutant is termed an "attainment" area, whereas an area that exceeds the standards is a "nonattainment" area.  Areas for which there is insufficient information to determine compliance with the standards are "unclassifiable."  42 U.S.C. § 7407(d).

Specifically at issue in this case is the "prevention of significant deterioration" program (PSD), which is designed to prevent the deterioration of air quality by requiring authorization for construction of any new or modified source of air pollution.  42 U.S.C. §§ 7470-7492;  40 C.F.R. § 51.166.  Each state must include the PSD program in its implementation plan.  Before beginning any "major modification," as defined by the Act, any major stationary source in an attainment or unclassifiable area must obtain a PSD permit from the authorizing agency, which is responsible for insuring that the modification complies with "best available control technology" emissions limits.  42 U.S.C. § 7475(a); 40 C.F.R. §§ 52.21(j)(3); Wis. Stat. § 285.60; Wis. Admin. Code §§ NR 405.01, 405.07.

Wisconsin promulgated a state implementation plan containing provisions

implementing the PSD program that has been approved by the United States EPA. The Wisconsin plan requires sources to obtain a permit from the Wisconsin Department of Natural Resources before any modification. Wis. Stat. § 285.60(1)(a)1; Wis. Admin. Code § NR 406.03. The department is responsible for overseeing and implementing the regulatory scheme in Wisconsin. In 1990, Congress added Title V to the Clean Air Act, which established an operating permit program. 42 U.S.C. §§ 7661-7661(f). Title V requires that certain air emission sources, including major stationary sources, apply for and obtain an operating permit that includes all "enforceable emission limitations and standards" and "such other conditions as are necessary to assure compliance with application requirements" of the Clean Air Act. 42 U.S.C. §§ 7661a(a), 7661c(a)-(b).

## B. The Parties

Plaintiff Sierra Club is an incorporated, not-for-profit organization with its headquarters in San Francisco, California and an office in Madison, Wisconsin. It has more than 10,000 members in Wisconsin. Its purpose is to preserve, protect and enhance the environment, including reducing pollution from coal.

Defendant Dairyland Power Cooperative is a cooperative association headquartered in La Crosse, Wisconsin. It generates and transmits electricity to 25 electric distribution cooperatives and 16 municipal utilities, which in turn deliver electricity to approximately

500,000 people. Three electric generating plants owned and operated by defendant are at issue: the Alma and J.P. Madgett stations in Alma, Wisconsin and the Genoa station in Genoa, Wisconsin.

### C. Defendant's Plants

The Genoa and Alma plants have coal-fired boilers and emit thousands of tons of carbon dioxide, nitrogen oxides, sulfur oxides, carbon monoxide and particulate matter each year. Individually, the plants have the "potential to emit," as that term is defined in Wis. Admin. Code § NR 405.02(25), in excess of 100 tons a year of those pollutants. Each plaint is a "major emitting facility" or "major stationary source" as those terms are used in 42 U.S.C. § 7475(a), 40 C.F.R. §§ 52.21(a)(2), (b)(1) and Wis. Admin. Code. § NR 405.02(22). The Genoa station is located in Vernon County, Wisconsin, and the Alma station is located in Buffalo County, Wisconsin. At the times relevant to this complaint, Vernon and Buffalo County were classified as either "attainment" or "unclassifiable" for all pollutants for purposes of 42 U.S.C. § 7407(d).

On multiple occasions, defendant modified and thereafter operated each of the eight boilers at the Alma and Genoa stations without obtaining appropriate permits authorizing the construction, without meeting "best available control technology" emission limits and without installing appropriate technology to control emissions of pollutants. In addition,

defendant emits air pollution from the plants in excess of limits established in permits issued by the Wisconsin DNR and United States EPA. The twenty-two projects undertaken at defendant's Alma and Genoa plants that form the basis of plaintiff's claims in this litigation were implemented between 1993 and 2009.

At some point, defendant obtained Title V permits for the Genoa and Alma plants. However, defendant did not obtain preconstruction or Title V permits from the EPA or Wisconsin DNR before undertaking work related to any of the 22 projects at issue and did not include PSD requirements, including best available control technology limits, as applicable requirements in its Title V permit application.

OPINION

A.  Prevention of Significant Deterioration

In deciding whether to dismiss a complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6), the court must accept well-pleaded facts as true, construe the complaint in the light most favorable to plaintiff and draw all inferences in plaintiff's favor.  Reger Development, LLC v. National City Bank, 592 F.3d 759, 763 (7th Cir. 2010).  If the complaint contains sufficient facts which, if accepted as true, state a claim that is plausible on its face, the motion must be denied.  Id. at 764 (citing Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009)).

7

Plaintiff contends that defendant has violated, and continues to violate, 42 U.S.C. § 7475 and the implementing PSD regulations by having failed to obtain PSD permits (count 3), comply with best available control technology limits (count 4), and demonstrate that emissions comply with applicable air quality standards (count 5) before the construction of major modifications of the Genoa and Alma plants. Plaintiff seeks civil penalties as well as declaratory and equitable relief. Defendant argues that plaintiff's claims for civil penalties are time-barred if they apply to any modifications that were begun more than five years before this lawsuit was filed.

The Clean Air Act does not specify a limitation period during which claims of violation must be brought by the EPA or a citizen. Thus, courts have universally applied the general five-year statute of limitations set forth in 28 U.S.C. § 2462 to Clean Air Act claims for penalties, including PSD claims. E.g., National Parks & Conservation Association v. Tennessee Valley Authority (hereinafter Nat'l Parks 11th Cir.), 502 F.3d 1316, 1322 (11th Cir. 2007); United States v. Southern Indiana Gas & Electric Co., 2002 WL 1760752, at *3 (S.D. Ind. July 26, 2002). Defendant contends that because the construction projects at issue in this motion were completed more than five years before the instant lawsuit was filed, plaintiff's claims for civil penalties based on defendant's alleged failure to comply with PSD requirements are barred. Plaintiff argues that its claims are not time-barred for two reasons. First, plaintiff contends that under the discovery rule, its claims did not accrue until it

8

discovered defendant's violations. Because it did not allege in its complaint that it discovered defendant's violations more than five years ago, plaintiff argues, the statute of limitations issue cannot be resolved on a motion to dismiss. Second, plaintiff contends that the alleged PSD violations are not one-time infractions, but rather ongoing violations that continue until the source is brought into compliance with PSD requirements. Thus, plaintiff contends that each day defendant operates the Genoa and Alma plants without a permit and without complying with the other PSD requirements is a new and separate violation.

