UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
SIERRA CLUB,
            Plaintiff,

      vs.                         Case No. 10-CV-303-BBC

DAIRYLAND POWER
COOPERATIVE,                      Madison, Wisconsin
                                 December 23, 2010
            Defendant.       9:00 a.m.
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

  STENOGRAPHIC TRANSCRIPT OF TELEPHONIC MOTION HEARING
    HELD BEFORE MAGISTRATE JUDGE STEPHEN L. CROCKER

APPEARANCES:

For the Plaintiff:   McGillivray, Westerberg & Bender LLC
                     BY:  PAMELA R. MCGILLIVRAY
                          DAVID C. BENDER
                     305 South Paterson Street
                     Madison, Wisconsin  53703

For the Defendant:   Winston & Strawn, LLP
                     BY:  NASH E. LONG
                     214 North Tryon Street
                     Charlotte, North Carolina  28202

                     Winston & Strawn, LLP
                     BY:  ELIZABETH C. WILLIAMSON
                     1700 K Street, N.W.
                     Washington, DC 20006

                     Wheeler, Van Sickle & Anderson, S.C
                     BY:  VINCENT M. MELE
                     25 West Main Street, Suite 801
                     Madison, Wisconsin  53703


            CHERYL A. SEEMAN, RMR, CRR
               Official Court Reporter
             United States District Court
          120 North Henry Street, Room 520
             Madison, Wisconsin  53703
                  1-608-255-3821

1        THE COURT:  Good morning.  This is Magistrate

2   Judge Crocker.  I understand I have the attorneys for

3   the parties in the Sierra Club lawsuit against

4   Daryland Power Cooperative.  I have a court reporter

5   here.  That's why you are on speaker phone.  So let me

6   note that our case number is 10-CV-303-BBC and let's

7   get the appearances, please, first on behalf of the

8   plaintiff.

9        MS. MCGILLIVRAY:  Good morning, Your Honor.

10  This is Pam McGillivray and with me is David Bender

11  for Sierra Club.  And I would like to say I apologize

12  for the delay.  We had a little bit of technical

13  problems this morning with the conference call.

14       THE COURT:  All right.  Well, apology

15  accepted.  If that's the worst thing that happens to

16  any of us today, it's going to be a good day, right?

17  And who have we got on behalf of the defendant today?

18       MR. LONG:  Good morning, Your Honor.  This is

19  Nash Long from Winston & Strawn.  With me on the line

20  are Liz Williamson, also from Winston & Strawn, and

21  Vincent Mele from Wheeler, Van Sickle & Anderson.

22       THE COURT:  All right.  Well, good morning to

23  all of you, also.  Counsel, you know the drill.  We've

24  done this once before and this call will proceed much

25  as the last one did.  We are online to get additional

1   input from the parties on the plaintiff's motion to

2   quash the 30(b)(6) depositions.  The motion is

3   docketed as 40.  The corrective brief and supporting

4   documents I think are 44 and 45.  We've also got the

5   response to that.  I've read all of your submissions,

6   so I have a pretty good sense of the parties'

7   positions on this.

8       As is my habit, I will give you the Court's

9   preliminary view of where I think we find ourselves

10  and then get input from each side in turn.  The bottom

11  line, from the Court's perspective, is that I do not

12  see the utility of these 30(b)(6) depositions at this

13  time, and let me explain what I mean by that and why I

14  think that.

15      I don't have any problem at all with the

16  defendant, with Dairyland, trying to get this

17  information.  Certainly it's entitled to know, why did

18  you bring this lawsuit, what's your methodology,

19  what's your basic formula here, is it routine at the

20  unit, routine in the industry, why did you pick the

21  one you did; all of that.  It's fair game.  It's

22  pretty much the equivalent of contention

23  interrogatories in the form of a 30(b)(6).

24      However, I don't know that holding these

25  depositions now will actually adduce any usable

1   evidence.  And the reason that that's the Court's view

2   at this point is that it's pellucid that the plaintiff

3   is not intending to rely on its attorneys or its

4   background consultants to prove its case.  It is

5   clearly stated that it's going to put out some expert

6   reports -- I believe February 7 is the deadline -- and

7   it's all going to be spelled out there in 26(a)(2)

8   form.  And that's what it's going to use for summary

9   judgment, that's what it's going to use at trial.