1. Best available control technology and air quality demonstrations as independent claims

As an initial matter, the parties dispute whether plaintiff's fourth and fifth claims, alleging defendant's failure to apply best available control technology and failure to conduct air quality analysis, are independent of plaintiff's third claim alleging defendant's failure to obtain a PSD permit. Defendant contends that plaintiff asserts these claims in an attempt to avoid a statute of limitations problem.

Under the Clean Air Act and Wisconsin regulations, the obligation to apply best available control technology and perform air quality analysis are part of the PSD permitting process and are incorporated into a facility's construction plans and PSD permits. Nevertheless, plaintiff contends that defendant's failure to implement best available control technology and perform required air quality demonstrations are violations separate from

9

failing to obtain a preconstruction permit and that even if the statute of limitations bars its permit claims, it may still proceed on its remaining claims. Defendant disagrees, contending that the obligation to apply best available control technology and conduct air quality analysis are linked inextricably to the preconstruction permitting process and are not freestanding obligations.

42 U.S.C. § 7475(a) sets forth eight conditions that must be fulfilled before a major emitting facility "may be constructed." In addition to the requirement that the source obtain a preconstruction permit setting forth emission limitations, § 7475(a)(1), the proposed facility must, among other requirements, be subject to best available control technology, §7475(a)(4), and demonstrate that the emissions increases resulting from its modifications will not threaten the area's attainment status, § 7475(a)(3). Contrary to defendant's argument, the individual requirements in 42 U.S.C. § 7475(a) "are not subsumed by the initial requirement to obtain a preconstruction permit." New York v. Niagara Mohawk Power Corporation, 263 F. Supp. 2d 650, 664 (W.D.N.Y. 2003).

Both the Clean Air Act and Wisconsin regulations establish that the obligations to apply best available control technology and conduct air quality analysis are independent obligations regardless what the PSD permit requires. In provisions separate from permitting provisions, the Wisconsin and federal PSD regulations state that sources undergoing major modification "*shall apply* best available control technology," 40 C.F.R. § 52.21; Wis. Admin.

10

Code 405.08(3) (emphasis added).  Further, under Wisconsin regulations, even if an owner or operator obtains a construction permit that does not require best available control technology, such approval "does not relieve any owner or operator of the responsibility to comply fully with applicable provisions of the [state implementation plan] and any other requirements under local, state or federal law," including the requirement to apply best available control technology.  Wis. Admin. Code § NR 405.16(1).  In addition, Wisconsin regulations require both pre-application and post-construction air quality analyses.  Wis. Admin. Code § NR 405.11.  By their own terms, these provisions create an obligation to apply best available control technology and conduct air quality demonstrations, regardless of the terms a preconstruction permit may or may not contain.

Thus, although the obligations to apply best available control technology, conduct monitoring and make air quality demonstrations may be determined during the permitting process and included in a PSD permit, they are obligations independent of the permit requirement and are emission standards or limitations within the meaning of 42 U.S.C. § 7604(f).  Plaintiff may bring separate claims for defendant's alleged failure to apply best available control technology and submit air quality demonstrations.  Whether the applicable statute of limitations bars these claims is discussed below.

11

2.  Discovery rule

The federal statute of limitations provides that enforcement actions for civil fines and penalties "shall not be entertained unless commenced within five years from the date when the claim first *accrued*." 28 U.S.C. § 2462 (emphasis added).  Plaintiff contends that under the discovery rule, its claims did not accrue until it discovered defendant's violations. Defendant contends that the discovery rule does not apply in this case and the claims accrued on the day defendant began making its modifications without a permit.  Def.'s Br., dkt. #14, at 2-3, 8 ("A claim that a source failed to comply with PSD requirements 'first accrue[s]' when that source commences construction without a PSD permit.")

Under the discovery rule, a claim does not accrue until the plaintiff knows he or she has suffered a loss and who or what caused the loss.  S.E.C. v. Koenig, 557 F.3d 736, 739 (7th Cir. 2009).  In other words, the claim accrues "when the wrong is discovered."  Id.  The Court of Appeals for the Seventh Circuit has not addressed whether the discovery rule applies to claims falling under the § 2642 statute of limitations generally or the Clean Air Act in particular, though the court of appeals has recognized that the "common view" is "that federal statutes of limitations do not begin to run until the claim has been discovered."  Id. (declining to decide when a claim accrues for purposes of § 2642) (citing United States v. Kubrick, 444 U.S. 111, 118 (1979)).

At least three courts of appeals have rejected application of the discovery rule to

12

claims for civil penalties under a federal statute.  For example, in <u>3M Co. v. Browner</u>, 17 F.3d 1453, 1462-63 (D.C. Cir. 1994), the court of appeals concluded that applying the discovery rule to claims for Clean Air Act violations was "unworkable; outside of the language of the statute; inconsistent with judicial interpretations of § 2642; unsupported by the discovery of injury rule adopted in non-enforcement, remedial cases; and incompatible with the functions served by a statute of limitations in penalty cases."  <u>See also</u> <u>Trawinski v. United Technologies</u>, 313 F.3d 1295, 1298 (11th Cir. 2002) ("This discovery rule, which might be applicable to statutes of limitations in state tort actions, has no place in a proceeding to enforce a civil penalty under a federal statute."); <u>Federal Election Commision v. Williams</u>, 104 F.3d 237, 240 (9th Cir. 1996) (relying on reasoning in <u>3M</u> and rejecting application of discovery rule to limitations periods under § 2462); <u>see also</u> <u>SEC v. Scrushy</u>, 2005 WL 3279894, at *2-3 (N.D. Ala. Nov. 29, 2005) (same).