10       So even if these depositions were to go forward

11   and even if the information that Dairyland really is

12   looking for here were to be adduced over or around any

13   claim of work product privilege, it's not the evidence

14   that the plaintiff would be relying on, and so I'm not

15   sure what good Dairyland could make of it at this

16   point.

17       Now, I understand the argument that you want to

18   know now because it affects the direction of discovery

19   in the future.  But when I look at 26(b)(3)(A) and (B)

20   and 26(b)(4)(B) and (D), I'm not sure that this is a

21   set of depositions that are worth taking.  February 7

22   is what, six and-a-half weeks away?  We've got the

23   intervening holidays.  By this court's standards,

24   we've given you some pretty lenient deadlines after

25   that -- summary judgment not until May, trial on

1  liability not until October.

2      So from the Court's perspective, if we were to

3  wait until the expert reports came out and then allow

4  30(b)(6) depositions on these topics if the defendant,

5  if Dairyland, still thought they were necessary and

6  would adduce useful evidence, fine, you know, let's

7  try it then, but at this point I'm just not seeing the

8  utility.

9      What I sense is that the responsive brief reads

10  almost like a Rule 11 challenge to the complaint, that

11  there is some resentment here that the Sierra Club did

12  this and Dairyland wants to know now, rather than

13  later, why it was hauled in to court.  And that's a

14  fair question, but I'm not sure that we're going to

15  get admissible evidence at this point that would

16  actually answer the question in a pragmatic,

17  efficient, and useful way.

18      So that's my preliminary view, but I would not

19  have gotten you on the phone if it were my final view;

20  I would have just issued an order.  So with that as

21  the starting point, why don't we start with the

22  nonmovant, with the respondent, because right now you

23  are in the hole and you've got to find a way to dig

24  your way out.  So who has got the point on behalf of

25  Dairyland today?

1           MR. LONG:  Your Honor, this is Nash Long and

2    I'll have the point and spade to try to dig out of

3    that hole.  I think to address your questions of why

4    we need the depositions now rely primarily on two

5    points.

6           As the Court noted, this information is

7    discoverable.  The basic argument that we can just

8    wait until the expert reports and then depose the

9    experts causes two problems: one, it will

10   substantially delay getting this information out; and

11   two, it's not going to provide us the full discovery

12   of what Sierra Club, as an organization, knows.  And

13   let me address those points in turn.

14          Certainly the opening expert reports are due on

15   February the 7th, but the scheduling order in the case

16   allows for plaintiffs to file reply reports, and the

17   reply report deadline is not until April the 18th.  So

18   if we are to depose the experts in lieu of the

19   30(b)(6) deposition of Sierra Club itself, we are

20   either going to have to depose them twice, which does

21   not seem efficient -- that is, depose them after the

22   7th and then again after the 18th -- or wait until the

23   18th of April, depose them then, which we might have

24   to do anyway to get their final position.

25          THE COURT:  Well, let me interrupt and ask

1  you this, and I apologize for digressing:  Perhaps

2  nobody has come up with a strategy yet on behalf of

3  Dairyland, but wouldn't you be deposing them before

4  your experts offered their reports in order to give

5  your experts the opportunity to respond?

6          MR. LONG:  Well, I'm not sure that we would.

7  I'm not sure that we would want to depose the same

8  expert twice over.  I think it's more efficient to see

9  what their final position is and ask them questions

10  about that.

11          THE COURT:  Okay.

12          MR. LONG:  I think that would be the

13  approach.

14          THE COURT:  I was just curious.  But in any

15  event, I interrupted you, so why don't you continue,

16  please.

17          MR. LONG:  And the second point, in addition

18  to the timing issue, is that there is no guarantee

19  that the position that and the information that an

20  expert has is coextensive with the information that

21  Sierra Club, as an organization, has.  Sierra Club has

22  been involved in these issues for quite some time all

23  accross the country.  They have internal organizations

24  or divisions, such as their Beyond Coal Campaign, that

25  has developed positions on the issues.  There is no

1    guarantee that the discoverable information the expert

2    has will be coextensive with that of Sierra Club.