Other courts have applied the discovery rule to federal claims for civil penalties governed by § 2642, including in the Clean Air Act context.  For example, in <u>New Jersey v. Reliant Energy Mid-Atlantic Power Holdings, LLC</u>, 2009 WL 3234438 (E.D. Pa. Sept. 30, 2009), the district court held that the discovery rule applies in Clean Air Act cases because the violations are difficult for the public to detect and the rule furthers the broad goal of protecting and enhancing air quality.  <u>Id.</u> at *13-14 (citing <u>L.E.A.D. v. Exide Corporation</u>, 1999 WL 124473, *4 (E.D. Pa. Feb. 19, 1999) (finding date claim accrues is date on which

notice of violation issued or quarterly reports of continuous emissions monitoring systems submitted)); see also Pennsylvania v. Allegheny Energy, Inc., 2006 WL 1509061, *4-5 (W.D. Pa. April 19, 2006) (holding that discovery rule applies to claims for PSD violations under Clean Air Act); Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals Inc., 913 F.2d 64, 75 (3d Cir. 1990) (holding that claim accrues under Clean Water Act when violation is reported); United States v. Material Service Corp., 1996 WL 563462, *4 (N.D. Ill. Sept. 30, 1996) (same); United States v. Aluminum Co. of America, 824 F. Supp. 640, 645-46 (E.D. Tex. 1993) (same).

In United States v. Murphy Oil USA, Inc., 143 F. Supp. 2d 1054, 1084-85 (W.D. Wis. 2001), this court considered whether the discovery rule should apply in Clean Air Act penalty cases. The defendant argued that the plaintiff's claims for PSD violations were barred by the statute of limitations and that the discovery rule did not apply to claims governed by § 2462. I agreed with the defendant that the reasoning in 3M, 17 F.3d 1453, which rejected the discovery rule, was persuasive because it avoided the "problems of faded memories, lost witnesses and discarded documents in penalty actions brought decade after alleged violations are finally discovered." Murphy Oil, 143 F. Supp. 2d at 1084. Nevertheless, I recognized that in some situations a plaintiff may be unable to detect violations and discover that it has a claim for relief. I concluded that "[i]f it is determined at trial that defendant made affirmative efforts to prevent plaintiff from discovering the

14

information that was necessary to discovery defendant's alleged violations . . . under the Clean Air Act," plaintiff would be permitted to rely on the discovery rule to toll the statute of limitations. Id. at 1085. In that case, the plaintiff presented such evidence at trial, and I concluded that the statute of limitations did not bar plaintiff's claims for civil penalties filed more than five years after the modifications at issue. United States v. Murphy Oil USA, Inc., 155 F. Supp. 2d 1117, 1123 (W.D. Wis. 2001) (finding defendant liable on plaintiff's PSD claims).

I conclude that the discovery rule may apply in actions for civil penalties under the Clean Air Act. Application of the discovery rule makes particular sense in cases such as Murphy Oil, in which a defendant's affirmative actions prevent the plaintiff from discovering the violations. A defendant should not benefit from concealing its violations. As the Court of Appeals for the Seventh Circuit has explained in another context, the statute of limitations should be tolled for "a concealed wrong." S.E.C., 557 F.3d at 739 (explaining that whether a court calls it the "discovery rule" or "equitable tolling," "a victim of fraud has the full time from the date that the wrong came to light, or would have done had diligence been employed.")

Moreover, the policy reasons that motivated other courts to apply the discovery rule in environmental cases are applicable in this case. Courts have specifically cited "(1) the difficulty of detecting such violations; (2) the inevitable reliance of government agencies on

15

a system of permits and self-reporting to enforce the Act; and (3) the Act's overall goal[s]" in applying the discovery rule. L.E.A.D., 1999 WL 124473, at *4 (applying discovery rule to Clean Water Act claims); see also Material Service, 1996 WL 563462, at *3. In Murphy Oil, I discounted these policy considerations because it did not appear that the plaintif United States should have had significant difficulty detecting the violations at issue. The defendant had made several modifications to an oil refinery and those modifications were disclosed to both the state Department of Natural Resources and to the EPA. Id. at 1066-69. In fact, the facility had obtained a synthetic minor permit for one of the modifications, allowing it to avoid major modification and PSD status. Id. at 1071. I noted that the United States had access to files concerning the defendant and had made on-site visits to the facility to inspect operations. Thus, the United States was not dependent solely on the defendant's self-reporting to detect violations.

In the present action, plaintiff is a citizen group, not the United States, making it potentially more difficult for it to detect violations of the type alleged. Unlike in Murphy Oil, plaintiff does not allege that defendant notified anyone of its intent to modify its plants or that defendant filed any reports about the modifications. Instead, plaintiff alleges that defendant failed to seek a permit for its modifications. Thus, the complaint suggests that because defendant failed to apply for a permit or disclose its modifications, plaintiff had no way of knowing of the alleged violations.

16

Finally, plaintiff was not required to plead facts about when it knew or should have known about defendant's modifications or whether defendant took steps to hide its modifications. Although a court may dismiss a claim when the complaint itself reveals that an action is untimely under the governing statute of limitations, United States v. Lewis, 411 F.3d 838, 842 (7th Cir. 2005), "[t]he statute of limitations is an affirmative defense, and a plaintiff is not required to negate an affirmative defense in his complaint." Tregenza v. Great American Communications Co., 12 F.3d 717, 719 (7th Cir. 1993); see also Mosley v. Board of Education, 434 F.3d 527, 533 (7th Cir. 2006) (same). In sum, because I cannot determine when plaintiff's claims "accrued" for purposes of the § 2462 statute of limitations, I will deny defendant's motion to dismiss plaintiff's claims for civil penalties. Reliant Energy, 2009 WL 3234438, at *14 ("It is unclear from the face of the complaints when the states learned of the alleged violations, and the extent to which they exercised reasonable diligence . . . [t]herefore, I conclude that dismissal . . . on this basis is improper on a Rule 12(b)(6) motion").

The federal statute of limitations does not apply to claims for declaratory or injunctive relief. 28 U.S.C. § 2462. However, defendant argues that because plaintiff's claims for civil penalties are barred by the statute of limitations, its claims for declaratory and injunctive relief are also barred under the concurrent remedy doctrine. Under this doctrine, a party may not seek an equitable remedy where the applicable statute of limitations would bar the

17

concurrent legal remedy.  Cope v. Anderson, 331 U.S. 461, 464 (1947); Nemkov v. O'Hare Chicago Corp., 592 F.2d 351, 355 (7th Cir. 1979).  Because I have not concluded that plaintiff's claims for civil penalties are barred by the statute of limitations, I need not decide at this time whether the concurrent remedy doctrine bars plaintiff's claims for declaratory and equitable relief.