3    That's point number two.

4        And I guess the final point that I would mention,

5    Your Honor, is this:  If there are discrepancies

6    between how Sierra Club approaches an issue under the

7    deposition notices and how an expert approaches the

8    same issue in this case, that discrepancy is relevant

9    and discoverable information for two reasons: one, it

10   goes to the reasonableness of the methodology the

11   expert will ultimately employ; and second, it goes to

12   the credibility of the expert, which will be an issue

13   for the jury to decide.

14       So I think if we allow Sierra Club to just avoid

15   the 30(b)(6) deposition, which is what their

16   invitation basically boils down to, we are just going

17   to be given the position of the experts and not have

18   the opportunity to explore other ways to address these

19   issues that Sierra Club has developed or knows are

20   reasonable under the regulations, and that would

21   prevent us from getting full discovery into the

22   credibility of the ultimate methodology that the

23   experts might employ.  So for those reasons, I think

24   it is important for us to get Sierra Club's position

25   and to get it now.

1          THE COURT:  All right.  Mr. Long, I don't

2  know that if, in this case, I have announced that I

3  don't ask rhetorical questions -- I tend to announce

4  that in every case where we do this -- so let me ask

5  some non-rhetorical questions.

6      You mentioned that one of the avenues you wish to

7  explore in these 30(b)(6) depositions is what the

8  Sierra Club knows sort of as an organization and

9  getting behind or understanding the thought process

10  behind its Beyond Coal Campaign and so forth.  Why is

11  this relevant and admissible in this case?

12      Isn't this case really about what happened at the

13  plants and whether in fact we've got violations of the

14  standards here?  And isn't that just a matter of

15  presenting some data and running some numbers as

16  opposed to looking at the political bent or the

17  environmental prejudices of the organization that's

18  financing this?

19          MR. LONG:  Your Honor, what one must do

20  before you can run those data through those analyses

21  is one has to decide what is the appropriate test and

22  what is the appropriate analysis to use because you

23  may get very different results to the question of

24  liability depending upon the standards or the

25  methodologies that are used to analyze those data.

1   And so for that reason, it is very important for us to

2   discover what are the permissible methodologies that

3   Sierra Club recognizes under the rules.

4        For example, there would be no need for agencies

5   to issue guidance memos or interpretive rulings or

6   statements in the Federal Register to elucidate the

7   application of the rule if they were perfectly clear

8   and covered all conceivable applications on their

9   face.

10        In this case, for decades, the agencies,

11   primarily EPA, has issued a series of interpretive

12   rulings or statements about how the rules are to be

13   applied; in other words, what are the tests that one

14   would use to run the data through them to produce the

15   results of liability or not.  And it is a key question

16   in this case, what are the appropriate standards to be

17   applied, both on routine and on the emissions increase

18   issue, to the PSD claims.

19        Depending upon what standards are ultimately

20   adopted, various defenses could spring into play; for

21   example, the fair notice due process defense.  If we

22   are correct, "we" being Dairyland, about how the rules

23   are to be applied in this case; that is, they should

24   be applied as they always have been and interpreted;

25   then you will not have a fair notice or a due process

1  defense.  However, on the other hand, if what I think

2  to be the litigation position of Sierra Club is

3  ultimately adopted, then additional defenses spring

4  into play, including that one.

5      So I think it is critical to understand and to

6  help the Court ultimately understand what are the

7  analogy, what are the tests to apply to the data, to

8  understand what are Sierra Club's positions about how

9  routines should be interpreted, what guidance is

10 authoritative and should be applied to that

11 determination; and the same for emissions increase, in

12 what areas are the actual potential tests allowed, in

13 what areas are the other tests recognized under the

14 rules allowed.

15     And for each one of those tests there are

16 separate plausible methodologies.  That's what EPA

17 stated in that *EPA* case that we cited for the Court.