3. Ongoing violations

Even if the discovery rule did not apply in this setting, there is another reason why defendant's statute of limitations defense fails at this stage:  defendant's alleged violations have been ongoing.  Under the ongoing violation theory, even where the statute of limitations applies to a claim for civil penalties, the statute of limitations does not bar violations that are ongoing.  Havens Realty Corp. v. Coleman, 455 U.S. 363, 380 (1982) ("Statutes of limitations . . . are intended to keep stale claims out of the courts.  Where the challenged violation is a continuing one, the staleness disappears.") (internal citations omitted).  Courts have extended the application of the "continuing violation" theory to the environmental context, including cases involving the Clean Water Act and the Toxic Substances Control Act.  E.g., Newell Recycling Co. v. EPA, 231 F.3d 204, 206-7 (5th Cir. 2000) (applying the continuing violation theory to stockpiling of pollutants under the Toxic Substance Control Act); United States v. Reaves, 923 F. Supp. 1530, 1534 (M.D. Fla. 1996)

18

(applying continuing violation theory to illegal wetland fill under Clean Water Act).

Plaintiff contends that the continuing violation theory applies to its claims under the prevention of significant deterioration provisions (PSD) of the Clean Air Act because each day defendant operates the Genoa and Alma plants without a permit and without complying with the other PSD requirements is a new and separate violation of 42 U.S.C. § 7475(a) and Wisconsin regulations. Defendant contends that the requirements set forth in the Clean Air Act's PSD provisions are solely preconstruction requirements and therefore, any violation of those provisions ceased on the date the construction was completed, at the latest. The issue turns on whether the PSD requirements apply only at the time of the construction or modification of the emitting facility or whether they constitute ongoing operational requirements.

The Court of Appeals for the Seventh Circuit has not addressed the question whether § 7475 imposes liability for the operation, rather than only the construction, of a facility that has failed to comply with the PSD requirements. The parties in this case expected the court of appeals to decide the issue in United States v. Cinergy Corp., App. Nos. 09-3344, 09-3350, 09-3351, and defendant asked this court to stay decision on its motion to dismiss until the court of appeals issued its opinion. The court of appeals issued an opinion on October 12, 2010, but it did not reach the statute of limitations issue. United States v. Cinergy Corp., — F.3d —, 2010 WL 4009180, *6 (7th Cir. Oct. 12, 2010). Defendant cites

19

Sierra Club v. Franklin County Power of Illinois, LLC, 546 F.3d 918, 929 (7th Cir. 2008), in which the court of appeals stated that "it makes sense to conclude that the *last* possible moment at which a preconstruction violation occurs is 'when the actual construction is commenced, and not at some later point in time.'" Id. (quoting United States v. Illinois Power Co., 245 F. Supp. 2d 951, 957 (S.D. Ill. 2003)) (emphasis in Franklin County). However, the court was distinguishing the limitations issue considered in two district court cases from the ripeness issue that was before the court of appeals. The statute of limitations issue was not before the court in Franklin Power and the court did not address whether PSD requirements may be operational and ongoing in nature.

A division exists among the courts that have addressed the continuing nature of a PSD violation for statute of limitations purposes. Three courts of appeals have considered the question, with the Courts of Appeals for the Eighth and Eleventh Circuits ruling that PSD violations are one-time violations and the Court of Appeals for the Sixth Circuit ruling that the violation is ongoing. Compare Sierra Club v. Otter Tail Power Co., 615 F.3d 1008, 1018 (8th Cir. 2010) (finding no ongoing obligations in the Clean Air Act's PSD requirements) and National Parks & Conservation Association v. Tennessee Valley Authority (hereinafter Nat'l Parks 11th Cir.), 502 F.3d 1316, 1323-25 (11th Cir. 2007) (finding no ongoing obligations in Alabama's state implementation of PSD), with National Parks Conservation Association v. Tennessee Valley Authority (hereinafter Nat'l Parks 6th Cir),

20

480 F.3d 410, 416 (6th Cir. 2007) (finding that Tennessee's PSD regulations impose ongoing duties to obtain PSD permit and apply best available control technology). District courts in at least seven circuits have ruled that PSD violations are one-time violations for statute of limitations purposes. E.g., New York v. Niagara Mohawk Power Corporation, 263 F. Supp. 2d 650, 661 (W.D.N.Y. 2003); United States v. Westvaco Corp., 144 F. Supp. 2d 439, 443-44 (D. Md. 2001); United States v. Brotech Corp., 2000 WL 1368023, *3 (E.D. Pa. Sept. 19, 2000); United States v. Campbell Soup Co., 1997 WL 258894, *1-2 (E.D. Cal. Mar. 11, 1997); United States v. Louisiana-Pacific Corp., 682 F. Supp. 1122, 1130 (D. Colo. 1987). A number of district courts in this circuit, including this court, have found that PSD violations are not continuing in nature and accrue no later than the time at which construction is completed. E.g., United States v. Midwest Generation, LLC, 694 F. Supp. 2d 999, 1008-9 (N.D. Ill. 2010); United States v. Cinergy Corp., 397 F. Supp. 2d 1025, 1030 (S.D. Ind. 2005); Illinois Power, 245 F. Supp. 2d at 957; Southern Indiana Gas & Electric, 2002 WL 1760752, at *5; Murphy Oil, 143 F. Supp. 2d at 1083.

Courts deciding the statute of limitations issue have considered the Act's explicit labeling of the PSD permitting program as a "preconstruction" program and the statutory provision stating that "[n]o major emitting facility . . . may be *constructed* without meeting the PSD requirements." 42 U.S.C. § 7475(a) (emphasis added). Those courts finding that the PSD violations are one-time violations focus on the "preconstruction" title of the

21

statutory section, the distinction between construction and operating permits and the language that seemingly defines a PSD violation as *construction*, not *operation*, of a new source or modification without a PSD permit. <u>E.g.</u>, <u>Midwest Generation</u>, 694 F. Supp. 2d at 1007-08 (examining text of Clean Air Act and finding that it provides separate rules governing construction and operation of facilities); <u>Illinois Power Co.</u>, 245 F. Supp. 2d at 955 (noting distinction between violations of preconstruction permit requirements and operation permit requirements); <u>Murphy Oil</u>, 143 F. Supp. 2d at 1081-82 ("[T]he federal and state statutory schemes set forth separate guidelines for constructing or modifying a major source and for operating a source.")