18 And which ones of those that the Sierra Clubs agrees

19 that are reasonable and can be employed can lead to

20 very different answers to the question of whether

21 there was emissions increase.  And if that's the case,

22 then you have very different questions on the issue of

23 liability.

24     So I think this is not just simply a question of

25 taking the data, running it through a series of tests.

1   If that was the case, you wouldn't need an expert to

2   do it.

3          THE COURT:  Well, Mr. long, perhaps your last

4   statement answered the question I'm going to ask.  And

5   I apologize if it's naive, but I'm still having

6   trouble getting around this notion of what Sierra Club

7   believes isn't evidence.  In other words, I could see

8   where, in certain cases, the decision to employ

9   certain methodology over others that might be

10  preferable or more widely accepted in the field could

11  be impeaching of a particular witness.

12      But when we are talking about an organization and

13  when we are talking about particular plants, I still

14  have this notion that what this case comes down to is

15  the methodologies actually offered by Sierra Club as

16  evidence, and what they don't offer as evidence isn't

17  really impeaching directly of them.  If they've made

18  choices, they've made choices, but I'm not sure the

19  reasons for those choices affect anything.  Either

20  they've have got the proof or they don't and they

21  either win or lose on that basis.

22      So maybe I'm just asking you to repeat yourself,

23  but have you got anything else for me on why it's

24  important to know the *why's* of Sierra Club's decisions

25  as opposed to simply knowing what its experts are

1    going to say and offer as proof in this particular

2    case?

3              MR. LONG:  Your Honor, it will allow us to

4    present alternative reasonable methodologies for the

5    jury and allow the jury to make a decision about which

6    alternative methodology, including the alternative

7    methodology that Sierra Club might recognize

8    independent of litigation, are the appropriate ones to

9    apply.

10         I think it is relevant to judge the credibility

11   of the expert and the expert's selection of the

12   methodologies and I also think it is relevant

13   information to demonstrate the reasonableness of

14   possible alternative methodologies that we would

15   present to the jury for them to make the decision

16   about whether or not these activities were major

17   modifications.

18              THE COURT:  Sure.  And you keep talking about

19   a jury.  I think everyone has agreed to a bench trial,

20   but your point remains valid.  But let me ask one more

21   question, and then I'm going to hear from

22   Ms. McGillivray, because I've got more hearings yet

23   this morning.  You are not the only ones to suffer on

24   December 23 today.

25         But accepting, for the purposes of today's

1    discussion, your point that this could be admissible

2    and that there are other methodologies out there, two

3    questions occur to me: (a) isn't Dairyland going to be

4    putting its own experts and other industry witnesses

5    before the judge, either at summary judgment or at

6    trial, to say, well, plaintiff's experts ignored all

7    of these other things that are actually more

8    applicable and more widely accepted?

9         Apart from that, until Sierra Club commits to a

10   position through its experts and their reports, how

11   can you know what to impeach?  In other words, what's

12   the downside, other than the loss of time of waiting

13   until the experts issue their reports on behalf of

14   plaintiff and then coming back to the plaintiff and

15   saying, well, why did you not do B, C and D; why did

16   you pick A; and then create your impeachment record in

17   that fashion?

18            MR. LONG:  I think the answer -- I have three

19   things to say in response to that: one is, yes, we

20   will be providing -- we expect to provide our own

21   expert testimony, but we are not going to rely solely

22   on expert testimony -- I anticipate that we will be

23   developing fact witness testimony -- and that answers

24   the question of why we need to know what Sierra Club's

25   litigation position is now.

1    We need to be aware of what the position is the

2    Sierra Club developed for this case so we can be

3    asking third parties, interviewing third parties, and

4    possibly deposing third parties, about how the

5    regulations have been interpreted and applied.

6    There could be depositions not only of EPA

7    witnesses, but also of witnesses with the Wisconsin

8    Department of Natural Resources in this case, and we

9    don't want to be in a position of delaying those

10   depositions or sealing up those depositions until we

11   know exactly what Sierra Club's position is.  We want

12   to go ahead and start scheduling those and trying to

13   move forward so that we are not telescoping all of

14   that type of discovery should it be necessary at the

15   tail end of the discovery phase of the case.