On the other side, district courts in at least three circuits have found that PSD violations can be ongoing for statute of limitations purposes. <u>E.g.</u>, <u>Sierra Club v. Portland General Electric Co.</u>, 663 F. Supp. 2d 983, 993 (D. Or. 2009); <u>United States v. Duke Energy Corp.</u>, 278 F. Supp. 2d 619 (M.D.N.C. 2003), <u>aff'd on other grounds</u>, 411 F.3d 539 (4th Cir. 2005), <u>vacated on other grounds</u>, <u>Environmental Defense v. Duke Energy Corp.</u>, 127 S. Ct. 1423 (2007); United States v. CEMEX California Cement, LLC, No. EDCV07-223-GW(JCRx), slip. op. dkt. #22 (C.D. Cal. July 10, 2007); <u>United States v. Ohio Edison Co.</u>, 2003 WL 23415140, *5-6 (S.D. Ohio Jan. 17, 2003); <u>United States v. American Electric Power Service Corp.</u>, 137 F. Supp. 2d 1060, 1066 (S.D. Ohio 2001). These courts concluded that the "preconstruction" and "operating" requirements under the Clean Air Act

are not separated exclusively into either the PSD program or Title V program, but are intertwined.  In other words, the PSD program contemplates not only preconstruction requirements, but also ongoing operational requirements.  Although the PSD program is titled "preconstruction requirements," this title  refers to the timing of the initial application for a PSD permit and not whether its requirements are one-time or ongoing for statute of limitations purposes. Ohio Edison Co., 2003 WL 23415140, *5-6 ("This Court is of the [view] that the PSD provisions contemplate not only certain preconstruction obligations but also subsequent operation after modification."); see also Portland General Electric, 663 F. Supp. 2d at 993 ("[T]he PSD program applies to both the construction and operation of a major source."); Duke Energy Corp., 278 F. Supp. 2d at 652 (expressing skepticism that the distinction between construction and operating permits is "relevant" to PSD statute of limitations issues).

Defendant urges this court to adopt the "majority" position, and asserts that Wisconsin's PSD program requirements apply exclusively to construction and modification, not operation, and that only Wisconsin's Title V program applies to the operation of defendant's plants.  Defendant cites the reasoning set forth in Otter Tail, 615 F.3d at 1008:

> The operative statutory provision states that "[n]o major emitting facility . . . may be *constructed*" without meeting the PSD requirements.  42 U.S.C. § 7475 (a) (emphasis added).  This language unambiguously indicates that the PSD requirements are conditions of construction, not operation.

23

Defendant also argues that in three of the cases in which courts have concluded that the PSD program includes ongoing operational requirements, the relevant state's implementation plan contained language suggesting that the PSD requirements were ongoing.  Nat'l Parks 6th Cir., 480 F.3d at 419 (provision allowing state agency to issue after-the-fact construction permits containing proper emission limits); Portland General Electric, 663 F. Supp. 2d at 992-94 (provision stating that no source may construct *or operate* without PSD permit); Duke Energy, 278 F. Supp. 2d at 652 (permits were integrated, containing both construction and operation requirements).

After reviewing the language in the Clean Air Act, Wisconsin's PSD regulations and the several cases addressing the statute of limitations question and the doctrine of continuing violations since this court decided Murphy Oil, 143 F. Supp. 2d at 1083-84, I conclude that Murphy Oil was decided incorrectly with respect to this issue.  I am persuaded by those cases that have found that violations of the Clean Air Act's PSD requirements constitute a series of discrete infractions occurring at the commencement of construction and continuing until the defendant obtains a permit and comes into compliance with PSD obligations.  In making this determination, I turn first to the language of the statute.  Middleton v. City of Chicago, 578 F.3d 655, 658 (7th Cir. 2009) ("It is well established that when the statute's language is plain, the sole function of the courts—at least where the disposition of the text is not absurd—is to enforce it according to its terms.") (internal citations and quotations omitted).

24

The Clean Air Act's citizen suit provision authorizes plaintiff to sue anyone "who is alleged to have violated . . . or to be in violation of (A) an emission standard or limitation under this chapter." 42 U.S.C. § 7604(a)(1). An "emission standard or limitation" includes "any standard, limitation, or schedule established under any permit issued . . . under any applicable State implementation plan approved by the [EPA] Administrator, any permit term or condition, and any requirement to obtain a permit as a condition of operations." Id. § 7604(f)(4). It its third, fourth and fifth claims, plaintiff alleges that defendant is violating the Clean Air Act and Wisconsin regulations by failing to obtain a PSD permit before modifying its plants, failing to utilize best available control technology and failing to submit analysis of air quality in the area of the Alma and Genoa stations. For plaintiff's claims to be timely, then, these violations must be either ongoing violations of standards or limitations or constitute a failure to obtain a permit that is required for operation of defendant's plants.

Section 7475 of the Clean Air Act, which sets forth the PSD requirements, is titled "Preconstruction requirements" and provides that "[n]o major emitting facility . . . may be constructed in any area in which this part applies unless . . . a permit has been issued for such proposed facility in accordance with this part setting forth emission limitations for such facility which conform to the requirements of this part. . . ." 42 U.S.C. § 7475(a)(1). Upon a cursory reading of the statutory language, it appears that the permitting requirement exists only before construction commences and therefore could not be a "permit [required] as a

25

condition of operations," within the meaning of the citizen suit provision, 42 U.S.C. §
7604(f)(4). However, a careful review of the statutory language makes it apparent that the
title "preconstruction" requirements does not reflect the true nature of a PSD permit's
ongoing pollution control requirements, or the program's overall goals to maintain air
quality. As the Court of Appeals for the Fifth Circuit points out, "[t]he CAA statutory
scheme contemplates at least two different types of air permits *unhappily* named
'preconstruction permits' and 'operating permits,' with confusion easily resulting from the
fact that preconstruction permits often include limits on a source's operations." United
States v. Marine Shale Processors, 81 F.3d 1329, 1355 (5th Cir. 1996) (emphasis added).