16   And one final point, just to clear it up, we did

17   include a jury demand in our answer in this case, at

18   least that was my intention and recollection.  And so

19   I do think that there is a jury demand that was made,

20   but that's not relevant to your question.  The

21   question is, why do we need it now.  And the answer

22   is, we need to know what we are being sued about and

23   we need to know the positions that Sierra Club has

24   underlying those so that we can start the process of

25   understanding whether that is consistent with the

1  accepted agency practice and accepted industry

2  practice and that may involve third-party discovery.

3          THE COURT:  Fair enough.  And I have one last

4  question and then I'm going to hear from plaintiff,

5  but, Mr. Long, you probably got the same impression

6  reading the plaintiff's brief that the Court did.  But

7  the impression I got is that notwithstanding the

8  ultimate discoverability of all this information, at

9  this point it's all based on attorney work product.

10    So even if this Court were to allow these

11  depositions to go forward on these topics, what do you

12  anticipate getting if in fact all you get at this

13  point is objections and refusals to answer based on

14  attorney work product?

15          MR. LONG:  I think that there are questions

16  that we could ask, and we detailed some of those in

17  the brief, that would not be getting to work product.

18  We don't need to see, you know, any handwritten notes.

19  We don't need to see any documents that might be

20  protected by Rule 26, which as I read it, deals

21  primarily with the documents.  We don't need the

22  documents to understand what their position is and

23  what guidance that they recognize as applicable and

24  persuasive for analyzing these issues of routine and

25  emissions increase under the PSD rules.

1      We are just trying to understand what tests they

2  are coming at or what they used or what it's based on,

3  and that doesn't necessarily imply that we have to see

4  their actual calculations themselves for them to state

5  their position on how it should be done.

6           THE COURT:  All right.  Well, thank you.  Who

7  has got the point on behalf of Sierra Club today?

8           MS. MCGILLIVRAY:  This is Pam McGillivray,

9  Your Honor.

10          THE COURT:  All right.

11          MS. MCGILLIVRAY:  I want to just back up

12 because what these notices actually request is not

13 general positions of Sierra Club and what has -- what

14 the Beyond Coal Campaign has been doing, as suggested

15 now by Mr. Nash.  The notices are specific to the

16 plant and the project and activities that are in this

17 complaint.  And in fact, in Dairyland's own motion for

18 protective order, they had suggested that nothing

19 beyond that would be relevant and the Court

20 essentially agreed in limiting the response to the 114

21 requests of the EPA.

22      So just looking at the specific notices here,

23 there is nothing that would suggest that Sierra Club's

24 position on any other NSR related or understanding of

25 guidances or regulations are actually going to be

1    something that we would be preparing a witness for

2    anyway.

3           THE COURT:  Let me interrupt you there and

4    ask you this -- and this is sort of an irrelevant

5    question, but it occurs to me now -- if that sort of a

6    30(b)(6) notice were to be sent to the Sierra Club,

7    would you be prepared to put up a witness on those

8    types of issues?

9           MS. MCGILLIVRAY:  Your Honor, we didn't get

10   that, but we would certainly object on relevancy

11   grounds to the past position of Sierra Club in cases

12   not involving Dairyland Power, not involving the

13   regulations at issue in this case.  I don't see that

14   it would be relevant to this proceeding at all.

15       As far as any questions that go to the

16   credibility of our experts, once they are chosen, once

17   they are identified with their reports, certainly we

18   would expect the defendant to depose that expert and

19   to look into any past work with Sierra Club and their

20   positions -- is it accurately obtained, contrary or

21   the same as.  I think that goes to the credibility  of

22   our witnesses.

23       We have not named Sierra Club witnesses as fact

24   witnesses.  In fact, we've told Dairyland that they

25   have no firsthand knowledge on any of these issues.

1   Dairyland has submitted its initial disclosures

2   without indicating any witnesses from Sierra Club.  We

3   really don't think that they would be called on

4   anything other than standing issues, and that is not

5   part of this notice either.