Several components of § 7475(a) relate solely to preconstruction review, such as
subsection (a)(2), which requires a proper analysis and public participation in the permitting
process. Other components, however, create ongoing requirements related to the operation
of a facility. For example, a "modification" subject to PSD requirements includes not only
construction projects, but also changes in the method of *operation*. 42 U.S.C. § 7411(a)(4)
(incorporated into the PSD program at 42 U.S.C. § 7479(2)(c)). Subsection (a)(1) requires
a permit "setting forth emission limitations," 42 U.S.C. § 7475(a)(1), which are ongoing
requirements, 42 U.S.C. § 7602k. Subsection (a)(4) requires the operator to utilize best
available control technology for pollutants emitted from the facility. Id. § 7475(a)(4).
Subsection (a)(3) requires a demonstration by the operator "that emissions from

construction *or operation*" will not result in violations of air quality standards. Finally, subsection (a)(7) requires ongoing monitoring "as may be necessary to determine the effect which emissions" from the facility have on air quality. Id. § 7475(a)(7). Taken together, these provisions illuminate the true nature of the PSD program's ongoing emissions controls. The PSD program is not merely a requirement to obtain a permit before construction, as a building permit might be; rather, it is a program that attaches ongoing obligations affecting operation of a pollution source when that source undergoes modification. C.f. Citizens Against Ruining the Environment v. EPA, 535 F.3d 670, 673 n.3 (7th Cir. 2008) (no source may be modified "unless a permit *prescribing emission limitations* has been issued") (emphasis added). Thus, although a PSD permit includes certain requirements that apply preconstruction, to focus solely on those requirements "exclu[des] language in the statute stating that the PSD permit shall set forth emission limitations for that source following the construction activity." Duke Energy, 278 F. Supp. 2d at 650.

In addition, a closer look at the requirement to utilize best available control technology shows that it is an ongoing operational obligation, not merely a preconstruction requirement. "Best available control technology" is defined in the Clean Air Act as "an emission limitation based on the maximum degree of reduction of each pollutant subject to regulation . . . ." 42 U.S.C. § 7479(3). The general definitions of the Act define "emission limitation" as "a requirement established by the State or the Administrator which limits the

quantity, rate, or concentration of emissions of air pollutants on *a continuing basis*, including any requirement relating to the operation or maintenance of a source . . . . to assure *continuous* emission reduction." 42 U.S.C. § 7602(k) (emphasis added). This language demonstrates that PSD sources must apply best available control technology emission limits continuously, once PSD is triggered, and that the obligation to apply best available control technology applies to the operation of a facility. This makes sense. Best available control technology limits are valuable because they apply after a construction project takes place, when the plant is operational. "It makes little sense for a PSD permit to set emissions limitations and require pollution control technology, but not require a facility to operate pursuant to those restrictions." Portland General Electric, 663 F. Supp. 2d at 993; Duke Energy, 278 F. Supp. 2d at 650-51 (holding that PSD emission limitations are "just as integral to achieving the objectives of PSD as the preconstruction analysis and review" and are "a condition of operation").

Turning to the Wisconsin PSD regulations, defendant points out that the Wisconsin state implementation plan sets forth separate guidelines for constructing or modifying major sources, on one hand, and for operating major sources, on the other. Wis. Admin. Code NR ch. 405 (Wisconsin PSD requirements); Wis. Admin. Code NR ch. 406 (Wisconsin construction requirements); Wis. Admin. Code NR ch. 407 (Wisconsin operation permit requirements). In addition, Wisconsin's PSD program provides that "[n]o major stationary

28

source or major modification *may begin actual construction* unless" the owner or operator of such source complies with the PSD requirements. Wis. Admin. Code § NR 405.07 (emphasis added). This language suggests that only "begin[ning] actual construction" would be a violation of the PSD regulations. However, it is irrelevant that Wisconsin has separate PSD and Title V operating programs. As defendant admits, the Title V operating program does not impose new obligations but instead consolidates pre-existing requirements such as those from the PSD program into a single document to facilitate compliance. Def.'s Br., dkt. #14, at 13; see also Citizens Against Ruining the Environment, 535 F.3d at 672 ("It is reasonable to interpret Title V to complement, not to limit, the EPA's enforcement authority."); see also Ohio Public Interest Research Group, Inc. v. Whitman, 386 F.3d 792, 794 (6th Cir. 2004) (citing 42 U.S.C. §§ 7661c(a), (c); 40 C.F.R. §§ 70.6(a)(3), (c)(1)). That Title V contains operational requirements does not mean that the PSD program must lack operational requirements. E.g., Wis. Admin. Code § NR 407.09(2)(d) (explaining that PSD conditions may still apply after source receives operational permit). Before Title V was enacted in 1990, the PSD program had been imposing operational requirements on new sources and major modifications for thirteen years, and these operational requirements were specified in PSD permits. The separate Title V permitting program, which was enacted thirteen years after PSD, "consolidates" PSD and other requirements, but is not itself a source of operational requirements. Citizens Against Ruining the Environment, 535 F.3d

29

at 672; see also Portland General Electric, 663 F. Supp. 2d at 994 (Title V and PSD program

"work in concert").  Thus, defendant's argument that only the Title V program imposes

operational requirements fails.

Further, a close reading of the Wisconsin plan leads to the conclusion that PSD

requirements apply after construction begins.  Under Wisconsin's plan, PSD requirements,

including best available control technology and monitoring, are incorporated into

preconstruction permits.  Wis. Stat. §§ 285.63(3); 285.65(3).  A preconstruction permit

controls operating conditions for a period of time after construction or modification is

complete.  Even after a preconstruction permit expires, the conditions established in the

permit "are permanent unless the conditions are revised through a revision of the

construction permit or through the issuance of a new construction permit."  Wis. Stat. §

285.66(1); Wis. Stat. § 285.60(1)(a)2; Wis. Admin. Code § NR 407.09(2)(d)1 (providing

that conditions remaining applicable to pollution source during operation include "[a]ny best

available control technology . . . established under [the PSD program or other parts of the

state implementation plan]").  Additionally, Wisconsin's ongoing monitoring requirements

indicate that a facility is subject to the PSD program post-construction.  Wisconsin's PSD

program requires that "after construction of the stationary source or modification," the

owner or operator is to "conduct such ambient monitoring as the department determines is

necessary to determine the effect emissions from the stationary source or modification may

30

have, or are having, on air quality in any area."  Wis. Admin. Code § NR 405.11(2).  In sum, because a PSD permit imposes ongoing operational requirements that may be violated after construction is complete, a major source has an obligation to obtain a permit even after its construction is complete.