6       As far as allowing us depositions soon after

7   February 7th, we aren't objecting to a 30(b)(6)

8   deposition of Sierra Club altogether.  It was on the

9   basis of these notices because the information is

10  privileged, because it is based on the analysis and

11  calculations of counsel.

12      So that information, which is on document, which

13  we have provided on a privilege log in explanation to

14  defendants, would have to be conveyed to the client in

15  order to provide the information so that that client

16  could have -- be prepared for a proper 30(b)(6)

17  deposition.  That would require revealing

18  attorney-client privileged information as well as the

19  attorney opinion and mental impressions.  That's the

20  basis of this protective order, that information is

21  privileged, not that it isn't relevant or not that

22  contention interrogatories may have to be responded

23  to.

24      As far as the timing of the response to

25  contention questions, Dairyland has refused to answer

1  Sierra Club's interrogatories requesting its basis for

2  its defense on the particular project at issue here.

3  In response to interrogatories, it's stated that the

4  objection being that contention interrogatories are

5  better left for later in the discovery stage towards

6  the end of discovery.

7       It is now wanting to hold a double standard in

8  saying, eighth page, Sierra Club's information now but

9  won't provide its information until later in the

10 proceeding.  And certainly, as we suggested in our

11 motion, we are willing to hold a 30(b)(6) deposition

12 on these issues after the discovery or after the

13 identification of experts.

14             THE COURT:  Well -- I'm sorry.  Were you

15 done?

16             MS. MCGILLIVRAY:  Yes.  Thank you.

17             THE COURT:  Okay.  Let me just pose a couple

18 of informational questions to you as well.  Picking up

19 on your last point, certainly the Court would allow a

20 30(b)(6) deposition at whatever time is appropriate

21 here.  But if there were to be a 30(b)(6) deposition

22 on the topics that are the subject of your motion to

23 quash, no matter when that was held, how could your

24 position change?

25      In other words, you are going to put experts

1    forward, your experts are going to offer their

2    calculations and their results.  At that point, if

3    Dairyland wants to do the 30(b)(6) on the same topics,

4    wouldn't the information still be privileged?

5           MS. MCGILLIVRAY:  Well, Your Honor, I think

6    that what we would use as a basis for informing the

7    client of the topics here, which are what are the

8    calculations and analyses that we are relying on in

9    bringing our case forward, would be what the experts

10   have presented, because then it would be no longer

11   subject to -- that information, as opposed to what we

12   did to prepare the pleadings, would not be subject to

13   privilege.

14          THE COURT:  All right.  So as a practical

15   matter, it would basically be an expert deposition

16   filtered through a 30(b)(6) witness?

17          MS. MCGILLIVRAY:  If that's what the

18   defendants want to do, correct.

19          THE COURT:  All right.  And let me ask this

20   as a question as opposed to offering it as a statement

21   or a leading question:  I'm inferring from what you

22   are telling me, and I certainly inferred from your

23   brief in support of your motion, that plaintiff's

24   position today is that although there could have been

25   a lot of different ways that the plaintiff developed

1   the information that led to this lawsuit, it happened

2   to use an attorney and the attorney did the

3   calculations and an attorney ran the data and the

4   attorney gave the advice to the Sierra Club and Sierra

5   Club filed its lawsuit on that basis.  And therefore,

6   in this particular case, on the particular path that

7   led to the lawsuit, everything would be privileged at

8   this point.  Is that a fair characterization of your

9   position on this one?

10          MS. MCGILLIVRAY:  Yes, Your Honor.  With the

11  slight addition that counsel did confer with a

12  non-testifying consultant on some of the calculations.

13          THE COURT:  Understood.

14          MS. MCGILLIVRAY:  That has also been provided

15  in notice in the privilege log.

16          THE COURT:  All right.  So let me ask one

17  more question, which requires you to make a

18  prediction.  In the event the Court were to say to you

19  and to defendant, to Dairyland, go ahead and take the

20  deposition, although it's not clear that anything

21  useful will result, will any questions be answerable

22  or is this basically going to be three pages of

23  assertion of privilege?