The broad purpose of the PSD program and the Clean Air Act also support the maintenance of a citizen suit for a major source's failure to obtain a PSD permit and fulfill other PSD obligations.  When Congress established the PSD program, existing facilities were grandfathered, that is, they were allowed to defer installing emission controls.  But Congress intended that modification of those facilities would trigger the requirement to install and operate such controls so as to reduce emissions.  Wisconsin Electric Power Co. v. Reilly, 893 F.2d 901, 909 (7th Cir. 1990) ("Congress did not permanently exempt existing plants from [PSD] requirements"); Alabama Power Co. v. Costle, 636 F.2d 323, 400 (D.C. Cir. 1979) ("The statutory scheme intends to 'grandfather' existing industries; but the provisions concerning modifications indicate that this is not to constitute a perpetual immunity from all standards under the PSD program.")  The purpose of the Act's PSD mandate is to control air quality through proper source review and emissions controls, such as best available control technology.  42 U.S.C. § 7470.  It would be difficult to achieve these goals if the failure to obtain a PSD permit, with proper emission controls, is viewed as a one-time event that cannot be enforced at a later time.  United States v. American Electric Power Service

31

Corp., 137 F. Supp. 2d 1060, 1066 (S.D. Ohio 2001) (finding it "illogical to conclude that a defendant may only be held liable for constructing a facility, rather than operating such facility, without complying with the permit requirements").

Finally, acceptance of defendant's arguments that at most, PSD violations can give rise to a one-day violation subject to a penalty of $25,000 would effectively read the penalty provisions out of the Act and encourage non-compliance with costly PSD requirements. In Murphy Oil, I discounted plaintiff's argument that a one-time $25,000 penalty would be insufficient to deter a source from constructing or modifying its plant without obtaining a PSD permit. In that case, the source was potentially subject to injunctive relief in the form of shutting down new construction or requiring extensive and expensive modifications. Murphy Oil, 143 F. Supp. 2d at 1083. Here, defendant contends that it cannot be subject to either civil penalties *or* injunctive remedies. Accepting this argument would reward defendant for its own alleged failure to comply with PSD requirements and would lead to unfair and surely unintended results. For example, under defendant's argument, a owner or operator who actually follows the mandates of the Act, obtains a PSD permit and determines best available control technology for its facility, but then fails to implement or meet emission limitations would be subjected to greater enforcement liability than an owner or operator who ignores the PSD requirements altogether. The citizen suit provisions of the Act cannot be construed reasonably to countenance such an inequitable result. An ongoing requirement

32

to comply with PSD permits, emission limitations and air quality demonstration requirements, with civil penalties for violations, insures a level playing field for all companies. In sum, I conclude that the obligation to obtain a PSD permit continues during the operation of a source that has undergone a major modification until a permit is obtained.

Now that I have concluded that defendant's alleged failures to obtain a required PSD permit, apply best available control technology and make air quality demonstrations are ongoing violations of the Clean Air Act and Wisconsin state implementation plan, the remaining question is what effect, if any, the five-year statute of limitations has on plaintiff's claims. In cases involving ongoing violations, claims for violations that recur within the limitations period are not barred. E.g., Heard v. Sheahan, 253 F.3d 316, 318 (7th Cir. 2001) ("Every day that [prison officials] prolonged [prisoner's] agony by not treating his painful condition marked a fresh infliction of punishment that caused the statute of limitations to start running anew."); Palmer v. Board of Education, 46 F.3d 682, 686 (7th Cir. 1995) (school board's decision to "leave the building shuttered" was new violation each year).

As the Court of Appeals for the Sixth Circuit explained, each day a facility operates absent a PSD permit and absent best available control technology, it is committing a violation of the Clean Air Act. Nat'l Parks 6th Cir., 480 F.3d at 417-19 (failure to obtain PSD permit "presents a series of discrete violations rather than a single violation that may

33

or may not be 'continuing' in nature."); <u>see also</u> <u>Portland General Electric</u>, 663 F. Supp. 2d at 994.  This is a sensible interpretation of the ongoing violation doctrine that does not eliminate the statute of limitations.  Thus, plaintiff may seek civil penalties only for the five years preceding suit.

## B.  <u>Title V</u>

In count 6 of its complaint, plaintiff seeks relief for defendant's alleged violations of the Clean Air Act's Title V program and implementing regulations.  Defendant contends that count 6 should be dismissed for lack of subject matter jurisdiction over the claim. Specifically, defendant contends that plaintiff's claim constitutes an impermissible collateral attack on its Title V permits because plaintiff is alleging that the Title V permits are defective as a result of defendant's failure to submit complete or accurate permit applications.  Defendant contends that in order to obtain judicial review of this issue, plaintiff must have raised such claim administratively under 42 U.S.C. § 7661d, during the period when Wisconsin DNR and the EPA were reviewing defendant's permit applications, and then sought review of EPA's failure to object to the permit in the United States Court of Appeals for the Seventh Circuit.

Title V of the Clean Air Act, 42 U.S.C. § 7661-7661f, establishes an operating permitting program for certain sources, to be administered by the states.  The Clean Air Act

sets forth provisions for challenging a Title V permit, requiring each state to provide an opportunity for public comment on applications, renewals and revisions, as well as an opportunity for review in state court of the final permit action. Additionally, if a Title V application does not comply with a requirement of the Clean Air Act, the EPA is required to object to the issuance of the permit. 42 U.S.C. § 7661d(b)(1). If it does not object, any person may petition the EPA to do so. Id. § 7661d(b)(2). If the EPA denies the petition requesting it to object, the petitioner may appeal the denial under 42 U.S.C. § 7607(b)(1), which allows a request for judicial review to be filed "in the United States Court of Appeals for the appropriate circuit." Alternatively, because issuance of a final permit by the state is a final agency action, the permit is reviewable on direct appeal in the state courts. Wis. Stat. § 227.52. The Act specifically prohibits private parties from seeking judicial review in a civil enforcement proceeding of an action of the EPA, if that action could have been reviewed pursuant to § 7607(b)(1). 42 U.S.C. § 7607(b)(2) ("Action of the Administrator with respect to which review should have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement.")