24          MS. MCGILLIVRAY:  Your Honor, it's hard to

25  know.  And I think defendant had suggested that Sierra

1    Club reverse course on this.   The reason that we filed

2    this motion to quash rather than go through with the

3    deposition is because we were basically threatened

4    with seeking sanction for refusal to attend a

5    deposition if we advised client to assert their

6    privileges.

7         Certainly we agree that facts are discoverable.

8    We think that we provided all those facts through

9    interrogatories, through interrogatory responses and

10   through direct reference to Dairyland's own documents

11   with work order numbers and with specific references

12   to the activity, so we think we've given that

13   information.

14        I do understand that, you know, that defendant is

15   entitled to a deposition on the facts even though we

16   have responded to interrogatories.   But everything

17   about the calculations, about the analysis, the legal

18   conclusions, the legal strategy, would all be subject

19   to an objection and with an instruction not to

20   respond.   So the reason that we originally contacted

21   defendant about this issue was because we think it

22   would be an unfruitful exercise in which there would

23   be nothing but objections raised based on the specific

24   matters listed in the 30(b)(6) notices.

25             THE COURT:   Okay.   Well, thank you.   And I

1   don't need a reply from Mr. Long because I'm going to

2   deny the motion to quash with these observations:

3          Frankly, I think that these would be pointless

4   depositions.  I haven't really been persuaded that my

5   initial view is incorrect.  And that view is that

6   really there is nothing useful to be gained from

7   deposing a 30(b)(6) witness on these topics at this

8   time, that it would be much more useful to do this

9   later, to depose the experts and then if necessary do

10  the 30(b)(6).

11         But one of this Court's philosophies is to be as

12  *laissez-faire* toward discovery as it can and to allow

13  discovery as widely as it can while being fair.  So

14  I'm not going to tell Dairyland it cannot proceed with

15  these depositions, but I will simply offer this:

16         We never look for trouble here in this court.  We

17  like to think that things work out appropriately and

18  that the Court doesn't need to expect that things will

19  turn out badly.  But in the event this turns out to be

20  a fairly pointless deposition and nothing good comes

21  out of it and it turns out that Sierra Club was

22  correct and Sierra Club wants to be reimbursed for the

23  time and money, certainly it can file a motion to that

24  effect.

25         Now, that's not a veiled threat to Dairyland; it

1  may just be that Sierra Club is wrong, that it's

2  holding its cards too close to the chest and that it

3  asserts the privilege incorrectly.  I don't know.  I

4  don't know what's going to happen and that's why I'm

5  not going to quash the subpoenas.  That's why I'm not

6  going to prevent these depositions from going forward.

7  I think Dairyland is entitled to attempt to adduce the

8  evidence it thinks will be necessary.

9      I don't think this is going to work, but, you

10  know, with the understanding that the parties can

11  always come back to court after the depositions if

12  they think it's necessary, feel free to file motions

13  at that time.

14      With that, I think we are done today, but let's

15  double-check.  Ms. McGillivray, it's your motion, so

16  I'll check in with you first.  Any questions or

17  concerns about where we've landed?

18          MS. MCGILLIVRAY:  No, Your Honor.

19          THE COURT:  Okay.  Mr. Long, any questions or

20  concerns about where we've landed?

21          MR. LONG:  No, Your Honor.

22          THE COURT:  All right.  Then we are done.

23  Thank you all.  Please enjoy your day and have

24  pleasant holidays.

25          (Adjourned at 9:38 a.m.)

1              I, CHERYL A. SEEMAN, Certified Realtime and

2    Merit Reporter, in and for the State of Wisconsin,

3    certify that the foregoing is a true and accurate

4    record of the proceedings held on the 23rd day of

5    December, 2010, before Magistrate Judge Stephen L.

6    Crocker, of the Western District of Wisconsin, in my

7    presence and reduced to writing in accordance with my

8    stenographic notes made at said time and place.

9    Dated this 11th day of January, 2011.

10

11

12

13

14

15                          _____
                                   /s/

16                          Cheryl A. Seeman, RMR, CRR
                            Federal Court Reporter

17

18

19

20

21

22

23   The foregoing certification of this transcript does not
     apply to any reproduction of the same by any means unless
24   under the direct control and/or direction of the
     certifying reporter.

25