Defendant contends that although plaintiff is alleging that defendant is operating in violation of its Title V permit, in fact its allegations focus solely on alleged omissions in defendant's applications and defects in the permitting process. Defendant argues that because such claims could have and should have been raised during the administrative review

35

process, this court has no jurisdiction to hear plaintiff's challenge.

Defendant cites several cases in support of its argument. In <u>Otter Tail</u>, 615 F.3d at 1020, the Court of Appeals for the Eighth Circuit held that § 7607(b)(2) "establish[es] an exclusive avenue for circuit court review of the EPA's failure to object to a proposed Title V permit, and thus of a claim that a proposed permit does not comply with the CAA." Otter Tail is distinguishable from this case, however, because the state agency and EPA had reviewed a proposed modification under Title V, provided for public notice and comment and determined that new source performance standards were not implicated. Id. at 1020-21. Plaintiff had not appealed the determination. Thus, unlike the modifications at issue in this case, the project in Otter Tail had undergone a permit proceeding.

Defendant also cites United States v. Solar Turbines, Inc., 732 F. Supp. 535 (M.D. Pa. 1989) and United States v. AM General Corp., 34 F.3d 472 (7th Cir. 1994), which are not useful because they involve an enforcement action based on conduct that was expressly sanctioned by a facially valid permit. Here, plaintiff does not allege that defendant's Title V permits, or any other permit, allowed defendant to make the modifications at issue or allowed defendant to submit allegedly false certification of compliance or incomplete permit applications.

Defendant cites <u>Romoland School District v. Inland Empire Energy Center, LLC</u>, 548 F.3d 738 (9th Cir. 2008), for the proposition that citizens may not bring collateral attacks

36

on Title V permits.  In <u>Romoland</u>, the court of appeals concluded that the plaintiffs were challenging a Title V permit, not the defendant's compliance with the terms of its permit. <u>Id.</u> at 751.  The court held that a plaintiff could not bring an action in federal district court alleging that the terms of a Title V permit were inconsistent with other requirements of the Act.  <u>Id.</u> at 754-56.  However, the court noted that "Title V permits are by no means wholly insulated from the [Clean Air Act's] citizen suit provision." <u>Id.</u> at 754.  To the contrary, as the court of appeals observed, to the extent a defendant violates a term or condition of its Title V permit or seeks to begin building and operating a plant without obtaining a permit under Title V, either of those violations would be subject to a citizen suit under § 7604.  <u>Id.</u>; <u>see also</u> 42 U.S.C. § 7604(f) (authorizing citizen suit for violation of emission standard or limitation including any "standard, limitation, or schedule established under any permit issued pursuant to subchapter V of this chapter").  The lesson of these cases is that although citizens may not bring a collateral challenge to an existing Title V permit, a violation of a Title V permit itself is subject to a citizen suit under § 7604, as is a violation of any standard or limitation in the Title V regulations or a state implementation plan.

Plaintiff alleges in count 6 that defendant violated Title V regulations, the Wisconsin state implementation plan and its Title V permits by submitting applications that falsely certified compliance with all applicable air pollution control requirements, failing to apply for revised Title V permits for major modifications made to its boilers, submitting

37

applications that failed to identify various PSD requirements as "applicable requirements,"
submitted applications that did not submit a compliance plan or compliance schedule,
failing to supplement or correct misinformation in applications and failing to disclose
violations.  Plf.'s Cpt., dkt. #1, at ¶¶ 126-130.  To the extent that plaintiff is challenging
defendant's submission of allegedly incomplete permit applications that resulted in defective
Title V permits, I agree with defendant that plaintiff was required to utilize the process set
forth in § 7661d.  As discussed above, under that section any person who objects to the
issuance of a permit or renewal permit may petition the EPA administrator.  Judicial review
of the administrator's decision is available only through the applicable court of appeals, not
in the district court.  42 U.S.C. §§ 7661d(b)(2), 7607.  Reliant Energy, 2009 WL 3234438,
at *19 (dismissing plaintiff's claim based on defective Title V permit for lack of subject
matter jurisdiction); BP Amoco Chemical Co. v. Flint Hills Resources, LLC, 615 F. Supp. 2d
765, 777 (N.D. Ill. 2009) (same).  Therefore, I will grant defendant's motion to dismiss as
it relates to this part of count 6.

However, plaintiff also alleged in its complaint that defendant violated its Title V
permits, as well as Wis. Admin. Code §§ 439.03(1)(c), (9) and (10), by falsely certifying
compliance after permits had been issued to defendant.  Plf.'s Cpt., dkt. #1, ¶ 129.  A claim
alleging that defendant violated a specific provision in its Title V permit is actionable under
§ 7604.  In addition, plaintiff alleges that defendant failed to apply for a Title V permit for

its plants after the modifications and failed to supplement or correct information after it made modifications to its plants.  According to plaintiff's allegations, this is unlike the situation in <u>Otter Tail</u>, because neither the EPA or Wisconsin DNR made any permit determination regarding the modifications at issue.  These allegations are not collateral attacks on defendant's permit.  In sum, plaintiff may proceed on count 6 to the extent it is challenging defendant's false certifications and failure to submit applications and amendments, rather than defects in defendant's Title V permit.  <u>Allegheny Energy, Inc.</u>, 2006 WL 1509061, at * 7-8 (denying motion to dismiss based on "impermissible collateral attack" arguments where facility failed to comply with operating permit application requirements, did not report its modification and state agency "never authorized it to operate its Plants without meeting [PSD] emission standards.").

## ORDER

IT IS ORDERED that

1.  The motions for leave to file supplemental information filed by plaintiff Sierra Club, dkt. #15, and defendant Dairyland Power Cooperative, dkt. #19, are GRANTED.

2.  Defendant's motion to dismiss, dkt. #13, is DENIED in part and GRANTED in part.  Defendant's motion is GRANTED with respect to the allegations in plaintiff's sixth claim that defendant violated Title V and Wisconsin's state implementation plan by

submitting incomplete applications that resulted in defective Title V permits.  Defendant's

motion is DENIED in all other respects.

 Entered this 21st day of October, 2010.

<div style="margin-left:40%">

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

</div>