## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 12-cv-462 |
| v. | ) | |
| | ) | |
| DAIRYLAND POWER COOPERATIVE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### NOTICE OF LODGING CONSENT DECREE

Plaintiff, the United States of America, on behalf of the United States Environmental Protection Agency, hereby provides notice to the Court that it is lodging with the Court a proposed Consent Decree in the above-captioned matter that would fully resolve the violations alleged in the Complaint filed contemporaneously herewith.

The United States is not seeking the Court's consideration of the proposed Consent Decree at this time and asks the Court **to take no action at this time** in connection with the proposed Decree. The United States is lodging the Consent Decree with the Court for the purpose of soliciting public comment on the settlement, as required by 28 C.F.R. § 50.7. The 30-day public comment period will begin with the publication of a notice in the *Federal Register* seeking comments on the Consent Decree. At the end of the public comment period, the United States will file a motion with the Court to advise the Court of any comments received and of the United States' position as to whether the proposed decree should be approved and entered by the Court.

1

Dated:  June 28, 2012

Respectfully submitted,

IGNACIA S. MORENO
Assistant Attorney General
Environment & Natural Resources Division

ELIAS QUINN
JASON A. DUNN
Attorneys
Environmental Enforcement Section
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Phone: (202) 514-1111
Facsimile: (202) 616-6583
Jason.Dunn@usdoj.gov
Elias.Quinn@usdoj.gov

JOHN W. VAUDREUIL
United States Attorney
Western District of Wisconsin
Suite 303, City Station
660 West Washington Avenue
Madison, Wisconsin, 53703

6/28/12

LESLIE K. HERJE
Assistant United States Attorney
Chief, Civil Division
Western District of Wisconsin

OF COUNSEL:
JANET R. CARLSON
Associate Regional Counsel
SABRINA ARGENTIERI
Associate Regional Counsel
United States Environmental
    Protection Agency, Region 5
77 W. Jackson Boulevard
Chicago, IL 60604-3590

3

## CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of June, 2012, I caused true and accurate copies of the Complaint and the Notice of Lodging of Consent Decree with attached Consent Decree, to be served on counsel in this action at the address indicated below by both electronic copy and first class mail.

John M. Holloway, III, Esq.
Elizabeth C. Williamson, Esq.
Winston and Strawn LLP
1700 K Street, N.W.
Washington, D.C. 20006-3817

David C. Bender
McGillivray Westerberg & Bender LLC
211 S. Paterson Street, Suite 320
Madison, WI 53703

Elias Quinn
Trial Attorney
Environmental Enforcement Section
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| _____ ) | | |
| UNITED STATES OF AMERICA, ) | | |
| ) | | |
| Plaintiff ) | | |
| ) | | |
| ) | | |
| ) | | |
| ) | | |
| v. ) | Civil Action No.: <u>12-</u>cv-462 | |
| ) | | |
| DAIRYLAND POWER COOPERATIVE, ) | | |
| ) | | |
| ) | | |
| Defendant. ) | | |
| ) | | |
| _____) | | |

| | | |
|---|---|---|
| _____ ) | | |
| SIERRA CLUB, ) | | |
| ) | | |
| Plaintiff ) | | |
| ) | | |
| v. ) | Civil Action No.: 10-CV-303-bbc | |
| ) | | |
| DAIRYLAND POWER COOPERATIVE, ) | | |
| ) | | |
| ) | | |
| Defendant. ) | | |
| ) | | |
| _____) | | |

<u>CONSENT DECREE</u>

TABLE OF CONTENTS

I.        JURISDICTION AND VENUE .................................................................3
II.       APPLICABILITY ...................................................................................3
III.      DEFINITIONS .......................................................................................4
IV.       REQUIREMENT TO CEASE BURNING COAL .................................14
V.        NOx EMISSION REDUCTIONS AND CONTROLS ..........................16
VI.       SO2 EMISSION REDUCTIONS AND CONTROLS ...........................23
VII.      PM EMISSION REDUCTIONS AND CONTROLS .............................30
VIII.     PROHIBITION ON NETTING CREDITS OR OFFSETS .....................36
IX.       ENVIRONMENTAL MITIGATION PROJECTS ..................................37
X.        CIVIL PENALTY ..................................................................................39
XI.       RESOLUTION OF PAST CIVIL CLAIMS ..........................................40
XII.      PERIODIC REPORTING .....................................................................41
XIII.     REVIEW AND APPROVAL OF SUBMITTALS ..................................44
XIV.      STIPULATED PENALTIES .................................................................44
XV.       FORCE MAJEURE ..............................................................................58
XVI.      DISPUTE RESOLUTION ....................................................................61
XVII.     PERMITS .............................................................................................63
XVIII.    INFORMATION COLLECTION AND RETENTION ...........................66
XIX.      NOTICES ..............................................................................................67
XX.       SALES OR TRANSFERS OF OPERATIONAL OR OWNERSHIP INTERESTS ...70
XXI.      EFFECTIVE DATE ...............................................................................72
XXII.     RETENTION OF JURISDICTION .......................................................72
XXIII.    MODIFICATION ..................................................................................72
XXIV.     GENERAL PROVISIONS ....................................................................72
XXV.      SIGNATORIES AND SERVICE ..........................................................76
XXVI.     PUBLIC COMMENT/AGENCY REVIEW ..........................................76
XXVII.    CONDITIONAL TERMINATION OF ENFORCEMENT UNDER CONSENT
          DECREE ...............................................................................................77
XXVIII.   FINAL JUDGMENT .............................................................................78
APPENDIX A -- ENVIRONMENTAL MITIGATION PROJECTS

WHEREAS, on June 8, 2010, Plaintiff, Sierra Club, filed a Complaint and on February 17, 2011, filed an Amended Complaint for civil penalties, declaratory and injunctive relief, with costs and fees, under the Clean Air Act ("CAA or the "Act"), 42 U.S.C. §§ 7401, *et seq.*, and specifically the CAA's citizen suit provision, 42 U.S.C. § 7604, against the Defendant, Dairyland Power Cooperative ("DPC"), Civil Action No. 10-CV-303-bbc (W.D. Wis.);

WHEREAS, the United States of America ("the United States"), on behalf of the United States Environmental Protection Agency ("EPA"), is concurrently filing a Complaint and Consent Decree, for injunctive relief and civil penalties pursuant to Sections 113(b)(2) and 167 of the Act, 42 U.S.C. §§ 7413(b)(2) and 7477, alleging that DPC violated the Prevention of Significant Deterioration ("PSD") provisions of Part C of Subchapter I of the Act, 42 U.S.C. §§ 7470-7492, requirements of Title V of the Act, 42 U.S.C. §§ 7661-7661f, and the federally enforceable Wisconsin State Implementation Plan ("Wisconsin SIP");

WHEREAS, the United States provided DPC and Wisconsin with actual notice pertaining to DPC's alleged violations, in accordance with Section 113(a)(1) and (b) of the Act, 42 U.S.C. § 7413(a)(1) and (b);

WHEREAS, in their Complaints, the United States and Sierra Club (hereinafter "Plaintiffs") allege, *inter alia,* that DPC made major modifications to major emitting facilities, and failed to obtain the necessary permits and install and operate the controls necessary under the Act to reduce sulfur dioxide ("$SO_2$"), oxides of nitrogen ("$NO_x$") and/or particulate matter ("PM") emissions at certain electricity generating stations located in Wisconsin, and that such emissions damage human health and the environment;

WHEREAS, the Sierra Club alleges in its Amended Complaint, Case 10-cv-303 (Dkt. # 71), that DPC exceeded its Opacity permit limits at the Alma, Genoa, and J.P. Madgett Units, and its Carbon Monoxide (CO) permit limits at the J.P. Madgett Unit;

WHEREAS, in the Complaints, the Plaintiffs collectively allege claims upon which relief can be granted against DPC under Sections 113, 167, and 304 of the Act, 42 U.S.C. §§ 7413, 7477, and 7604;

WHEREAS, DPC has denied and continues to deny the violations alleged in the Complaints; maintains that it has been and remains in compliance with the Act and is not liable for civil penalties or injunctive relief; and states that it is agreeing to the obligations imposed by this Decree solely to avoid the costs and uncertainties of litigation and nothing herein shall constitute an admission of liability;

WHEREAS, the Plaintiffs and DPC (collectively, the "Parties") have agreed that settlement of these actions is in the best interests of the Parties and in the public interest, and that entry of this Consent Decree without further litigation is the most appropriate means of resolving these matters;

WHEREAS, the Parties anticipate that the installation and operation of pollution control equipment and practices pursuant to this Consent Decree and the retirement of certain facilities required by this Consent Decree will achieve significant reductions of $SO_2$, $NO_x$, and PM emissions and improve air quality;

WHEREAS, the Parties have agreed, and this Court by entering this Consent Decree finds, that this Consent Decree has been negotiated in good faith and at arm's length and that this Consent Decree is fair, reasonable, in the public interest, and consistent with the goals of the Act;

WHEREAS, DPC has cooperated in the resolution of these matters; and

2

WHEREAS, the Parties have consented to entry of this Consent Decree without trial of any issues;

NOW, THEREFORE, without any admission of fact or law, it is hereby ORDERED, ADJUDGED, AND DECREED as follows:

## I.      JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action, the subject matter herein, and the Parties consenting hereto, pursuant to 28 U.S.C. §§ 1331, 1345, 1355, and 1367, and pursuant to Sections 113, 167, and 304 of the Act, 42 U.S.C. §§ 7413, 7477, and 7604.  Venue is proper under Sections 113(b) and 304(c) of the Act, 42 U.S.C. §§ 7413(b) and 7604(c), and under 28 U.S.C. § 1391(b) and (c).  Solely for the purposes of this Consent Decree and the underlying Complaint, and for no other purpose, DPC waives all objections and defenses that it may have to the Court's jurisdiction over this action, to the Court's jurisdiction over DPC, and to venue in this district.   DPC consents to and shall not challenge entry of this Consent Decree or this Court's jurisdiction to enter and enforce this Consent Decree.  Except as expressly provided for herein, this Consent Decree shall not create any rights in or obligations of any party other than the Parties to this Consent Decree.  Except as provided in Section XXVI (Public Comment/Agency Review) of this Consent Decree, the Parties consent to entry of this Consent Decree without further notice.

## II.      APPLICABILITY

2.      Upon entry, the provisions of this Consent Decree shall apply to and be binding upon the Parties, their successors and assigns, and upon DPC's directors, officers, employees, servants, and agents solely in their capacities as such.

3

3.      DPC shall provide a copy of this Consent Decree to all vendors, suppliers, consultants, contractors, agents, and any other company or other organization retained to perform any of the work required by this Consent Decree.  Notwithstanding any retention of contractors, subcontractors, or agents to perform any work required under this Consent Decree, DPC shall be responsible for ensuring that all work is performed in accordance with the requirements of this Consent Decree.  In any action to enforce this Consent Decree, except as expressly provided herein (i.e., Section XV Force Majeure), DPC shall not assert as a defense the failure of its officers, directors, employees, servants, agents, or contractors to take actions necessary to comply with this Consent Decree.

## III.    DEFINITIONS

4.      Every term expressly defined by this Section shall have the meaning given that term herein. Every other term used in this Consent Decree that is also a term used under the Act or in a federal regulation implementing the Act shall mean in this Consent Decree what such term means under the Act or those regulations.

5.      A "12-Month Rolling Average Emission Rate" shall be expressed in lb/mmBTU and calculated in accordance with the following procedure:  first, sum the pounds of the pollutant in question emitted from the applicable plant during the most recent complete month and the previous 11 months; second, sum the heat input to the applicable plant in mmBTU during the most recent complete month and the previous 11 months; and third, divide the total number of pounds of the pollutant emitted during the 12 months by the total heat input during the 12 months.  A new 12-Month Rolling Average Emission Rate shall be calculated for each new complete month in accordance with the provisions of this Consent Decree.  Each 12-Month

4

Rolling Average Emission Rate shall include all emissions that occur during all periods of operation, including startup, shutdown, and Malfunction.

6.    A "30-Day Rolling Average $NO_x$ Emission Rate" for a Unit shall be expressed in lb/mmBTU and calculated in accordance with the following procedure:  first, sum the total pounds of $NO_x$ emitted from the Unit during the current Unit Operating Day and the previous 29 Unit Operating Days; second, sum the total heat input to the Unit in mmBTU during the current Unit Operating Day and the previous 29 Unit Operating Days; and third, divide the total number of pounds of $NO_x$ emitted during the 30 Unit Operating Days by the total heat input during the 30 Unit Operating Days.  A new 30-Day Rolling Average $NO_x$ Emission Rate shall be calculated for each new Unit Operating Day.  Each 30-Day Rolling Average $NO_x$ Emission Rate shall include all emissions that occur during all periods within any Unit Operating Day, including emissions from startup, shutdown, and Malfunction.

7.    A "30-Day Rolling Average $SO_2$ Emission Rate" for a Unit shall be expressed in lb/mmBTU and calculated in accordance with the following procedure: first, sum the total pounds of $SO_2$ emitted from the Unit during the current Unit Operating Day and the previous 29 Unit Operating Days; second, sum the total heat input to the Unit in mmBTU during the current Unit Operating Day and the previous 29 Unit Operating Days; and third, divide the total number of pounds of $SO_2$ emitted during the 30 Unit Operating Days by the total heat input during the 30 Unit Operating Days.  A new 30-Day Rolling Average $SO_2$ Emission Rate shall be calculated for each new Unit Operating Day.  Each 30-Day Rolling Average $SO_2$ Emission Rate shall include all emissions that occur during all periods within any Unit Operating Day, including emissions from startup, shutdown, and Malfunction.

8.      "Alma Site" means DPC's facilities at Alma, Wisconsin, including Alma and J.P. Madgett, as regulated by the current Title V operating permit #606034110-P21.

9.      "Alma" means, solely for purposes of this Consent Decree, Dairyland's Alma Generating Station, consisting of the following coal-fired boilers designated as Unit 1 (22 MW), Unit 2 (22 MW), Unit 3 (22 MW), Unit 4 (64 MW) and Unit 5 (88 MW) and related equipment, which is located in Buffalo County, Wisconsin.

10.     "Baghouse" means a full stream (fabric filter or membrane) particulate emissions control device.

11.     "Cease(s) Burning Coal" or "Ceasing Burning Coal" or "Ceased Burning Coal" means that DPC shall permanently cease burning coal in the Unit and shall submit all necessary permit applications and requests for authorization to reflect the permanent cessation of coal burning at such Unit.  DPC can only subsequently operate such a Unit if it is Repowered within the meaning of this Consent Decree, and DPC obtains all required CAA permit(s) for the Repowered Unit, including an appropriate permit pursuant to CAA Subchapter I, Parts C and D, and Wis. Admin Code chs. NR 405, 406 and 408.

12.      "CEMS" or "Continuous Emission Monitoring System," means, for obligations involving the monitoring of $NO_x$, $SO_2$, and PM emissions under this Consent Decree, the devices defined in 40 C.F.R. § 72.2 and installed and maintained as required by 40 C.F.R. Parts 60 and 75.

13.     "Clean Air Act" or "Act" or "CAA" means the federal Clean Air Act, 42 U.S.C. §§ 7401-7671q, and its implementing regulations.

14.     "Consent Decree" means this Consent Decree and the Appendices hereto, which are incorporated into the Consent Decree.

6

15.     "Continuously Operate" or "Continuous Operation" means that when a pollution control technology or combustion control is required to be used at a Unit pursuant to this Consent Decree (including, but not limited to, SCR, SNCR, FGD, DSI, ESP (only Alma Unit 4 and Alma Unit 5, as G-3 and J.P. Madgett are controlled by Baghouses), Baghouse, or Low $NO_x$ Combustion System), it shall be operated at all times such Unit is in operation, except as otherwise provided by Section XV (Force Majeure), so as to minimize emissions to the greatest extent practicable, consistent with the technological limitations, manufacturers' specifications, and good engineering and maintenance practices for such equipment and the Unit.

16.     "Date of Entry" means the date this Consent Decree is approved or signed by the United States District Court Judge.

17.     "Date of Lodging" means the date this Consent Decree is filed for lodging with the Clerk of the Court for the United States District Court for the Western District of Wisconsin.

18.     "Day" means calendar day unless otherwise specified in this Consent Decree.

19.     "DPC" or "Dairyland" or "Defendant" means Dairyland Power Cooperative.

20.     "DPC System" means the Alma, Genoa, and J.P. Madgett Generating Stations.

21.     "Dry Sorbent Injection" or "DSI" means an add-on air pollution control system in which sorbent (e.g., Trona, hydrated lime, sodium carbonate, etc.) is injected into the flue gas stream upstream of a PM Control Device to react with and neutralize acid gases (such as $SO_2$ and HCl) in the exhaust stream forming a dry powder material that may be removed in a primary or secondary PM Control Device.

22.     "Electrostatic Precipitator" or "ESP" means a device for removing particulate matter from combustion gases by imparting an electric charge to the particles and then attracting

them to a metal plate or screen of opposite charge before the combustion gases are exhausted to the atmosphere.

23. "Emission Rate" for a given pollutant means the number of pounds of that pollutant emitted per million British thermal units of heat input (lb/mmBTU), measured in accordance with this Consent Decree.

24. "Environmental Mitigation Projects" or "Projects" means the projects set forth in Section IX and Appendix A of this Consent Decree.

25. "EPA" means the United States Environmental Protection Agency.

26. "Flue Gas Desulfurization System" or "FGD" means a pollution control device that employs flue gas desulfurization technology, including an absorber or absorbers utilizing lime, limestone, or a sodium-based slurry, for the reduction of $SO_2$ emissions. A "dry" FGD means an add-on air pollution control system located downstream of the steam generating unit that sprays an alkaline sorbent slurry (spray dryer) to react with and neutralize acid gases such as $SO_2$ and HCl in the exhaust stream forming a dry powder material.

27. "Fossil Fuel" means any hydrocarbon fuel, including coal, petroleum coke, petroleum oil, or natural gas.

28. "G-3" or "Genoa" means, solely for purposes of this Consent Decree, DPC's Genoa Generating Station consisting of one tangentially-fired boiler designated as Station #3 (396 Gross MW) and related equipment, which is located in Vernon County, Wisconsin.

29. "Greenhouse Gases" means the air pollutant defined at 40 C.F.R. § 86.1818-12(a) as of the Date of Lodging of this Consent Decree as the aggregate group of six greenhouse gases: carbon dioxide, nitrous oxide, methane, hydrofluorocarbons, perfluorocarbons, and sulfur

hexafluoride.  This definition continues to apply even if 40 C.F.R. § 86.1818-12(a) is

subsequently revised, stayed, vacated, or otherwise modified.

30.     "J.P. Madgett" or "Madgett" means, solely for purposes of this Consent Decree,

Dairyland's J.P. Madgett Generating Station consisting of one dry-bottom wall-fired boiler (424

Gross MW) and related equipment, which is located in Buffalo County, Wisconsin.

31.     "lb/mmBTU" means pound per million British thermal units

32.      "Low $NO_x$ Combustion System" means burners and associated combustion air

control equipment, including overfire air (if installed at the Unit), which control mixing

characteristics of Fossil Fuel and oxygen, thus restraining the formation of $NO_x$ during

combustion of fuel in the boiler.

33.     "Malfunction" means a failure to operate in a normal or usual manner by any air

pollution control equipment, process equipment, or a process, which is sudden, infrequent, and

not reasonably preventable.  Failures that are caused in part by poor maintenance or careless

operation are not Malfunctions.

34.     "Netting" shall mean the process of determining whether a particular physical

change or change in the method of operation of a major stationary source results in a "net

emissions increase," as that term is defined at 40 C.F.R. § 52.21(b)(3)(i) and in the Wisconsin

SIP.

35.     "$NO_x$" means oxides of nitrogen, measured in accordance with the provisions of

this Consent Decree.

36.     "$NO_x$ Allowance" means an authorization to emit a specified amount of $NO_x$ that

is allocated or issued under an emissions trading or marketable permit program of any kind that

has been established under the Act or the Wisconsin SIP; provided, however, that a "$NO_x$

9

Allowance" shall only include an allowance allocated to DPC under the Cross-State Air Pollution Rule (CSAPR) (76 Fed. Reg. 48208 (August 8, 2011) (as amended)) *after* the earlier of (a) December 31 of the year in which EPA approves the Wisconsin SIP for CSAPR, or (b) December 31, 2015.

37.     "Nonattainment NSR" means the new source review program within the meaning of Part D of Subchapter I of the Act, 42 U.S.C. §§ 7501-7515 and 40 C.F.R. Part 51, and corresponding provisions of the federally enforceable Wisconsin SIP.

38.     "Operational or Ownership Interest" means part or all of DPC's legal or equitable ownership interest in any Unit ("Ownership Interest") or the right to be the operator (as that term is used and interpreted under the Act) of any Unit.

39.     "Parties" means the United States of America on behalf of EPA, the Sierra Club, and DPC.  "Party" means one of the named "Parties."

40.     "PM" means total filterable particulate matter, measured in accordance with the provisions of this Consent Decree.

41.     "PM CEMS" or "PM Continuous Emission Monitoring System" means, for obligations involving the monitoring of PM emissions under this Consent Decree, the equipment that samples, analyzes, measures, and provides, by readings taken at frequent intervals, an electronic and/or paper record of PM emissions.

42.     "PM Control Device" means any device, including an ESP or Baghouse, which reduces emissions of PM.

43.     "PM Emission Rate" means the number of pounds of PM emitted per million BTU of heat input (lb/mmBTU).

44.     "Plant-Wide Annual Tonnage Cap" at Alma Units 4 and 5 means the sum of the tons of pollutant in question emitted from Alma Units 4 and 5 including, without limitations, all tons of that pollutant emitted during periods of startup, shutdown, and Malfunction, in the designated year.

45.     "Prevention of Significant Deterioration" or "PSD" means the new source review program within the meaning of Part C of Subchapter I of the Act, 42 U.S.C. §§ 7470-7492 and 40 C.F.R. Part 52, and corresponding provisions of the federally enforceable Wisconsin SIP.

46.     "Project Dollars" means DPC's expenditures and payments incurred or made in carrying out the Environmental Mitigation Projects identified in Section IX (Environmental Mitigation Projects) of this Consent Decree to the extent that such expenditures or payments both: (a) comply with the requirements set forth in Section IX and Appendix A of this Consent Decree, and (b) constitute DPC's direct payments for such projects, or DPC's external costs for contractors, vendors, and equipment.

47.     "Removal Efficiency" for a given pollutant means the percentage of that pollutant removed that the applicable emission control device has been designed for and has been demonstrated to achieve.

48.     "Repower" or "Repowered" means that a Unit is Repowered to Natural Gas or Repowered to Another Non-Fossil Fuel Approved by EPA within the meaning of this Consent Decree.

49.     "Repower to Natural Gas" or "Repowered to Natural Gas" means, solely for purposes of this Consent Decree, the permanent decommissioning of devices, systems, equipment, and ancillary or supporting systems (collectively, "Equipment") such that a Unit cannot be fired with coal and/or petroleum coke, and the installation of all Equipment needed to

11

fire the Unit with natural gas containing no more than 0.5 grains of sulfur per 100 standard cubic feet of natural gas, including installation of the following combustion controls to reduce emissions of NOx: low-NOx natural gas burners, an overfire air system, and flue gas recirculation.

50.    "Repower to Another Non-Fossil Fuel Approved by EPA" or "Repowered to Another Non-Fossil Fuel Approved by EPA" means, solely for purposes of this Consent Decree, the permanent decommissioning of devices, systems, equipment, and ancillary or supporting systems (collectively, "Equipment") such that a Unit cannot be fired with coal and/or petroleum coke, and the installation of all Equipment needed to fire the Unit with a non-fossil fuel approved by EPA pursuant to Section XIII (Review and Approval of Submittals).

51.    "SCR" or "Selective Catalytic Reduction" means a pollution control device for reducing $NO_x$ emissions through the use of selective catalytic reduction technology.

52.    "SNCR" or "Selective Non-Catalytic Reduction" means a pollution control device for the reduction of $NO_x$ emissions through the use of selective non-catalytic reduction technology that utilizes ammonia or urea injection into the boiler.

53.    "$SO_2$" means sulfur dioxide, measured in accordance with the provisions of this Consent Decree.

54.    "$SO_2$ Allowance" means an authorization or credit to emit a specified amount of $SO_2$ that is allocated or issued under an emissions trading or marketable permit program of any kind that has been established under the Act or the Wisconsin SIP; provided, however, that a "$SO_2$ Allowance" shall only include an allowance allocated to DPC under the Cross-State Air Pollution Rule (CSAPR) (76 Fed. Reg. 48208 (August 8, 2011)(as amended)) *after* the earlier of

(a) December 31 of the year in which EPA approves the Wisconsin SIP for CSAPR, or (b) December 31, 2015.

55.     "State" means the State of Wisconsin.

56.     "Super-Compliant Allowance" means a $NO_x$ Allowance or $SO_2$ Allowance attributable to reductions beyond the requirements of this Consent Decree, as described in Paragraphs 92 and 111.

57.     "Surrender" or "Surrender of Allowances" means, for purposes of $SO_2$ or $NO_x$ Allowances, permanently surrendering allowances from the accounts administered by EPA and Wisconsin for all Units in the DPC System, so that such allowances can never be used thereafter to meet any compliance requirements under the Act, a state implementation plan, or this Consent Decree.

58.     "System-Wide Annual $NO_x$ Tonnage Limitation" means the limitations, as specified in this Consent Decree, on the number of tons of $NO_x$ that may be emitted from J.P. Madgett, G-3, Alma Unit 4, and Alma Unit 5, collectively, during the relevant year (i.e., June 1 through May 31), and shall include all emissions of $NO_x$ during all periods of operations, including startup, shutdown, and Malfunction.

59.     "System-Wide Annual $SO_2$ Tonnage Limitation" means the limitations, as specified in this Consent Decree, on the number of tons of $SO_2$ that may be emitted from J.P. Madgett, G-3, Alma Unit 4, and Alma Unit 5, collectively, during the relevant year (i.e., June 1 through May 31), and shall include all emissions of $SO_2$ during all periods of operations, including startup, shutdown, and Malfunction.

60.     "Title V Permit" means the permit required of DPC's major sources pursuant to Subchapter V of the Act, 42 U.S.C. §§ 7661-7661e.

13

61.     "Unit" means collectively, the coal pulverizer, stationary equipment that feeds coal to the boiler, the boiler that produces steam for the steam turbine, the steam turbine, the generator, the equipment necessary to operate the generator, steam turbine, and boiler, and all ancillary equipment, including pollution control equipment and systems necessary for production of electricity, constituting an electric steam generating station in the DPC System.  An electric steam generating station may comprise one or more Units.

62.     "Unit Operating Day" means, for J.P. Madgett, any Day on which J.P. Madgett fires Fossil Fuel; for G-3, any Day on which G-3 fires Fossil Fuel; for Alma Unit 4, any Day on which Alma Unit 4 fires Fossil Fuel; and, for Alma Unit 5, any Day on which Alma Unit 5 fires Fossil Fuel.

63.     "Unit-Specific Annual Tonnage Cap" for a Unit means the sum of the tons of pollutant in question emitted from the Unit including, without limitations, all tons of that pollutant emitted during periods of operation, startup, shutdown, and Malfunction, in the designated year.  Where multiple Units are exhausted through a single stack, and where a common CEMS is allowed by federal regulation, Unit specific emissions shall be determined by the methodology provided in 40 C.F.R. Part 75.

64.     "Wisconsin SIP" means the Wisconsin State Implementation Plan, and any amendments thereto, as approved by EPA pursuant to Section 110 of the Act, 42 U.S.C. § 7410.

## IV.     REQUIREMENT TO CEASE BURNING COAL

65.     By no later than the Date of Entry, DPC shall Cease Burning Coal in the boilers of Alma Units 1, 2 and 3 and, by no later than June 30, 2012, Dairyland shall amend any submissions to Wisconsin's air emissions inventory, and apply to amend all applicable permits, so as to reflect the permanent cessation of coal burning at Alma Units 1, 2, and 3.

14

66.     By no later than December 31, 2014, DPC shall (a) Cease Burning Coal in the boiler of Alma Unit 4, and (b) amend any submissions to Wisconsin's air emissions inventory, and apply to amend all applicable permits, so as to reflect the fact that Alma Unit 4 has permanently Ceased Burning Coal, unless DPC notifies Plaintiffs in writing on or before December 31, 2012 that it is electing to instead comply with the requirements set forth in Paragraphs 83, 102, and 119 of this Consent Decree.  If DPC timely makes such election, it may comply with the requirements of Paragraphs 83, 102, and 119 instead of Ceasing Burning Coal at Alma Unit 4 under this Paragraph.

67.     DPC may operate a Unit that Ceases Burning Coal as required by this Section only if it first Repowers the Unit as defined in this Consent Decree, obtains an appropriate PSD permit from the State of Wisconsin for the Repowered Unit, and operates in compliance with the Emission Rates set forth in Paragraphs 49 or 50 (as applicable).  If DPC chooses to Repower to Another Non-Fossil Fuel Approved by EPA, DPC shall provide a written request to EPA for approval of such Repowering prior to submitting any required CAA permit for the Repowered Unit.

68.     Nothing in this Consent Decree is intended to prevent DPC from also Ceasing to Burn Coal in the boiler of any Unit or Repowering any Unit in addition to the Units identified in Paragraphs 65 and 66.  If DPC Ceases Burning Coal in a boiler at any Unit in the DPC System prior to the date that this Consent Decree would otherwise require DPC to install and operate pollution controls on such Unit, nothing in this Consent Decree requires DPC to also install and operate such additional pollution controls.

69.     Nothing in this Consent Decree is intended to prevent DPC from choosing to use an existing turbine-generator set from a Unit that has Ceased Burning Coal in its boiler to

produce electricity utilizing steam from a new or existing unit.  However, any newly constructed or reconstructed boiler or other newly constructed or reconstructed combustion source that is connected to a turbine-generator set from a Unit that has Ceased Burning Coal shall obtain a permit as a new emissions unit per applicable and appropriate PSD and/or Nonattainment NSR permitting requirements and the corresponding provisions in the Wisconsin SIP.

## V.     NOₓ EMISSION REDUCTIONS AND CONTROLS

### A.     Installation, Operation and Performance NOx Requirements at J.P. Madgett

70.     Commencing 30 Unit Operating Days after the Date of Entry of the Consent Decree, and continuing thereafter, DPC shall Continuously Operate the existing Low NOx Combustion System at J.P. Madgett so that it achieves and maintains a 30-Day Rolling Average $NO_x$ Emission Rate of no greater than 0.300 lb/mmBTU.

71.     DPC shall install an SCR at J.P. Madgett and, commencing on June 30, 2016 and continuing thereafter, DPC shall Continuously Operate such SCR so that it achieves and maintains a 30-Day Rolling Average $NO_x$ Emission Rate of no greater than 0.080 lb/mmBTU. During any 30-Day period used to calculate a 30-Day Rolling Average $NO_x$ Emission Rate for J.P. Madgett, if the dispatch of the Unit requires operation of such Unit at a load level that results in flue gas temperature so low that it becomes technically infeasible to Continuously Operate the SCR despite DPC's best efforts to do so (including, but not limited to, maintaining minimum load operation which provides for achieving sufficient inlet temperatures for injection of ammonia to the SCR), DPC shall not be subject to stipulated penalties pursuant to Section XIV (Stipulated Penalties) for violating the Emission Rate required by this Paragraph provided that DPC's emissions do not exceed a 30-Day Rolling Average $NO_x$ Emission Rate of 0.090 lb/mmBTU and DPC provides EPA with data and calculations to demonstrate that but for such

16

low load operation, DPC would have achieved and maintained a 30-Day Rolling Average $NO_x$ Emission Rate of no greater than 0.080 lb/mmBTU at such Unit.

72.     With prior written request to the Plaintiffs and written approval from EPA (after consultation by EPA with the Sierra Club), DPC may, in lieu of installing and operating SCR at J.P. Madgett, install and operate alternate equivalent $NO_x$ control technology that has been designed for and has been demonstrated to achieve at least 90 percent $NO_x$ Removal Efficiency and a 30-Day Rolling Average Emission Rate of not greater than 0.080 lb/mmBTU. If DPC elects to request approval of alternate equivalent technology under this Paragraph, DPC shall provide the written request to the Plaintiffs by no later than December 31, 2013. DPC shall commence operation of the alternate equivalent $NO_x$ control technology at J.P. Madgett by June 30, 2016, and shall thereafter Continuously Operate such equivalent $NO_x$ control technology so as to achieve and maintain a 30-Day Rolling Average Emission Rate for $NO_x$ of not greater than 0.080 lb/mmBTU. EPA, after consultation with Sierra Club, will make its decision under this section after review of the written request by DPC as soon as reasonably practicable.

B.     **Selective Non-Catalytic Reduction Installation, Operation, and Performance Requirements at G-3**

73.     Commencing 30 Unit Operating Days after the Date of Entry of the Consent Decree, and continuing thereafter, DPC shall Continuously Operate the existing Low NOx Combustion System (including overfire air) at G-3.

74.     Commencing 30 Unit Operating Days after the Date of Entry of the Consent Decree, and continuing through December 30, 2012, DPC shall Continuously Operate the existing Low NOx Combustion System (including overfire air) at G-3 so that it achieves and maintains a 30-Day Rolling Average $NO_x$ Emission Rate of no greater than 0.200 lb/mmBTU.

17

75.     Commencing on December 31, 2012, and continuing through December 30, 2014, DPC shall Continuously Operate the existing Low NOx Combustion System (including overfire air) at G-3 so that it achieves and maintains a 30-Day Rolling Average $NO_x$ Emission Rate of no greater than 0.180 lb/mmBTU.

76.     Commencing on December 31, 2014, and continuing thereafter, DPC shall Continuously Operate the existing Low NOx Combustion System (including overfire air) at G-3 so that it achieves and maintains a 30-Day Rolling Average $NO_x$ Emission Rate of no greater than 0.140 lb/mmBTU.

77.     DPC shall install SNCR at G-3 and, commencing on June 1, 2015 and continuing thereafter, DPC shall Continuously Operate such SNCR.

78.     For the period commencing on June 1, 2015 and continuing through May 31, 2016, and each June 1 through May 31 thereafter, DPC shall not exceed a Unit-Specific Annual Tonnage Cap of 1,140 tons of $NO_x$ per year at G-3.

C.     **Installation, Operation and Performance Requirements for NOx Controls, and Limitations on NOx Emissions at Alma Units 4 and 5**

79.     Commencing on the Date of Entry of the Consent Decree, and continuing thereafter, DPC shall Continuously Operate the existing Low NOx Combustion System (including overfire air) and SNCRs at Alma Unit 4 and Alma Unit 5.

80.     Commencing 30 Unit Operating Days after the Date of Entry of the Consent Decree, and continuing thereafter, DPC shall Continuously Operate the existing Low NOx Combustion System (including overfire air) and SNCRs at Alma Unit 4 and Alma Unit 5 so as to achieve and maintain a 30-Day Rolling Average $NO_x$ Emission Rate of no greater than 0.350 lb/mmBTU.

18

81.     For the period commencing on June 1, 2012 and continuing through May 31, 2013, DPC shall not exceed a Unit-Specific Annual Tonnage Cap of 748 tons of $NO_x$ per year at Alma Unit 5, and a Plant-Wide Annual Tonnage Cap of 1,308 tons of $NO_x$ per year at Alma Units 4 and 5.

82.     By no later than December 31, 2014, DPC shall Cease Burning Coal in the boiler at Alma Unit 4.  In addition, for the period commencing on June 1, 2013 and continuing through May 31, 2014, and each June 1 through May 31 thereafter, DPC shall not exceed a Unit-Specific Annual Tonnage Cap of 748 tons of $NO_x$ per year at Alma Unit 5; provided, however, that DPC may elect, pursuant to Paragraph 66, to comply with the alternate compliance option set forth in Paragraph 83 in lieu of the requirements set forth in this Paragraph.

83.     *Alternate Compliance Option*:  If DPC provides timely notice pursuant to Paragraph 66, DPC may, in lieu and instead of complying with the requirements set forth in Paragraph 82, comply with the following annual tonnage limitations:

a.      For the period commencing on June 1, 2012 and continuing through May 31, 2013, and each June 1 through May 31 thereafter until May 31, 2019, DPC shall not exceed a Plant-Wide Annual Tonnage Cap of 1,308 tons of $NO_x$ per year at Alma Units 4 and 5; provided that if either Alma Unit 4 or Alma Unit 5 Ceases Burning Coal then the other Unit (Alma Unit 4 or Alma Unit 5) that continues to burn coal shall meet a Unit-Specific Annual Tonnage Cap of 746 tons of $NO_x$ per year; and

b.      For the period commencing June 1, 2019 and continuing through May 31, 2020, and each June 1 through May 31 thereafter, DPC shall not exceed a Plant-Wide Annual Tonnage Cap of 785 tons of $NO_x$ per year at Alma Units 4 and 5;

19

provided that if either Alma Unit 4 or Alma Unit 5 Ceases Burning Coal then the other Unit (Alma Unit 4 or Alma Unit 5) that continues to burn coal shall meet a Unit-Specific Annual Tonnage Cap of 449 tons of $NO_x$ per year.

**D.    System-Wide Annual $NO_x$ Tonnage Limitations**

84.    The DPC System, collectively, shall operate so as not to exceed the following System-Wide Annual $NO_x$ Tonnage Limitations:

| For the 12-Month Period Specified Below: | System-Wide Annual NOx Tonnage Limitation: |
|---|---|
| June 1, 2012 to May 31, 2013 | 7,808 |
| June 1, 2013 to May 31, 2014 | 7,693 |
| June 1, 2014 to May 31, 2015 | 7,242 |
| June 1, 2015 to May 31, 2016 | 6,257 |
| June 1, 2016 to May 31, 2017 and continuing each 12-month period thereafter | 3,199 |

Provided, however, that if DPC provides timely notice that it elects to comply with the alternative compliance option pursuant to Paragraph 66, DPC shall, in lieu of complying with the System-Wide Annual $NO_x$ Tonnage Limitations set forth above, instead comply with the following System-Wide Annual $NO_x$ Tonnage Limitations:

| For the 12-Month Period Specified Below: | System-Wide Annual NOx Tonnage Limitation: |
|---|---|
| June 1, 2012 to May 31, 2013 | 7,821 |
| June 1, 2013 to May 31, 2014 | 7,707 |
| June 1, 2014 to May 31, 2015 | 7,482 |
| June 1, 2015 to May 31, 2016 | 6,817 |
| June 1, 2016 to May 31, 2017 | 3,748 |
| June 1, 2017 to May 31, 2018 | 3,748 |
| June 1, 2018 to May 31, 2019 | 3,748 |
| June 1, 2019 to May 31, 2020 and continuing each 12-month period thereafter | 3,236 |

**E.**      **Monitoring of NO$_x$ Emissions**

85.      In determining a 30-Day Rolling Average NO$_x$ Emission Rate, DPC shall use

NO$_x$ emission data obtained from a CEMS in accordance with the procedures of 40 C.F.R. Part

75, except that:  (1) NO$_x$ emissions data need not be bias adjusted; (2) for any CEMS with a span

less than 100 parts per million ("ppm"), the calibration drift and out-of-control criteria in

Procedure 1, section 4.3 of 40 C.F.R. Part 60, Appendix F shall apply in lieu of the specifications

in 40 C.F.R. Part 75, Appendix B; (3) for any CEMS with a span less than or equal to 30 ppm the

exemption from the 40 C.F.R. Part 75 linearity check will not apply and either the 40 C.F.R.

Part 75 linearity check or the cylinder gas audit described in Procedure 1, section 5.1.2 of 40

C.F.R. Part 60, Appendix F shall be performed on a quarterly basis; and (4) for any Unit

controlled by SCR, an annual relative accuracy test audit shall meet, at a minimum, a relative

accuracy of less than 20% or an accuracy of less than 0.015 lb/mmBTU (expressed as the

absolute difference between the monitor mean and the reference value mean).  The above

linearity checks need not be performed during a calendar quarter if the Unit operating time is less

than 168 hours as provided in 40 C.F.R. Part 75.

86.      For purposes of calculating the System-Wide Annual NO$_x$ Tonnage Limitation,

DPC shall use NO$_x$ emission data obtained from a CEMS in accordance with the procedures

specified in 40 C.F.R. Part 75.

**F.**      **Use and Surrender of NO$_x$ Allowances**

87.      Except as may be necessary to comply with Section XIV (Stipulated Penalties),

DPC shall not use NO$_x$ Allowances to comply with any requirement of this Consent Decree,

including by claiming compliance with any emission limitation required by this Consent Decree

by using, tendering, or otherwise applying NO$_x$ Allowances to offset any excess emissions.

21

88.     Except as provided in this Consent Decree, beginning in calendar year 2012 and continuing each calendar year thereafter, DPC shall not sell, bank, trade, or transfer any $NO_x$ Allowances allocated to the DPC System.

89.     Beginning in calendar year 2012, and continuing each calendar year thereafter, DPC shall Surrender all $NO_x$ Allowances allocated to the DPC System for that calendar year that DPC does not need in order to meet its own federal and/or state CAA regulatory requirements for (a) the DPC System Units, or (b) any electricity generating unit in the State of Wisconsin in which DPC has an Operational or Ownership Interest (i.e., Weston Unit 4, located in Marathon County, Wisconsin) that is subject to a federal consent decree entered by a U.S. District Court addressing PSD and/or Nonattainment NSR violations to which the United States is a party.

90.     Nothing in this Consent Decree shall prevent DPC from purchasing or otherwise obtaining $NO_x$ Allowances from another source for purposes of complying with federal and/or state CAA regulatory requirements to the extent otherwise allowed by law.

91.     The requirements of this Consent Decree pertaining to DPC's use and Surrender of $NO_x$ Allowances are permanent injunctions not subject to any termination provision of this Consent Decree.

**G.      Super-Compliant $NO_x$ Allowances**

92.     Notwithstanding Paragraphs 88 and 89, in each calendar year beginning in 2012, and continuing thereafter, DPC may sell, bank, use, trade, or transfer $NO_x$ Allowances allocated to the DPC System that are made available in that calendar year solely as a result of:

a.      the installation and operation of any $NO_x$ air pollution control equipment that is not otherwise required by, or necessary to maintain compliance with, any provision of this Consent Decree, and is not otherwise required by law;

22

b.      the use of SCR or SNCR prior to the date established by this Consent Decree; or

c.      achievement and maintenance of an Emission Rate below an applicable 30-Day Rolling Average $NO_x$ Emission Rate;

provided that DPC is also in compliance for that calendar year with all emission limitations for $NO_x$ set forth in this Consent Decree.  DPC shall timely report the generation of such Super-Compliant Allowances in accordance with Section XII (Periodic Reporting) of this Consent Decree.

**H.      Method for Surrender of $NO_x$ Allowances**

93.     DPC shall Surrender all $NO_x$ Allowances required to be Surrendered pursuant to Paragraph 89 by June 30 of the immediately following calendar year.

94.     For all $NO_x$ Allowances required to be Surrendered, DPC shall first submit a $NO_x$ Allowance transfer request form to EPA's Office of Air and Radiation's Clean Air Markets Division directing the transfer of such $NO_x$ Allowances to the EPA Enforcement Surrender Account or to any other EPA account that EPA may direct in writing.  As part of submitting these transfer requests, DPC shall irrevocably authorize the transfer of these $NO_x$ Allowances and identify – by name of account and any applicable serial or other identification numbers or station names – the source and location of the $NO_x$ Allowances being Surrendered.

**VI.      $SO_2$ EMISSION REDUCTIONS AND CONTROLS**

**A.      $SO_2$ Emission Limitations and Control Performance Requirements at J.P. Madgett**

95.     For the 12-month period commencing on December 31, 2012, and continuing through December 31, 2014, DPC shall achieve and maintain a 12-Month Rolling Average Emission Rate for $SO_2$ of no greater than 0.900 lb/mmBTU from J.P. Madgett.

96.     DPC shall install a dry FGD at J.P. Madgett and, commencing on December 31, 2014 and continuing thereafter, DPC shall Continuously Operate such FGD so that it achieves and maintains a 30-Day Rolling Average $SO_2$ Emission Rate of no greater than 0.090 lb/mmBTU.

97.     With prior written notice to EPA, DPC may, in lieu of installing and operating an FGD at J.P. Madgett pursuant to Paragraph 96, install and operate DSI that has been designed for and has been demonstrated to achieve at least 95 percent $SO_2$ removal efficiency and a 30-Day Rolling Average $SO_2$ Emission Rate of no greater than 0.080 lb/mmBTU.  If DPC elects to install such DSI, DPC shall provide such written notice by June 30, 2012, and, commencing on May 1, 2014 and continuing thereafter, DPC shall Continuously Operate such DSI so as to achieve and maintain a 30-Day Rolling Average $SO_2$ Emission Rate of not more than 0.090 lb/mmBTU.  If, during the period beginning May 1, 2014 and ending April 30, 2015, DPC fails to Continuously Operate such DSI so that it achieves and maintains a 30-Day Rolling Average $SO_2$ Emission Rate of not more than 0.090 lb/mmBTU, then, in addition to any other remedies that may be available to Plaintiffs, DPC shall (a) install a dry FGD at J.P. Madgett and, commencing no later than December 31, 2018 and continuing thereafter, DPC shall Continuously Operate such FGD so as to achieve and maintain a 30-Day Rolling Average $SO_2$ Emission Rate of not more than 0.090 lb/mmBTU; and (b) continue to Continuously Operate the installed DSI so as to achieve and maintain a 30-Day Rolling Average $SO_2$ Emission Rate of not more than 0.090 lb/mmBTU until the dry FGD is in operation.

**B.      SO$_2$ Emission Limitations and Control Performance Requirements at G-3**

98.     Commencing no later than six months after the Date of Entry of this Consent Decree, and continuing through December 30, 2012, DPC shall Continuously Operate the

existing FGD on G-3, so as to achieve and maintain a 30-Day Rolling Average SO$_2$ Emission Rate of no greater than 0.100 lbs/mmBTU.

99.     Commencing on December 31, 2012, and continuing thereafter, DPC shall Continuously Operate the FGD on G-3, so as to achieve and maintain a 30-Day Rolling Average SO$_2$ Emission Rate of no greater than 0.090 lbs/mmBTU.

**C.     SO$_2$ Emission Limitations and Control Requirements at Alma Units 4 and 5**

100.     DPC shall install either DSI or a dry FGD at Alma Unit 5, and commencing no later than 30 months after the Date of Entry of this Consent Decree, and continuing thereafter, DPC shall Continuously Operate such DSI or dry FGD on Alma Unit 5 so that it achieves and maintains a 30-Day Rolling Average SO$_2$ Emission Rate of no greater than 1.00 lb/mmBTU.

101.     By no later than December 31, 2014, DPC shall Cease Burning Coal in the boiler at Alma Unit 4.  In addition, for the period commencing on June 1, 2013 and continuing through May 31, 2014, DPC shall not exceed a Unit-Specific Annual Tonnage Cap of 3,452 tons of SO$_2$ per year at Alma Unit 5, and for the period commencing on June 1, 2014 and continuing through May 31, 2015, and each June 1 through May 31 thereafter, DPC shall not exceed a Unit-Specific Annual Tonnage Cap of 2,136 tons of SO$_2$ per year at Alma Unit 5.  Provided, however, that DPC may elect, pursuant to Paragraph 66, to comply with the alternate requirements set forth in Paragraph 102 in lieu of the requirements set forth in this Paragraph.

102.     *Alternate Compliance Option*.  If DPC provides timely notice pursuant to Paragraph 66, DPC may, in lieu and instead of complying with the requirements set forth in Paragraph 101, comply with the following requirements:

a.     DPC shall install either DSI or a dry FGD at Alma Unit 4, and commencing no later than 30 months after the Date of Entry of this Consent Decree, and

25

continuing thereafter, DPC shall Continuously Operate such DSI or FGD on Alma Unit 4 so that it achieves and maintains a 30-Day Rolling Average $SO_2$ Emission Rate of no greater than 1.00 lb/mmBTU;

b.      For the period commencing on June 1, 2013 and continuing through May 31, 2014, DPC shall not exceed a Plant-Wide Annual Tonnage Cap of 6,038 tons of $SO_2$ per year at Alma Units 4 and 5; provided that if either Alma Unit 4 or Alma Unit 5 Ceases Burning Coal then the other Unit (Alma Unit 4 or Alma Unit 5) that continues to burn coal shall meet a Unit-Specific Annual Tonnage Cap of 3,452 tons of $SO_2$ per year;

c.      For the period commencing June 1, 2014 and continuing through May 31, 2015, and each June 1 through May 31 thereafter until May 31, 2019, DPC shall not exceed a Plant-Wide Annual Tonnage Cap of 3,737 tons of $SO_2$ per year at Alma Units 4 and 5; provided that if either Alma Unit 4 or Alma Unit 5 Ceases Burning Coal then the other Unit (Alma Unit 4 or Alma Unit 5) that continues to burn coal shall meet a Unit-Specific Annual Tonnage Cap of 2,136 tons of $SO_2$ per year; and

d.      For the period commencing June 1, 2019 and continuing through May 31, 2020, and each June 1 through May 31 thereafter, DPC shall not exceed a Plant-Wide Annual Tonnage Cap of 2,242 tons of $SO_2$ per year at Alma Units 4 and 5; provided that if either Alma Unit 4 or Alma Unit 5 Ceases Burning Coal then the other Unit (Alma Unit 4 or Alma Unit 5) that continues to burn coal shall meet a Unit-Specific Annual Tonnage Cap of 1,282 tons of $SO_2$ per year.

26

### D. **System-Wide Annual SO$_2$ Tonnage Limitation.**

103.    The DPC System, collectively, shall operate so as not to exceed the following

System-Wide Annual SO$_2$ Tonnage Limitations:

| For the 12-Month Period Specified Below: | System-Wide Annual SO$_2$ Tonnage Limitation: |
|---|---|
| June 1, 2012 to May 31, 2013 | 24,570 |
| June 1, 2013 to May 31, 2014 | 20,067 |
| June 1, 2014 to May 31, 2015 | 11,303 |
| June 1, 2015 to May 31, 2016 and continuing each 12-month period thereafter | 4,472 |

Provided, however, that if DPC provides timely notice pursuant to Paragraph 66, DPC

shall, in lieu of complying with the System-Wide Annual SO$_2$ Tonnage Limitations set forth

above, instead comply with the following System-Wide Annual SO$_2$ Tonnage Limitations:

| For the 12-Month Period Specified Below: | System-Wide Annual SO$_2$ Tonnage Limitation: |
|---|---|
| June 1, 2012 to May 31, 2013 | 24,657 |
| June 1, 2013 to May 31, 2014 | 20,131 |
| June 1, 2014 to May 31, 2015 | 11,987 |
| June 1, 2015 to May 31, 2016 | 6,073 |
| June 1, 2016 to May 31, 2017 | 6,057 |
| June 1, 2017 to May 31, 2018 | 6,057 |
| June 1, 2018 to May 31, 2019 | 6,057 |
| June 1, 2019 to May 31, 2020 and continuing each 12-month period thereafter | 4,578 |

### E. **Monitoring of SO$_2$ Emissions**

104.    In determining a 30-Day Rolling Average SO$_2$ Emission Rate or a 12-Month

Rolling Average Emission Rate for SO$_2$, DPC shall use SO$_2$ emission data obtained from a

CEMS in accordance with the procedures of 40 C.F.R. Part 75, except that: (1) SO$_2$ emissions

data need not be bias adjusted; (2) for any CEMS with a span less than 100 ppm, the calibration

27

drift and out-of-control criteria in Procedure 1, section 4.3 of 40 C.F.R. Part 60, Appendix F shall

apply in lieu of the specifications in 40 C.F.R. Part 75, Appendix B; (3) for any CEMS with a

span less than or equal to 30 ppm the exemption from the 40 C.F.R. Part 75 linearity check will

not apply and either the 40 C.F.R. Part 75 linearity check or the cylinder gas audit described in

Procedure 1, section 5.1.2 of 40 C.F.R. Part 60, Appendix F shall be performed on a quarterly

basis; and (4) for any Unit controlled by FGD, an annual relative accuracy test audit shall meet,

at a minimum, a relative accuracy of less than 20% or an accuracy of less than 0.015 lb/mmBTU

(expressed as the absolute difference between the monitor mean and the reference value mean).

The above linearity checks need not be performed during a calendar quarter if the Unit operating

time is less than 168 hours as provided in 40 C.F.R. Part 75.

105.    For purposes of calculating the System-Wide Annual $SO_2$ Tonnage Limitation,

DPC shall use $SO_2$ emission data obtained from a CEMS in accordance with the procedures

specified in 40 C.F.R. Part 75.

### F.    Use and Surrender of $SO_2$ Allowances

106.    Except as may be necessary to comply with Section XIV (Stipulated Penalties),

DPC shall not use $SO_2$ Allowances to comply with any requirement of this Consent Decree,

including by claiming compliance with any emission limitation required by this Consent Decree

by using, tendering, or otherwise applying $SO_2$ Allowances to offset any excess emissions.

107.    Except as provided in this Consent Decree, beginning in calendar year 2012 and

continuing each calendar year thereafter, DPC shall not sell, bank, trade, or transfer any $SO_2$

Allowances allocated to the DPC System.

108.    Beginning in calendar year 2012, and continuing each calendar year thereafter,

DPC shall Surrender all $SO_2$ Allowances allocated to the DPC System for that calendar year that

28

DPC does not need in order to meet its own federal and/or state CAA regulatory requirements for (a) the DPC System Units, or (b) any electricity generating unit in the State of Wisconsin in which DPC has an Operational or Ownership Interest (i.e., Weston Unit 4, located in Marathon County, Wisconsin), that is subject to a federal consent decree entered by a U.S. District Court addressing PSD and/or Nonattainment NSR violations to which the United States is a party.

109.   Nothing in this Consent Decree shall prevent DPC from purchasing or otherwise obtaining $SO_2$ Allowances from another source for purposes of complying with federal and/or state CAA regulatory requirements to the extent otherwise allowed by law.

110.   The requirements of this Consent Decree pertaining to DPC's use and Surrender of $SO_2$ Allowances are permanent injunctions not subject to any termination provision of this Consent Decree.

**G.   Super-Compliant $SO_2$ Allowances**

111.   Notwithstanding Paragraphs 107 and 108, in each calendar year beginning in 2012, and continuing thereafter, DPC may sell, bank, use, trade, or transfer $SO_2$ Allowances made available in that calendar year solely as a result of:

a.   the installation and operation of any $SO_2$ air pollution control equipment that is not otherwise required by, or necessary to maintain compliance with, any provision of this Consent Decree, and is not otherwise required by law;

b.   the use of FGD or DSI prior to the date established by this Consent Decree; or

c.   achievement and maintenance of an Emission Rate below an applicable 30-Day Rolling Average $SO_2$ Emission Rate;

provided that DPC is also in compliance for that calendar year with all emission limitations for $SO_2$ set forth in this Consent Decree.  DPC shall timely report the generation of such Super-

29

Compliant Allowances in accordance with Section XII (Periodic Reporting) of this Consent Decree.

### H. Method for Surrender of $SO_2$ Allowances.

112. DPC shall Surrender all $SO_2$ Allowances required to be Surrendered pursuant to Paragraph 108 by June 30 of the immediately following calendar year.

113. For all $SO_2$ Allowances required to be Surrendered, DPC shall first submit an $SO_2$ Allowance transfer request form to EPA's Office of Air and Radiation's Clean Air Markets Division directing the transfer of such $SO_2$ Allowances to the EPA Enforcement Surrender Account or to any other EPA account that EPA may direct in writing. As part of submitting these transfer requests, DPC shall irrevocably authorize the transfer of these $SO_2$ Allowances and identify – by name of account and any applicable serial or other identification numbers or station names – the source and location of the $SO_2$ Allowances being Surrendered.

## VII. PM EMISSION REDUCTIONS AND CONTROLS

### A. Optimization of Baghouses and ESPs

114. Commencing 30 Unit Operating Days from the Date of Entry of this Consent Decree, and continuing thereafter, DPC shall Continuously Operate each PM Control Device on each Unit in the DPC System. Except as required during correlation testing under 40 C.F.R. Part 60, Appendix B, Performance Specification 11, and Quality Assurance Requirements under Appendix F, Procedure 2, as required by this Consent Decree, DPC shall, at a minimum, to the extent practicable: (a) fully energize each section of the ESP for Alma Units 4 and 5; operate each compartment of the Baghouse for G-3 and J.P. Madgett (regardless of whether those actions are needed to comply with opacity limits); and repair any failed ESP section or Baghouse compartment at the next planned Unit outage (or unplanned outage of sufficient length);

30

(b) operate automatic control systems on the ESPs for Alma Units 4 and 5 to maximize PM collection efficiency, where applicable; (c) maintain and replace bags on each Baghouse for G-3 and J.P. Madgett as needed to maximize collection efficiency, where applicable; (d) inspect for and repair during the next planned Unit outage (or unplanned outage of sufficient length) any openings in the Alma Units 4 and 5 ESP casings, ductwork and expansion joints to minimize air leakage; (e) maintain power levels delivered to the Alma Units 4 and 5 ESPs, consistent with manufacturers' specifications, the operational design of the Unit, and good engineering practices; and (f) optimize the plate-cleaning and discharge-electrode-cleaning systems for the Alma Units 4 and 5 ESPs at each Unit by varying the cycle time, cycle frequency, rapper-vibrator intensity, and number of strikes per cleaning event.

**B.**  **Operation and Performance Requirements for PM Controls at J.P. Madgett and G-3**

115.    Commencing 30 Unit Operating Days after the Date of Entry of the Consent Decree, and continuing thereafter, DPC shall Continuously Operate the existing Baghouse at G-3 so that it achieves and maintains a filterable PM Emission Rate of no greater than 0.0150 lb/mmBTU.

116.    Commencing 30 Unit Operating Days after the Date of Entry of the Consent Decree, and continuing thereafter, DPC shall Continuously Operate the existing Baghouse at J.P. Madgett so that it achieves and maintains a filterable PM Emission Rate of no greater 0.0150 lb/mmBTU.

**C.**  **Operation and Performance Requirements for PM Controls at Alma Units 4 and 5**

117.    Commencing no later than 30 months after the Date of Entry of this Consent Decree, and continuing thereafter, DPC shall Continuously Operate an ESP on Alma Unit 5 so

that it achieves and maintains a PM Emission Rate of no greater than 0.030 lb/mmBTU; provided that, if DPC installs a Baghouse at Alma Unit 5, DPC shall Continuously Operate the Baghouse so that such Unit achieves and maintains a filterable PM Emission Rate of no greater than 0.015 lb/mmBTU.

118.    By no later than December 31, 2014, DPC shall Cease Burning Coal in the boiler at Alma Unit 4.  In addition, for the period commencing on June 1, 2014 and continuing through May 31, 2015, and each June 1 through May 31 thereafter, DPC shall not exceed a Unit-Specific Annual Tonnage Cap of 64 tons of PM at Alma Unit 5; provided, however, that DPC may elect, pursuant to Paragraph 66, to comply with the alternate requirements set forth in Paragraph 119 in lieu of the requirements set forth in this Paragraph.

119.    *Alternate Compliance Option*.  If DPC provides timely notice pursuant to Paragraph 66, DPC may, in lieu and instead of complying with the requirements set forth in Paragraph 118, comply with the following requirements:

a.    Commencing no later than 30 months after the Date of Entry of this Consent Decree, and continuing thereafter, DPC shall Continuously Operate an ESP on Alma Unit 4 so that it achieves and maintains a filterable PM Emission Rate of no greater than 0.030 lb/mmBTU; provided that, if DPC installs a Baghouse at Alma Unit 4, DPC shall Continuously Operate the Baghouse so that such Unit achieves and maintains a filterable PM Emission Rate of no greater than 0.015 lb/mmBTU;

b.    For the period commencing on June 1, 2014 and continuing through May 31, 2015, and each June 1 through May 31 thereafter until May 31, 2019, DPC shall not exceed a Plant-Wide Annual Tonnage Cap of 112 tons of PM per year at Alma Units 4 and 5; provided that if either Alma Unit 4 or Alma Unit 5 Ceases

32

Burning Coal then the other Unit (Alma Unit 4 or Alma Unit 5) that continues to burn coal shall meet a Unit-Specific Annual Tonnage Cap of 64 tons of PM per year; and

c.     For the period commencing on June 1, 2019 and continuing through May 31, 2020, and each June 1 through May 31 thereafter, DPC shall not exceed a Plant-Wide Annual Tonnage Cap of 67 tons of PM per year at Alma Units 4 and 5; provided that if either Alma Unit 4 or Alma Unit 5 Ceases Burning Coal then the other Unit (Alma Unit 4 or Alma Unit 5) that continues to burn coal shall meet a Unit-Specific Annual Tonnage Cap of 39 tons of PM per year.

120.     Commencing in calendar year 2012, and continuing annually thereafter, DPC shall conduct a stack test for PM pursuant to Paragraph 121 for G-3, J.P. Madgett, Alma Unit 4, and Alma Unit 5, unless the Unit Ceases Burning Coal by December 31 of the prior calendar year, at which point this requirement shall no longer apply.

121.     To determine compliance with the filterable PM Emission Rate established in Paragraphs 115, 116, 117, and 119 (as applicable), DPC  shall use EPA Method 5 (filterable portion only), or any alternate method approved by EPA pursuant to Section XIII (Review and Approval of Submittals) of this Consent Decree.  Each test shall consist of three separate runs performed under representative operating conditions not including periods of startup, shutdown, or Malfunction.  The sampling time for each run shall be at least 120 minutes and the volume of each run shall be 1.70 dry standard cubic meters (60 dry standard cubic feet). DPC shall calculate the PM Emission Rate from the stack test results in accordance with 40 C.F.R. § 60.8(f).  The results of each PM stack test shall be submitted to Plaintiffs within 60 Days of completion of each test.

122.     Commencing in calendar year 2012, and continuing annually thereafter, DPC

shall also conduct a PM stack test for condensable PM at G-3, J.P. Madgett, Alma Unit 4, and

Alma Unit 5 using the reference methods and procedures set forth at 40 C.F.R. Part 51,

Appendix M, Method 202 or any alternate method approved by EPA under the terms of this

Consent Decree, unless the Unit Ceases Burning Coal by December 31 of the prior calendar

year, at which point this requirement shall no longer apply.  Each test shall consist of three

separate runs performed under representative operating conditions not including periods of

startup, shutdown, or Malfunction.  The sampling time for each run shall be at least 120 minutes

and the sample volume of each run shall be at least 1.70 dry standard cubic meters (60 dry

standard cubic feet).  DPC shall calculate the number of pounds of condensable PM emitted per

million BTU of heat input (lb/mmBTU) from the stack test results in accordance with 40 C.F.R.

§ 60.8(f).  The results of the PM stack test conducted pursuant to this Paragraph shall not be used

for the purpose of determining compliance with the PM Emission Rates required by this Consent

Decree.  The results of each PM stack test shall be submitted to Plaintiffs within 60 Days of

completion of each test.

123.     When DPC submits the application for modification of its Title V Permit pursuant

to Paragraph 192, that application shall include a Compliance Assurance Monitoring ("CAM")

plan, under 40 C.F.R. Part 64, for the PM Emission Rate in Paragraphs 115, 116, 117, and 119

(as applicable).  The PM CEMS required under Paragraph 124 may be used in that CAM plan.

**D.     PM CEMS**

124.     DPC shall install, correlate, maintain, and operate PM CEMS on J.P. Madgett and

G-3 as specified below. The PM CEMS shall comprise a continuous particle mass monitor

measuring filterable particulate matter concentration, directly or indirectly, on an hourly average

34

basis and a diluent monitor used to convert the concentration to units expressed in lb/mmBTU. The PM CEMS installed at each Unit must be appropriate for the anticipated stack conditions and capable of measuring filterable PM concentrations on an hourly average basis.   DPC shall maintain, in an electronic database that maintains data for at least five years, the hourly average emission values of all PM CEMS in lb/mmBTU. Except for periods of monitor malfunction, maintenance, repair, calibration, or testing as identified in DPC's approved PM CEMS protocols prepared pursuant to Paragraphs 125 and 126, DPC shall operate continuously the PM CEMS at all times when the Unit it serves is operating.

125.    By no later than December 31, 2012, DPC shall submit to EPA for review and approval pursuant to Section XIII (Review and Approval of Submittals) of this Consent Decree a plan for the installation and correlation of the PM CEMS for G-3 and J.P. Madgett.

126.    By no later than June 30, 2013, DPC shall submit to EPA for review and approval pursuant to Section XIII (Review and Approval of Submittals) of this Consent Decree a proposed Quality Assurance/Quality Control ("QA/QC") protocol that shall be followed for such PM CEMS.

127.    In developing both the plan for installation and correlation of the PM CEMS and the QA/QC protocol, DPC shall use the criteria set forth in 40 C.F.R. Part 60, Appendix B, Performance Specification 11, and Appendix F, Procedure 2.  Following EPA's approval of the plan described in Paragraph 125 and the QA/QC protocol described in Paragraph 126, DPC shall thereafter operate the PM CEMS in accordance with the approved plan and QA/QC protocol.

128.    By no later than December 31, 2013, except for periods of monitor malfunction, maintenance, repair, calibration, or testing as identified in DPC's approved PM CEMS protocols prepared pursuant to Paragraphs 125 and 126, DPC shall install, correlate, maintain, and operate

35

continuously the PM CEMS at G-3 and J.P. Madgett when the Unit it serves is operating, conduct performance specification tests on the PM CEMS, and demonstrate compliance with the PM CEMS installation and correlation plans submitted to and approved by EPA in accordance with Paragraphs 125 and 126.  DPC shall operate the PM CEMS in accordance with the approved plan and QA/QC protocol.  DPC shall report, pursuant to Section XII (Periodic Reporting), the data recorded by the PM CEMS during Unit operation, expressed in lb/mmBTU on a rolling average 3-hour basis in electronic format to EPA and identify in the report any PM emission rates in excess of the applicable PM Emission Rate and any concentrations measured by the PM CEMS that are greater than 125% of the highest PM concentration level used in the most recent correlation testing performed pursuant to Performance Specification 11 in 40 C.F.R. Part 60, Appendix B.

####     E.     **General PM Provisions**

129.    Compliance with the PM Emission Rates established by this Consent Decree shall be determined using stack test data obtained in accordance with Paragraph 121.  Data from PM CEMS shall be used, at a minimum, to monitor PM emissions on a continuous basis.

130.    Nothing in this Consent Decree is intended to, or shall, alter or waive any applicable law (including but not limited to any defenses, entitlements, challenges, or clarifications related to the Credible Evidence Rule, 62 Fed. Reg. 8314 (Feb. 24, 1997)) concerning the use of data for any purpose under the Act.

### VIII.   **PROHIBITION ON NETTING CREDITS OR OFFSETS**

131.    Except as provided in Paragraph 132, emission reductions that result from actions to be taken by DPC after the Date of Entry of this Consent Decree to comply with the requirements of this Consent Decree shall not be considered as a creditable contemporaneous

36

emission decrease for the purpose of obtaining a Netting credit or offset under the Act's Nonattainment NSR and PSD programs.

132.    The limitations on the generation and use of Netting credits and offsets set forth in the previous Paragraph do not apply to emission reductions achieved by a particular DPC System Unit that are greater than those required under this Consent Decree for that particular DPC System Unit.  For purposes of this Paragraph, emission reductions from a DPC System Unit are greater than those required under this Consent Decree if they result from such Unit's compliance with federally-enforceable emission limits that are more stringent than those limits imposed on the Unit under this Consent Decree and under applicable provisions of the Act or the Wisconsin SIP.

133.    Nothing in this Consent Decree is intended to preclude the emission reductions generated under this Consent Decree from being considered by the applicable state regulatory agency or EPA for the purpose of attainment demonstrations submitted pursuant to Section 110 of the Act, 42 U.S.C. § 7410, or in determining impacts on National Ambient Air Quality Standards, PSD increment, or air quality related values, including visibility, in a Class I area.

## IX.    ENVIRONMENTAL MITIGATION PROJECTS

134.    DPC shall implement the Environmental Mitigation Projects ("Projects") described in Appendix A to this Consent Decree in compliance with the approved plans and schedules for such Projects and other terms of this Consent Decree.  In implementing the Projects, DPC shall spend no less than $5,000,000 in Project Dollars.  DPC shall not include its own personnel costs in overseeing the implementation of the Projects as Project Dollars.

135.    DPC shall maintain, and present to EPA upon request, all documents to substantiate the Project Dollars expended to implement the Projects described in Appendix A, and shall provide these documents to EPA within 60 Days of a request for the documents.

136.    All plans and reports prepared by DPC pursuant to the requirements of this Section IX of the Consent Decree and required to be submitted to EPA shall be publicly available from DPC without charge in paper or electronic format.

137.    DPC shall certify, as part of each plan submitted to EPA for any Project, that DPC is not otherwise required by law to perform the Project described in the plan, that DPC is unaware of any other person who is required by law to perform the Project, and that DPC will not use any Project, or portion thereof, to satisfy any obligations that it may have under other applicable requirements of law, including but not limited to any applicable renewable or energy efficiency portfolio standards.

138.    DPC shall use good faith efforts to secure as much environmental benefit as possible for the Project Dollars expended, consistent with the applicable requirements and limits of this Consent Decree.

139.    If DPC elects (where such an election is allowed) to undertake a Project by contributing funds to another person or entity that will carry out the Project in lieu of DPC, but not including DPC's agents or contractors, that person or instrumentality must, in writing: (a) identify its legal authority for accepting such funding; and (b) identify its legal authority to conduct the Project for which DPC contributes the funds.  Regardless of whether DPC elects (where such election is allowed) to undertake a Project by itself or to do so by contributing funds to another person or instrumentality that will carry out the Project, DPC acknowledges that it will receive credit for the expenditure of such funds as Project Dollars only if DPC demonstrates that

the funds have been actually spent by either DPC or by the person or instrumentality receiving them, and that such expenditures met all requirements of this Consent Decree.

140.    DPC shall comply with the reporting requirements described in Appendix A.

141.    Within 90 Days following the completion of each Project required under this Consent Decree (including any applicable periods of demonstration or testing), DPC shall submit to EPA a report that documents the date that the Project was completed, the results achieved by implementing the Project, including the emission reductions or other environmental benefits, and the Project Dollars expended by DPC in implementing the Project.

## X.    CIVIL PENALTY

142.    Within 30 Days after the Date of Entry of this Consent Decree, DPC shall pay to the United States a civil penalty in the amount of $950,000.  The civil penalty shall be paid by Electronic Funds Transfer ("EFT") to the United States Department of Justice, in accordance with current EFT procedures, referencing USAO File Number 2012A18113/001 and DOJ Case Number 90-5-2-1-10163 and the civil action case name and case number assigned to the United States' enforcement action in this case.  The costs of such EFT shall be DPC's responsibility. Payment shall be made in accordance with instructions provided to DPC by the Financial Litigation Unit of the U.S. Attorney's Office for the Western District of Wisconsin.  Any funds received after 2:00 p.m. EDT shall be credited on the next business day.  At the time of payment, DPC shall provide notice of payment, referencing the USAO File Number, the DOJ Case Number, and the civil action case name and case number, to the Department of Justice and to EPA in accordance with Section XIX (Notices) of this Consent Decree.

143.    Failure to timely pay the civil penalty shall subject DPC to interest accruing from the date payment is due until the date payment is made at the rate prescribed by 28 U.S.C.

§ 1961, and shall render DPC liable for all charges, costs, fees, and penalties established by law for the benefit of a creditor or of the United States in securing payment.

144.    Payments made pursuant to this Section are penalties within the meaning of Section 162(f) of the Internal Revenue Code, 26 U.S.C. § 162(f), and are not tax-deductible expenditures for purposes of federal law.

## XI.    RESOLUTION OF PAST CIVIL CLAIMS

145.    Claims of the United States Based on Modifications Occurring Before the Date of Lodging of this Consent Decree.  Entry of this Consent Decree shall resolve all civil claims of the United States against DPC that arose from any modifications commenced at G-3, J.P. Madgett and Alma Units 1, 2, 3, 4 and 5  prior to the Date of Lodging of this Consent Decree, under any or all of:  (a) Part C or D of Subchapter I of the Act, 42 U.S.C. §§ 7470-7492, 7501-7515, and the implementing PSD and Nonattainment NSR provisions of the Wisconsin SIP; (b) Section 111 of the Act, 42 U.S.C. § 7411, and 40 C.F.R. § 60.14; and (c) Title V of the Act, 42 U.S.C. § 7661-7661f, but only to the extent that such Title V claims are based on DPC's failure to obtain an operating permit that reflects applicable requirements imposed under Part C or D of Subchapter I of the Act.

146.    Claims of the Sierra Club.  Entry of this Consent Decree shall resolve all civil claims, causes of action, demands, actions and/or rights of action, of whatever kind or nature, that the Sierra Club has under 42 U.S.C. § 7604(a), Wis. Stat. ch.. 285, and Wis. Admin. Code chs. NR 400-499 against DPC, known or unknown, developed or undeveloped, that arose pursuant to:

a.    Part C or D of Subchapter I of the Act, 42 U.S.C. §§ 7470-7492, 7501-7515, and the implementing PSD and Nonattainment NSR provisions of the Wisconsin SIP;

40

b.      Section 111 of the Act, 42 U.S.C. § 7411, and 40 C.F.R. § 60.14; and

c.      Title V of the Act, 42 U.S.C. § 7661-7661f, but only to the extent that such Title

V claims are based on DPC's failure to obtain an operating permit that reflects

applicable requirements imposed under Part C or D of Subchapter I of the Act,

from any operations, emissions, or modifications commenced at G-3, J.P. Madgett, or Alma

Units 1, 2, 3, 4 or 5 or any combination thereof, prior to the Date of Lodging of this Consent

Decree.  Entry of this Consent Decree shall also resolve all civil claims, causes of action,

demands, actions and/or rights of action, of whatever kind or nature, that the Sierra Club now has

under 42 U.S.C. § 7604(a), Wis. Stat. ch. 285, and Wis. Admin. Code chs. NR 400-499 against

DPC for any alleged violations of visible emissions (opacity) limits and Carbon Monoxide (CO)

limits applicable to Alma, G-3 or J.P. Madgett which occurred prior to the Date of Lodging of

this Consent Decree.

## XII.   PERIODIC REPORTING

147.    After entry of this Consent Decree, DPC shall submit to Plaintiffs a periodic

report, within 60 Days after the end of each half of the calendar year (January through June and

July through December).  The report shall include the following information:

a.      all information necessary to determine compliance during the reporting period

with:  all applicable 30-Day Rolling Average $NO_x$ Emission Rates and 30-Day

Rolling Average $SO_2$ Emission Rates; all applicable 12-Month Rolling Average

Emission Rates for $SO_2$; all applicable PM Emission Rates; all applicable Unit-

Specific Annual Tonnage Caps; all applicable Plant-Wide Annual Tonnage Caps;

all applicable System-Wide Annual Tonnage Limitations; the obligation to

41

monitor $NO_x$, $SO_2$, and PM emissions; the obligation to optimize PM emission controls; and the obligation to Surrender $NO_x$ Allowances and $SO_2$ Allowances;

b.      3-hour rolling average PM CEMS data as required by Paragraph 128, identifying all 3-hour periods in excess of 0.030 lb/mmBTU or 0.015 lb/mmBTU, as appropriate, and all periods of monitor malfunction, maintenance, and/or repair as provided in Paragraph 124;

c.      emission reporting and Allowance accounting information necessary to determine Super-Compliant $NO_x$ and $SO_2$ Allowances that DPC claims to have generated in accordance with Sections V.G and VI.G through control of emissions beyond the requirements of this Consent Decree;

d.      schedule for the installation or upgrade and commencement of operation of new or upgraded pollution control devices required by this Consent Decree, including the nature and cause of any actual or anticipated delays, and any steps taken by DPC to mitigate such delay;

e.      all affirmative defenses asserted pursuant to Paragraphs 163 through 171 during the period covered by the progress report;

f.      an identification of all periods when any pollution control device required by this Consent Decree to Continuously Operate did not Continuously Operate, the reason(s) for the equipment not operating, and the basis for DPC's compliance or non-compliance with the Continuous Operation requirements of this Consent Decree; and

g.      a summary of actions implemented and expenditures made pursuant to

implementation of the Environmental Mitigation Projects required pursuant to

Section IX.

148.    In any periodic report submitted pursuant to this Section XII, DPC may

incorporate by reference information previously submitted under its Title V permitting

requirements, provided that DPC attaches the Title V Permit report (or the pertinent portions of

such report) and provides a specific reference to the provisions of the Title V Permit report that

are responsive to the information required in the periodic report.

149.    In addition to the reports required pursuant to this Section XII, if DPC violates or

deviates from any provision of this Consent Decree, DPC shall submit to Plaintiffs a report on

the violation or deviation within 10 business days after DPC knew or by the exercise of due

diligence should have known of the event.  In the report, DPC shall explain the cause or causes

of the violation or deviation and any measures taken or to be taken by DPC to cure the reported

violation or deviation or to prevent such violation or deviation in the future.  If at any time, the

provisions of this Consent Decree are included in Title V Permits, consistent with the

requirements for such inclusion in this Consent Decree, then the deviation reports required under

applicable Title V regulations shall be deemed to satisfy all the requirements of this Paragraph.

150.    Each DPC report shall be signed by the Responsible Official as defined in Title V

of the Act for the Genoa Site or Alma Site, as appropriate, and shall contain the following

certification:

*This information was prepared either by me or under my direction or supervision
in accordance with a system designed to assure that qualified personnel properly
gather and evaluate the information submitted.  Based on my evaluation, or the
direction and my inquiry of the person(s) who manage the system, or the
person(s) directly responsible for gathering the information, I hereby certify*

43

*under penalty of law that, to the best of my knowledge and belief, this information is true, accurate, and complete. I understand that there are significant penalties for submitting false, inaccurate, or misleading information to the United States.*

## XIII.   REVIEW AND APPROVAL OF SUBMITTALS

151.    DPC shall submit each plan, report, or other submission required by this Consent Decree to Plaintiffs whenever such a document is required to be submitted for review or approval pursuant to this Consent Decree. EPA may approve the submittal or decline to approve it and provide written comments explaining the bases for declining such approval as soon as reasonably practicable. Within 60 Days of receiving written comments from EPA, DPC shall either: (a) revise the submittal consistent with the written comments and provide the revised submittal to EPA; or (b) submit the matter for dispute resolution, including the period of informal negotiations, under Section XVI (Dispute Resolution) of this Consent Decree.

152.    Upon receipt of EPA's final approval of the submittal, or upon completion of the submittal pursuant to dispute resolution, DPC shall implement the approved submittal in accordance with the schedule specified therein or another EPA-approved schedule or as resolved at the completion of the Dispute Resolution process.

## XIV.   STIPULATED PENALTIES

153.    For any failure by DPC to comply with the terms of this Consent Decree, and subject to the provisions of Sections XV (Force Majeure) and XVI (Dispute Resolution), DPC shall pay, within 30 Days after receipt of written demand to DPC by the United States, the following stipulated penalties to the United States:

| Consent Decree Violation | Stipulated Penalty |
|---|---|
| a.  Failure to pay the civil penalty as specified in Section X (Civil Penalty) of this Consent Decree | $10,000 per Day |
| b.  Failure to comply with any applicable 30-Day Rolling Average $NO_x$ Emission Rate, 30-Day Rolling Average $SO_2$ Emission Rate, or 12-month Rolling Average $SO_2$ Tonnage Limitation | $2,500 per Day per violation where the violation is less than 5% in excess of the lb/mmBTU limits<br><br>$5,000 per Day per violation where the violation is equal to or greater than 5% but less than 10% in excess of the lb/mmBTU limits<br><br>$10,000 per Day per violation where the violation is equal to or greater than 10% in excess of the lb/mmBTU limits |
| c.  Failure to comply with the applicable System-Wide Annual $NO_x$ Tonnage Limitations established by this Consent Decree | (1) $5,000 per ton for first 100 tons, $10,000 per ton for each additional ton above 100 tons, plus (2) either the Surrender of $NO_x$ Allowances in an amount equal to two times the number of tons of $NO_x$ emitted that exceeded the System-Wide Annual $NO_x$ Tonnage Limitation, or the payment of $2,500 per ton for an amount of tons equal to two times the number of tons of $NO_x$ emitted that exceeded the System-Wide Annual $NO_x$ Tonnage Limitation |

| | |
|---|---|
| d. Failure to comply with the applicable Plant-Wide Annual Tonnage Cap for $NO_x$ established for Alma Units 4 and 5 by this Consent Decree | (1) $5,000 per ton for first 100 tons, $10,000 per ton for each additional ton above 100 tons, plus (2) either the Surrender of $NO_x$ Allowances in an amount equal to two times the number of tons of $NO_x$ emitted that exceeded the Plant-Wide Annual Tonnage Cap, or the payment of $2,500 per ton for an amount of tons equal to two times the number of tons of $NO_x$ emitted that exceeded the Plant-Wide Annual Tonnage Cap |
| e. Failure to comply with any applicable Unit-Specific Annual Tonnage Cap for $NO_x$ | (1) $5,000 per ton for first 100 tons, $10,000 per ton for each additional ton above 100 tons, plus (2) either the Surrender of $NO_x$ Allowances in an amount equal to two times the number of tons of $NO_x$ emitted that exceeded the Unit-Specific Annual Tonnage Cap, or the payment of $2,500 per ton for an amount of tons equal to two times the number of tons of $NO_x$ emitted that exceeded the Unit-Specific Annual Tonnage Cap |

| | |
|---|---|
| f. Failure to comply with the applicable System-Wide Annual $SO_2$ Tonnage Limitations established by this Consent Decree | (1) $5,000 per ton for first 100 tons, $10,000 per ton for each additional ton above 100 tons, plus (2) either the Surrender of $SO_2$ Allowances in an amount equal to two times the number of tons of $SO_2$ emitted that exceeded the System-Wide Annual $SO_2$ Tonnage Limitation, or the payment of $2,500 per ton for an amount of tons equal to two times the number of tons of $SO_2$ emitted that exceeded the System-Wide Annual $SO_2$ Tonnage Limitation |
| g. Failure to comply with the applicable Plant-Wide Annual Tonnage Cap for $SO_2$ established for Alma Units 4 and 5 required by this Consent Decree. | (1) $5,000 per ton for the first 100 tons over the limit, and $10,000 per ton for each additional ton over the limit, plus (2) either the Surrender of $SO_2$ Allowances in an amount equal to two times the number of tons of $SO_2$ emitted that exceeded Plant-Wide Annual Tonnage Cap, or the payment of $2,500 per ton for an amount of tons equal to two times the number of tons of $SO_2$ emitted that exceeded the Plant-Wide Annual Tonnage Cap |

| | |
|---|---|
| h.  Failure to comply with any applicable Unit-Specific Annual Tonnage Cap for $SO_2$ | (1) $5,000 per ton for the first 100 tons over the limit, and $10,000 per ton for each additional ton over the limit, plus (2) either the Surrender of $SO_2$ Allowances in an amount equal to two times the number of tons of $SO_2$ emitted that exceeded Unit-Specific Annual Tonnage Cap, or the payment of $2,500 per ton for an amount of tons equal to two times the number of tons of $SO_2$ emitted that exceeded the Unit-Specific Annual Tonnage Cap |
| i.  Failure to comply with the applicable Plant-Wide Annual Tonnage Cap for PM for Alma Units 4 and 5 established by this Consent Decree | $10,000 per ton for the first 10 tons over the limit, and $25,000 per ton for each additional ton over the limit |
| j.  Failure to comply with any applicable Unit-Specific Annual Tonnage Cap for PM | $10,000 per ton for the first 10 tons over the limit, and $25,000 per ton for each additional ton over the limit |
| k.  Failure to comply with any applicable PM Emission Rate, where the violation is less than 5% in excess of the lb/mmBTU limit | $2,500 per Unit Operating Day per violation, starting on the Unit Operating Day that a stack test result demonstrates a violation and continuing each Unit Operating Day thereafter until and excluding such Unit Operating Day on which a subsequent stack test demonstrates compliance with the applicable PM Emission Rate |

48

| l.  Failure to comply with any applicable PM Emission Rate, where the violation is equal to or greater than 5% but less than 10% in excess of the lb/mmBTU limit | $5,000 per Unit Operating Day per violation, starting on the Unit Operating Day a stack test result demonstrates a violation and continuing each Unit Operating Day thereafter until and excluding such Unit Operating Day on which a subsequent stack test demonstrates compliance with the applicable PM Emission Rate |
|---|---|
| m.  Failure to comply with any applicable PM Emission Rate, where the violation is equal to or greater than 10% in excess of the lb/mmBTU limit | $10,000 per Unit Operating Day per violation, starting on the Unit Operating Day a stack test result demonstrates a violation and continuing each Unit Operating Day thereafter until and excluding such Unit Operating Day on which a subsequent stack test demonstrates compliance with the applicable PM Emission Rate |
| n.  Failure to install, commence Continuous Operation, or Continuously Operate an $NO_x$, $SO_2$, or PM control device as required under this Consent Decree | $10,000 per Day per violation during the first 30 Days; $37,500 per Day per violation thereafter |
| o.  Failure to Cease Burning Coal a Unit as required under this Consent Decree | $10,000 per Day per violation during the first 30 Days; $37,500 per Day per violation thereafter |
| p.  Failure to conduct a stack test for PM as required by Paragraphs 120 and 122 of this Consent Decree | $5,000 per Day per violation |
| q.  Failure to install or operate $NO_x$, $SO_2$, and/or PM CEMS as required in this Consent Decree | $1,000 per Day per violation |
| r.  Failure to apply for any permit required by Section XVII (Permits) | $1,000 per Day per violation |

| s. Failure to timely submit, modify, or implement, as approved, the reports, plans, studies, analyses, protocols, or other submittals required by this Consent Decree | $750 per Day per violation during the first 10 Days; $1,000 per Day per violation thereafter |
|---|---|
| t. Failure to surrender $SO_2$ Allowances as required under this Consent Decree | $37,500 per Day. In addition, $1,000 per $SO_2$ Allowance not surrendered |
| u. Failure to surrender $NO_x$ Allowances as required under this Consent Decree | $37,500 per Day. In addition, $1,000 per $NO_x$ Allowance not surrendered |
| v. Using, selling, banking, trading, or transferring $NO_x$ Allowances or $SO_2$ Allowances except as permitted under this Consent Decree | Either the surrender of Allowances in an amount equal to four times the number of Allowances used, sold, banked, traded, or transferred in violation of this Consent Decree, or the payment of $2,500 per ton for an amount of tons equal to four times the number of Allowances used, sold, banked, traded, or transferred in violation of this Consent Decree |
| w. Failure to optimize ESPs and Baghouses as required by Paragraph 114. | $1,000 per Day per violation |
| x. Failure to undertake and complete as described in Appendix A any of the Environmental Mitigation Projects in compliance with Section IX (Environmental Mitigation Projects) of this Consent Decree | $1,000 per Day per violation during the first 30 Days; $5,000 per Day per violation thereafter |
| y. Any other violation of this Consent Decree | $1,000 per Day per violation |

154.     Violation of any limit based on a 30-Day rolling average constitutes 30 Days of violation but where such a violation (for the same pollutant and from the same Unit) recurs within periods less than 30 Days, DPC shall not be obligated to pay a daily stipulated penalty for any Day of the recurrence for which a stipulated penalty has already been paid.

155.     Violation of any limit based on a 12-Month rolling average constitutes 365 Days of violation but where such a violation (for the same pollutant and from the same Unit) recurs within periods less than 12-Months, DPC shall not be obligated to pay a daily stipulated penalty for any Day of the recurrence for which a stipulated penalty has already been paid.

156.     All stipulated penalties shall begin to accrue on the Day after the performance is due or on the Day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases, whichever is applicable. Nothing in this Consent Decree shall prevent the simultaneous accrual of separate stipulated penalties for separate violations of this Consent Decree.

157.     For purposes of the stipulated penalty Allowance Surrender required pursuant to Subparagraphs 153.c to 153.h, DPC shall make the Surrender of any Allowances required by such Subparagraph by June 30 of the immediately following calendar year.

158.     DPC shall pay all stipulated penalties to the United States within 30 Days of receipt of written demand to DPC from the United States, and shall continue to make such payments every 30 Days thereafter until the violation(s) no longer continues, unless DPC elects within 20 Days of receipt of written demand to DPC from the United States to dispute the accrual of stipulated penalties in accordance with the provisions in Section XVI (Dispute Resolution) of this Consent Decree.

159.     Stipulated penalties shall continue to accrue as provided in accordance with Paragraph 156 during any dispute, with interest on accrued stipulated penalties payable and calculated at the rate established by the Secretary of the Treasury, pursuant to 28 U.S.C. § 1961, but need not be paid until the following:

51

a.  If the dispute is resolved by agreement, or by a decision of the United States pursuant to Section XVI (Dispute Resolution) of this Consent Decree that is not appealed to the Court, accrued stipulated penalties agreed or determined to be owing, together with accrued interest, shall be paid within 30 Days of the effective date of the agreement or of the receipt of the United States' decision;

b.  If the dispute is appealed to the Court and the United States prevails in whole or in part, DPC shall, within 30 Days of receipt of the Court's decision or order, pay all accrued stipulated penalties determined by the Court to be owing, together with interest accrued on such penalties determined by the Court to be owing, except as provided in Subparagraph c, below;

c.  If the Court's decision is appealed by either Party, DPC shall, within 15 Days of receipt of the final appellate court decision, pay all accrued stipulated penalties determined to be owing, together with interest accrued on such stipulated penalties determined to be owing by the appellate court.

Notwithstanding any other provision of this Consent Decree, the accrued stipulated penalties agreed by the United States and DPC, or determined by the United States through Dispute Resolution, to be owing may be less than the stipulated penalty amounts set forth in Paragraph 153.

160.  All monetary stipulated penalties shall be paid in the manner set forth in Section X (Civil Penalty) of this Consent Decree and all Allowance Surrender stipulated penalties shall comply with the Allowance Surrender procedures of Paragraphs 93-94 and 112-113.

161.     Should DPC fail to pay stipulated penalties in compliance with the terms of this Consent Decree, the United States shall be entitled to collect interest on such penalties, as provided for in 28 U.S.C. § 1961.

162.     The stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the United States by reason of DPC's failure to comply with any requirement of this Consent Decree or applicable law, except that for any violation of the Act for which this Consent Decree provides for payment of a stipulated penalty, DPC shall be allowed a credit for stipulated penalties paid against any statutory penalties also imposed for such violation.

163.     <u>Affirmative Defense as to Stipulated Penalties for Excess Emissions Occurring During Malfunctions</u>:  If any of DPC's Units exceed an applicable 30-Day Rolling Average Emission Rate for $NO_x$ or $SO_2$, or fail to meet a Continuously Operate requirement set forth in this Consent Decree due to Malfunction, DPC, bearing the burden of proof, has an affirmative defense to stipulated penalties under this Consent Decree, if DPC has complied with the reporting requirements of Paragraphs 168 and 169 and has demonstrated all of the following:

    a.    the excess emissions or failure to Continuously Operate was/were caused by a sudden, unavoidable breakdown of technology, beyond DPC's control;

    b.    the excess emissions or failure to Continuously Operate (1) did not stem from any activity or event that could have been foreseen and avoided, or planned for, and (2) could not have been avoided by better operation and maintenance practices in accordance with manufacturers' specifications and recommendations and good engineering and maintenance practices;

c.      to the maximum extent practicable, the air pollution control equipment and

processes were maintained and operated in a manner consistent with approved

plans, QA/QC procedures, manufacturers' specifications and recommendations,

and good engineering and maintenance practices for minimizing emissions;

d.      repairs to equipment and processes were made in an expeditious fashion when

such repairs were needed to prevent the exceedance of an emission limit or the

shutdown of air pollution control equipment.  Off-shift labor and overtime must

have been utilized, to the extent practicable, to ensure that such repairs were made

as expeditiously as practicable;

e.      the amount and duration of the excess emissions (including any bypass) were

minimized to the maximum extent practicable during periods of such emissions,

and consistent with manufacturers' specifications and recommendations and good

engineering and maintenance practices;

f.      all possible steps were taken to minimize the excess emissions in accordance with

approved plans, QA/QC protocols, manufacturers' specifications and

recommendations, and good engineering and maintenance practices;

g.      all emission monitoring systems were kept in operation if at all possible and in

accordance with approved plans, QA/QC protocols, manufacturers' specifications

and recommendations, and good engineering and maintenance practices;

h.      DPC's actions in response to the excess emissions were documented by properly

signed, contemporaneous operating logs, or other relevant evidence;

i.      the excess emissions were not part of a recurring pattern indicative of inadequate

design, operation, or maintenance; and

54

j.      DPC properly and promptly notified EPA as required by this Consent Decree.

164.    To assert an affirmative defense for Malfunction under Paragraph 163, DPC shall submit actual emissions data for the Day the Malfunction occurred and the 29-Day period following the Day the Malfunction occurred.  DPC may, if it elects, submit emissions data for the same 30-Day period but that excludes the excess emissions.

165.    <u>Affirmative Defense as to Stipulated Penalties for Excess Emissions Occurring During Startup and Shutdown</u>: If any of DPC's Units exceed an applicable 30-Day Rolling Average Emission Rate for $NO_x$ or $SO_2$ set forth in this Consent Decree due to startup or shutdown, DPC, bearing the burden of proof, has an affirmative defense to stipulated penalties under this Consent Decree, if DPC has complied with the reporting requirements of Paragraphs 168 and 169 and has demonstrated all of the following:

a.      the periods of excess emissions that occurred during startup and shutdown were short and infrequent and could not have been prevented through careful planning and design consistent with good engineering and maintenance practices and manufacturers' specifications and recommendations;

b.      the excess emissions were not part of a recurring pattern indicative of inadequate design, operation, or maintenance or which could have been prevented by following manufacturers' specifications and recommendations and good engineering and maintenance practices;

c.      if the excess emissions were caused by a bypass (an intentional diversion of control equipment), then the bypass was unavoidable to prevent loss of life, personal injury, or severe property damage;

55

d.      at all time, the facility was operated in a manner consistent with good engineering and maintenance practices and manufacturers' specifications and recommendations for minimizing emissions;

e.      the frequency and duration of operation in startup or shutdown mode was minimized to the maximum extent practicable and consistent with good engineering and maintenance practices and manufacturers' specifications and recommendations;

f.      all possible steps were taken to minimize the excess emissions in accordance with approved plans, QA/QC protocols, manufacturers' specifications and recommendations, and good engineering and maintenance practices;

g.      All emissions monitoring systems were kept in operation if at all possible and in accordance with approved plans, QA/QC protocols, manufacturers' specifications and recommendations, and good engineering and maintenance practices;

h.      DPC's actions during the period of excess emissions were documented by properly signed, contemporaneous operating logs, or other relevant evidence; and

i.      DPC properly and promptly notified EPA as required by this Consent Decree.

166.    To assert an affirmative defense for startup or shutdown under Paragraph 165, DPC shall submit actual emissions data for the Day the excess emissions from startup or shutdown occurred and the 29-Day period following the Day the excess emissions from startup or shutdown occurred. DPC may, if it elects, submit emissions data for the same 30-Day period but that excludes the excess emissions.

167.    If excess emissions occurred due to a Malfunction during routine startup and shutdown, then those instances shall be treated as other Malfunctions subject to Paragraph 163.

56

168.    For an affirmative defense under Paragraphs 163 and 165, DPC, bearing the burden of proof, shall demonstrate, through submission of the data and information under the reporting provisions of this Section, that all reasonable and practicable measures in accordance with good engineering and maintenance practices and within DPC's control were implemented to prevent the occurrence of the excess emissions.

169.    DPC shall provide notice to Plaintiffs in writing of DPC's intent to assert an affirmative defense for Malfunction, startup, or shutdown under Paragraphs 163 and 165, as soon as practicable, but in no event later than 21 Days following the date of the Malfunction, startup or shutdown.  This notice shall be submitted pursuant to the provisions of Section XIX (Notices). The notice shall contain:

a.      the identity of each stack or other emission point where the excess emissions occurred;

b.      the magnitude of the excess emissions expressed in lb/mmBTU and the operating data and calculations used in determining the magnitude of the excess emissions;

c.      the time and duration or expected duration of the excess emissions or failure to Continuously Operate;

d.      the identity of the equipment causing the excess emissions or failure to Continuously Operate;

e.      the nature and suspected cause of the excess emissions or failure to Continuously Operate;

f.      the steps taken, if the excess emissions or failure to Continuously Operate were the result of a Malfunction, to remedy the Malfunction and the steps taken or planned to prevent the recurrence of the Malfunction;

57

g.      the steps that were or are being taken to limit the excess emissions or limit the duration of the failure to Continuously Operate; and

h.      if applicable, a list of the steps taken to comply with permit conditions governing Unit operation during periods of startup, shutdown, and/or Malfunction.

170.    A Malfunction, startup, or shutdown shall not constitute a Force Majeure Event unless the Malfunction, startup, or shutdown also meets the definition of a Force Majeure Event, as provided in Section XV (Force Majeure).

171.    The affirmative defense provided herein is only an affirmative defense to stipulated penalties for violations of this Consent Decree, and not a defense to any civil or administrative action for injunctive relief.

## XV.    FORCE MAJEURE

172.    For purposes of this Consent Decree, a "Force Majeure Event" shall mean an event that has been or will be caused by circumstances beyond the control of DPC, its contractors, or any entity controlled by DPC that delays compliance with any provision of this Consent Decree or otherwise causes a violation of any provision of this Consent Decree despite DPC's best efforts to fulfill the obligation.  "Best efforts to fulfill the obligation" include using the best efforts to anticipate any potential Force Majeure Event and to address the effects of any such event (a) as it is occurring and (b) after it has occurred, such that the delay and any adverse environmental effect of the delay or violation is minimized to the greatest extent possible and in accordance with good engineering practices.

173.    Notice of Force Majeure Events.  If any event occurs or has occurred that may delay compliance with or otherwise cause a violation of any obligation under this Consent Decree, as to which DPC intends to assert a claim of Force Majeure, DPC shall notify Plaintiffs

58

in writing as soon as practicable, but in no event later than 21 Days following the date DPC first knew, or by the exercise of due diligence should have known, that the event caused or may cause such delay or violation.  In this notice, DPC shall reference this Paragraph of this Consent Decree and describe the anticipated length of time that the delay or violation may persist, the cause or causes of the delay or violation, all measures taken or to be taken by DPC to prevent or minimize the delay or violation, the schedule by which DPC proposes to implement those measures, and DPC's rationale for attributing a delay or violation to a Force Majeure Event. DPC shall adopt all reasonable measures to avoid or minimize such delays or violations.  DPC shall be deemed to know of any circumstance which DPC, its contractors, or any entity controlled by DPC knew or should have known.

174.   <u>Failure to Give Notice</u>.  If DPC fails to comply with the notice requirements of this Section, the United States (after consultation with the Sierra Club) may void DPC's claim for Force Majeure as to the specific event for which DPC has failed to comply with such notice requirement.

175.   <u>United States' Response</u>.  The United States shall notify DPC in writing regarding DPC's claim of Force Majeure as soon as reasonably practicable.  If the United States (after consultation with Sierra Club) agrees that a delay in performance has been or will be caused by a Force Majeure Event, the Plaintiffs and DPC shall stipulate to an extension of deadline(s) for performance of the affected compliance requirement(s) by a period equal to the delay actually caused by the event.  In such circumstances, an appropriate modification shall be made pursuant to Section XXIII (Modification) of this Consent Decree.

176.   <u>Disagreement</u>.  If the United States (after consultation with Sierra Club) does not accept DPC's claim of Force Majeure, or if the United States and DPC cannot agree on the

length of the delay actually caused by the Force Majeure Event, the matter shall be resolved in accordance with Section XVI (Dispute Resolution) of this Consent Decree.

177. <u>Burden of Proof</u>. In any dispute regarding Force Majeure, DPC shall bear the burden of proving that any delay in performance or any other violation of any requirement of this Consent Decree was caused by or will be caused by a Force Majeure Event. DPC shall also bear the burden of proving that DPC gave the notice required by this Section and the burden of proving the anticipated duration and extent of any delay(s) attributable to a Force Majeure Event. An extension of one compliance date based on a particular event may, but will not necessarily, result in an extension of a subsequent compliance date.

178. <u>Events Excluded</u>. Unanticipated or increased costs or expenses associated with the performance of DPC's obligations under this Consent Decree shall not constitute a Force Majeure Event.

179. <u>Potential Force Majeure Events</u>. The Parties agree that, depending upon the circumstances related to an event and DPC's response to such circumstances, the kinds of events listed below are among those that could qualify as Force Majeure Events within the meaning of this Section: construction, labor, or equipment delays; Malfunction of a Unit or emission control or monitoring device; unanticipated coal supply or pollution control reagent delivery interruptions; acts of God; acts of war or terrorism; and orders by a government official, government agency, other regulatory authority, or a regional transmission organization (e.g., MISO), acting under and authorized by applicable law, that directs DPC to supply electricity in response to a declared emergency. Depending upon the circumstances and DPC's response to such circumstances, failure of a permitting authority to issue a necessary permit in a timely fashion may constitute a Force Majeure Event where the failure of the permitting authority to act

60

is beyond the control of DPC and DPC has taken all steps available to it to obtain the necessary permit, including, but not limited to: submitting a complete permit application; responding to requests for additional information by the permitting authority in a timely fashion; and accepting lawful permit terms and conditions after expeditiously exhausting any legal rights to appeal terms and conditions imposed by the permitting authority.

180.     As part of the resolution of any matter submitted to this Court under Section XVI (Dispute Resolution) regarding a claim of Force Majeure, the United States and DPC by agreement, or this Court by order, may in appropriate circumstances extend or modify the schedule for completion of work under this Consent Decree to account for the delay in the work that occurred as a result of any delay agreed to by the United States or approved by the Court. DPC shall be liable for stipulated penalties pursuant to Section XIV (Stipulated Penalties) for its failure thereafter to complete the work in accordance with the extended or modified schedule (provided that DPC shall not be precluded from making a further claim of Force Majeure with regard to meeting any such extended or modified schedule).

## XVI.   DISPUTE RESOLUTION

181.     The dispute resolution procedure provided by this Section shall be available to resolve all disputes arising under this Consent Decree, provided that the Party invoking such procedure has first made a good faith attempt to resolve the matter with the other Party.  The provisions of this Section XVI shall be the sole and exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree.

182.     The dispute resolution procedure required herein shall be invoked by one Party giving written notice to the other Party advising of a dispute pursuant to this Section.  The notice shall describe the nature of the dispute and shall state the noticing Party's position with regard to

such dispute.  The Party receiving such a notice shall acknowledge receipt of the notice, and the

Parties in dispute shall expeditiously schedule a meeting to discuss the dispute informally not

later than 14 Days following receipt of such notice.

183.    Disputes submitted to dispute resolution under this Section shall, in the first

instance, be the subject of informal negotiations between the Parties.  Such period of informal

negotiations shall not extend beyond 30 Days from the date of the first meeting between the

Parties' representatives unless they agree in writing to shorten or extend this period.

184.    If the Parties are unable to reach agreement during the informal negotiation

period, the Plaintiffs shall provide DPC with a written summary of their position regarding the

dispute.  The written position provided by the Plaintiffs shall be considered binding unless,

within 45 Days thereafter, DPC seeks judicial resolution of the dispute by filing a petition with

this Court.  The Plaintiffs may submit a response to the petition within 45 Days of filing.

185.    The time periods set out in this Section may be shortened or lengthened upon

motion to the Court of one of the Parties to the dispute, explaining the Party's basis for seeking

such a scheduling modification.

186.    This Court shall not draw any inferences nor establish any presumptions adverse

to either Party as a result of invocation of this Section or the Parties' inability to reach

agreement.

187.    As part of the resolution of any dispute under this Section, in appropriate

circumstances the Parties may agree, or this Court may order, an extension or modification of the

schedule for the completion of the activities required under this Consent Decree to account for

the delay that occurred as a result of dispute resolution.  DPC shall be liable for stipulated

penalties pursuant to Section XIV (Stipulated Penalties) for its failure thereafter to complete the

work in accordance with the extended or modified schedule, provided that DPC shall not be precluded from asserting that a Force Majeure Event has caused or may cause a delay in complying with the extended or modified schedule.

188.     The Court shall decide all disputes pursuant to applicable principles of law for resolving such disputes.  In their filings with the Court under Paragraph 184, the Parties shall state their respective positions as to the applicable standard of law for resolving the particular dispute.

### XVII.  PERMITS

189.     Unless expressly stated otherwise in this Consent Decree, in any instance where otherwise applicable law or this Consent Decree requires DPC to secure a permit to authorize construction or operation of any device, including all preconstruction, construction, and operating permits required under State law, DPC shall make such application in a timely manner. EPA will use best efforts to review expeditiously, to the extent applicable, all permit applications submitted by DPC to meet the requirements of this Consent Decree.  Sierra Club shall not file a legal challenge, including any lawsuit or any petition for a contested case hearing, challenging the issuance of any permits or other regulatory approvals necessary for the construction of any environmental control equipment or environmental mitigation project(s) required by this Consent Decree; provided, however, that Sierra Club is entitled to raise any deviation from the requirements of this Consent Decree in such permitting actions through the Dispute Resolution provisions in Section XVI of this Consent Decree.

190.     When permits are required, DPC shall complete and submit applications for such permits to the applicable State agency to allow sufficient time for all legally required processing and review of the permit request, including requests for additional information by the applicable

State agency.  Any failure by DPC to submit a timely permit application for a DPC System Unit, as required by permitting requirements under state and/or federal regulations, shall bar any use by DPC of Section XV (Force Majeure) of this Consent Decree where a Force Majeure claim is based on permitting delays.

191.    Notwithstanding the reference to DPC's Title V Permits in this Consent Decree, the enforcement of such permits shall be in accordance with their own terms and the Act and its implementing regulations.  DPC's Title V Permits shall not be enforceable under this Consent Decree, although any term or limit established by or under this Consent Decree shall be enforceable under this Consent Decree regardless of whether such term has or will become part of a Title V Permit, subject to the terms of Section XXVII (Conditional Termination of Enforcement Under Consent Decree) of this Consent Decree.

192.    Within 180 Days after the Date of Entry of this Consent Decree, DPC shall modify any applicable Title V Permit application(s), or apply for modification of its Title V Permits, to include a schedule for all Unit-specific, plant-specific, and system-specific performance, operational, maintenance, and control technology requirements established by this Consent Decree including, but not limited to, any (a) 12-Month Rolling Average Emission Rate, (b) 30-Day Rolling Average $NO_x$ Emission Rate, (c) 30-Day Rolling Average $SO_2$ Emission Rate, (d) Plant-Wide Annual Tonnage Cap, (e) System-Wide Annual $NO_x$ Tonnage Limitation, (f) System-Wide Annual $SO_2$ Tonnage Limitation, (g) Unit-Specific Annual Tonnage Cap, (h) the requirements pertaining to the Surrender of $SO_2$ and $NO_x$ Allowances, and (i) the Retirement of any Unit as required or elected under this Decree.

193.    Within one year from the Date of Entry of this Consent Decree, DPC shall either apply to permanently include the requirements and limitations enumerated in this Consent

64

Decree into a federally enforceable non-Title V permit or request a site-specific revision to the Wisconsin SIP to include the requirements and limitations enumerated in this Consent Decree. The permit application or Wisconsin SIP revision request shall require compliance with the following: any applicable (a) 12-Month Rolling Average Emission Rate, (b) 30-Day Rolling Average $NO_x$ Emission Rate, (c) 30-Day Rolling Average $SO_2$ Emission Rate, (d) Plant-Wide Annual Tonnage Cap, (e) System-Wide Annual $NO_x$ Tonnage Limitation, (f) System-Wide Annual $SO_2$ Tonnage Limitation, (g) Unit-Specific Annual Tonnage Cap, (h) requirement pertaining to the Surrender of $SO_2$ and $NO_x$ Allowances, and (i) the Ceasing of Burning Coal at any Unit as required or elected under this Decree.

194.    DPC shall provide the Plaintiffs with a copy of each application for a federally enforceable permit or Wisconsin SIP revision submitted pursuant to Paragraph 193, as well as a copy of any permit proposed as a result of such application, to allow for timely participation in any public comment opportunity.

195.    Prior to conditional termination of enforcement through this Consent Decree, DPC shall obtain enforceable provisions in its Title V permits that incorporate all Unit-specific, plant-specific, and system-specific performance, operational, maintenance, and control technology requirements established by this Consent Decree including, but not limited to, any (a) 12-Month Rolling Average Emission Rate, (b) 30-Day Rolling Average $NO_x$ Emission Rate, (c) 30-Day Rolling Average $SO_2$ Emission Rate, (d) Plant-Wide Annual Tonnage Cap, (e) System-Wide Annual $NO_x$ Tonnage Limitation, (f) System-Wide Annual $SO_2$ Tonnage Limitation, (g) Unit-Specific Annual Tonnage Cap, (h) the requirements pertaining to the Surrender of $SO_2$ and $NO_x$ Allowances, and (i) the Ceasing of Burning Coal at any Unit as required or elected under this Decree.

196.     If DPC proposes to sell or transfer to an entity unrelated to DPC ("Third Party Purchaser") part or all of its Operational or Ownership Interest of Units covered under this Consent Decree, DPC shall comply with the requirements of Section XX (Sales or Transfers of Operational or Ownership Interests) of this Consent Decree with regard to that Operational or Ownership Interest prior to any such sale or transfer.

## XVIII. <u>INFORMATION COLLECTION AND RETENTION</u>

197.     Any authorized representative of the United States, including its attorneys, contractors, and consultants, upon presentation of credentials, shall have a right of entry upon the premises of a DPC System Unit at any reasonable time for the purpose of:

    a.     monitoring the progress of activities required under this Consent Decree;

    b.     verifying any data or information submitted to the United States in accordance with the terms of this Consent Decree;

    c.     obtaining samples and, upon request, splits of any samples taken by DPC or its representatives, contractors, or consultants; and

    d.     assessing DPC's compliance with this Consent Decree.

198.     DPC shall retain, and instruct its contractors and agents to preserve, all non-identical copies of all records and documents (including records and documents in electronic form) that are now in its or its contractors' or agents' possession or control, and that directly relate to DPC's performance of its obligations under this Consent Decree for the following periods: (a) until December 31, 2023 for records concerning physical or operational changes undertaken in accordance with Section V ($NO_x$ Emission Reductions and Controls), Section VI ($SO_2$ Emission Reductions and Controls), and Section VII (PM Emission Reductions and

Controls); and (b) until December 31, 2021 for all other records.  This record retention requirement shall apply regardless of any corporate document retention policy to the contrary.

199.    All information and documents submitted by DPC pursuant to this Consent Decree shall be subject to any requests under applicable law providing public disclosure of documents unless (a) the information and documents are subject to legal privileges or protection or (b) DPC claims and substantiates in accordance with 40 C.F.R. Part 2 that the information and documents contain confidential business information.

200.    Nothing in this Consent Decree shall limit the authority of EPA to conduct tests and inspections at DPC's facilities under Section 114 of the Act, 42 U.S.C. § 7414, or any other applicable federal laws, regulations, or permits.

## XIX.   **NOTICES**

201.    Unless otherwise provided herein, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing and addressed as follows:

> As to the United States of America:
>
> (if by mail service)
> Chief, Environmental Enforcement Section
> Environment and Natural Resources Division
> U.S. Department of Justice
> P.O. Box 7611, Ben Franklin Station
> Washington, DC  20044-7611
> DJ# 90-5-2-1-10163
>
> (if by commercial delivery service)
> Chief, Environmental Enforcement Section
> Environment and Natural Resources Division
> U.S. Department of Justice
> ENRD Mailroom, Room 2121
> 601 D Street, NW
> Washington, DC 20004
> DJ# 90-5-2-1-10163

and

(if by mail service)
Director, Air Enforcement Division
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
Mail Code 2242A
1200 Pennsylvania Avenue, NW
Washington, DC 20460

(if by commercial delivery service)
Director, Air Enforcement Division
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
Ariel Rios South Building, Room 1119
1200 Pennsylvania Avenue, NW
Washington, DC  20004

and

Director, Air Division
U.S. EPA Region 5
77 W. Jackson Blvd. (AE-17J)
Chicago, IL  60604

As to the Sierra Club:

Director, Environmental Law Program
Sierra Club
85 Second Street, 2nd Fl.
San Francisco, CA 94105

and

David C. Bender
Pamela McGillivray
McGillivray Westerberg & Bender LLC
211 S. Paterson St., Ste 320
Madison, WI 53703

68

<u>As to DPC</u>:

Laurie Engen
Registered Agent
Dairyland Power Cooperative
3251 East Ave. S.
La Crosse, WI  54601

Donald R. Huff
Director, Environmental Affairs
Dairyland Power Cooperative
PO Box 817
3251 East Ave. S.
La Crosse, WI  54601

Robert M. Palmberg
Vice President, Generation
Dairyland Power Cooperative
PO Box 817
3251 East Ave. S.
La Crosse, WI  54601

and

John M. Holloway, III, Esq.
Elizabeth C. Williamson, Esq.
Winston & Strawn LLP
1700 K Street, N.W.
Washington, DC 20006-3817

and

Jeffrey L. Landsman
Wheeler, Van Sickle & Anderson, S.C.
25 West Main Street, Suite 801
Madison, WI 53703

202.    All notifications, communications, or submissions made pursuant to this Section

shall be sent either by:  (a) overnight mail or overnight delivery service with signature required

for delivery, or (b) certified or registered mail, return receipt requested.  All notifications,

communications, and transmissions (a) sent by overnight, certified, or registered mail shall be

69

deemed submitted on the date they are postmarked, or (b) sent by overnight delivery service shall be deemed submitted on the date they are delivered to the delivery service.

203.    Any Party may change either the notice recipient or the address for providing notices to it by serving the other Parties with a notice setting forth such new notice recipient or address.

## XX.    SALES OR TRANSFERS OF OPERATIONAL OR OWNERSHIP INTERESTS

204.    If DPC proposes to sell or transfer an Operational or Ownership Interest to another entity (a "Third Party Purchaser"), DPC shall advise the Third Party Purchaser in writing of the existence of this Consent Decree prior to such sale or transfer, and shall send a copy of such written notification to the Plaintiffs pursuant to Section XIX (Notices) of this Consent Decree at least 60 Days before such proposed sale or transfer.

205.    No sale or transfer of an Operational or Ownership Interest shall take place before the Third Party Purchaser and the Plaintiffs have executed, and the Court has approved, a modification pursuant to Section XXIII (Modification) of this Consent Decree making the Third Party Purchaser a party to this Consent Decree and jointly and severally liable with DPC for all the requirements of this Consent Decree that may be applicable to the transferred or purchased Operational or Ownership Interests.

206.    This Consent Decree shall not be construed to impede the transfer of any Operational or Ownership Interests between DPC and any Third Party Purchaser so long as the requirements of this Consent Decree are met.  This Consent Decree shall not be construed to prohibit a contractual allocation of the burdens of compliance with this Consent Decree as between DPC and any Third Party Purchaser of Operational or Ownership Interests, provided that both DPC and such Third Party Purchaser shall remain jointly and severally liable to the

70

United States for the obligations of this Consent Decree applicable to the transferred or purchased Operational or Ownership Interests.

207.    If the Plaintiffs agree, the Plaintiffs, DPC, and the Third Party Purchaser that has become a party to this Consent Decree pursuant to Paragraph 205 may execute a modification that relieves DPC of its liability under this Consent Decree for, and makes the Third Party Purchaser liable for, all obligations and liabilities applicable to the purchased or transferred Operational or Ownership Interests.  Notwithstanding the foregoing, however, DPC may not assign, and may not be released from, any obligation under this Consent Decree that is not specific to the purchased or transferred Operational or Ownership Interests, including the obligations set forth in Sections IX (Environmental Mitigation Projects) and X (Civil Penalty). DPC may propose and the Plaintiffs may agree to restrict the scope of the joint and several liability of any purchaser or transferee for any obligations of this Consent Decree that are not specific to the transferred or purchased Operational or Ownership Interests, to the extent such obligations may be adequately separated in an enforceable manner.

208.    Paragraphs 205-207 of this Consent Decree do not apply if an Ownership Interest is transferred solely as collateral security in order to consummate a financing arrangement (not including a sale-leaseback), so long as DPC: (a) remains the operator (as that term is used and interpreted under the Act) of the subject Unit(s); (b) remains subject to and liable for all obligations and liabilities of this Consent Decree; and (c) supplies the United States with the following certification within 30 Days after the transfer:

> "Certification of Change in Ownership Interest Solely for Purpose of Consummating Financing.  We, the Chief Executive Officer and General Counsel of Dairyland Power Cooperative ("DPC"), hereby jointly certify under Title 18 U.S.C. Section 1001, on our own behalf and on behalf of DPC, that any change in DPC's Ownership Interest in any Unit that is caused by the creation of a collateral security interest in such Unit(s) pursuant

to the financing agreement consummated on [insert applicable date] between DPC and [insert applicable entity]: a) is made solely for purpose of providing collateral security in order to consummate a financing arrangement; b) does not impair DPC's ability, legally or otherwise, to comply timely with all terms and provisions of the Consent Decree entered in *United States et al.  v. Dairyland Power Cooperative,* Civil Action_____; c) does not affect DPC's operational control of any Unit covered by that Consent Decree in a manner that is inconsistent with DPC's performance of its obligations under the Consent Decree; and d) in no way affects the status of DPC's obligations or liabilities under that Consent Decree."

## XXI.   EFFECTIVE DATE

209.    The effective date of this Consent Decree shall be the Date of Entry.

## XXII.  RETENTION OF JURISDICTION

210.    The Court shall retain jurisdiction of this case after entry of this Consent Decree to enforce compliance with the terms and conditions of this Consent Decree and to take any action necessary or appropriate for the interpretation, construction, execution, or modification of the Consent Decree, or for adjudication of disputes.  During the term of this Consent Decree, any Party to this Consent Decree may apply to the Court for any relief necessary to construe or effectuate this Consent Decree.

## XXIII. MODIFICATION

211.    The terms of this Consent Decree may be modified only by a subsequent written agreement signed by Plaintiffs and DPC. Where the modification constitutes a material change to any term of this Consent Decree, it shall be effective only upon approval by the Court.

## XXIV. GENERAL PROVISIONS

212.    When this Consent Decree specifies that DPC shall achieve and maintain a 30-Day Rolling Average Emission Rate, the Parties expressly recognize that compliance with such 30-Day Rolling Average Emission Rate shall commence immediately upon the date specified

and that compliance as of such specified date (e.g., December 30) shall be determined based on data from that date and the 29 prior Unit Operating Days.

213. This Consent Decree is not a permit. Compliance with the terms of this Consent Decree does not guarantee compliance with all applicable federal, state, or local laws or regulations. The emission rates and removal efficiencies set forth herein do not relieve DPC from any obligation to comply with other state and federal requirements under the Act, including DPC's obligation to satisfy any State modeling requirements set forth in the Wisconsin SIP.

214. This Consent Decree does not apply to any claim(s) of alleged criminal liability.

215. In any subsequent administrative or judicial action initiated by the United States or Sierra Club for injunctive relief or civil penalties relating to G-3 Unit, J.P. Madgett or Alma Units 1, 2, 3, 4 or 5 as covered by this Consent Decree, DPC shall not assert any defense or claim based upon principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, or claim splitting, or any other defense based upon the contention that the claims raised by the United States or Sierra Club in the subsequent proceeding were brought, or should have been brought, in the instant case; provided, however, that nothing in this Paragraph is intended to affect the validity of Section XI (Resolution of Past Civil Claims).

216. Nothing in this Consent Decree shall relieve DPC of its obligation to comply with all applicable federal, state, and local laws and regulations, including, but not limited to, the Clean Water Act and the National Pollutant Discharge Elimination System (NPDES) implementing regulations, Ambient Air Quality Standards, the National Emission Standards for Hazardous Air Pollutants From Coal and Oil-Fired Electric Utility Steam Generating Units (Utility MACT), and Standards of Performance for Fossil-Fuel-Fired Electric Utility, Industrial-Commercial-Institutional, and Small Industrial Commercial-Institutional Steam Generating Units

73

(Utility NSPS). Nothing in this Consent Decree should be construed to provide any relief from the emission limits or deadlines for the installation of pollution controls specified in these regulations.

217. Subject to the provisions in Section XI (Resolution of Past Civil Claims) and in Section XVI (Dispute Resolution), nothing contained in this Consent Decree shall be construed to prevent or limit the rights of the Plaintiffs to obtain penalties or injunctive relief under the Act or other federal, state, or local statutes, regulations, or permits. However, Sierra Club agrees not to file a request for a contested case hearing, a request for state circuit court review, or a petition pursuant to 42 U.S.C. § 7661d(b) challenging the issuance of any permits or other regulatory approvals that are necessary for the construction of environmental control equipment, or for any mitigation project identified in Appendix A, which is required by this Consent Decree; provided, however, that Sierra Club is entitled to raise any deviation from the requirements of this Consent Decree in such permitting actions through the Dispute Resolution provisions in Section XVI of this Consent Decree.

218. Each limit and/or other requirement established by or under this Consent Decree is a separate, independent requirement.

219. Performance standards, emissions limits, and other quantitative standards set by or under this Consent Decree must be met to the number of significant digits in which the standard or limit is expressed. For example, an Emission Rate of 0.100 is not met if the actual Emission Rate is 0.101. DPC shall round the fourth significant digit to the nearest third significant digit, or the third significant digit to the nearest second significant digit, depending upon whether the limit is expressed to three or two significant digits. For example, if an actual Emission Rate is 0.1004, that shall be reported as 0.100, and shall be in compliance with an

74

Emission Rate of 0.100, and if an actual Emission Rate is 0.1005, that shall be reported as 0.101, and shall not be in compliance with an Emission Rate of 0.100. DPC shall report data to the number of significant digits in which the standard or limit is expressed.

220.    This Consent Decree does not limit, enlarge, or affect the rights of any Party to this Consent Decree as against any third parties.

221.    This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in this Consent Decree, and supersedes all prior agreements and understandings among the Parties related to the subject matter herein.  No document, representation, inducement, agreement, understanding, or promise constitutes any part of this Consent Decree or the settlement it represents, nor shall they be used in construing the terms of this Consent Decree.

222.    Except as provided below, each Party to this action shall bear its own costs and attorneys' fees.  DPC shall pay Sierra Club's reasonable attorneys' fees and costs, pursuant to 42 U.S.C. § 7604(d).  The deadline for Sierra Club to file a motion for costs of litigation (including attorneys' fees) for activities prior to entry of this Consent Decree by the Court is hereby extended until 30 days after this Consent Decree is entered by the Court.  Prior to and/or during this 30-day period, Sierra Club and DPC shall seek to resolve informally any claim for costs of litigation (including attorneys' fees), and, if they cannot, will submit that issue to the Court for resolution.  An award of fees for activities prior to entry of this Consent Decree by the Court under this Paragraph does not waive Sierra Club's ability to seek recovery for costs of litigation (including attorneys' fees) incurred to monitor and/or enforce the provisions of this Consent Decree.

## XXV.  SIGNATORIES AND SERVICE

223.    Each undersigned representative of DPC and Sierra Club, and the Assistant Attorney General for the Environment and Natural Resources Division of the United States Department of Justice, certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind to this document the Party he or she represents.

224.    This Consent Decree may be signed in counterparts, and such counterpart signature pages shall be given full force and effect.

225.    Each Party hereby agrees to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons.

226.    Unless otherwise ordered by the Court, the United States agrees that DPC will not be required to file any answer or other pleading responsive to the United States' concurrently filed Complaint in this matter until and unless the Court expressly declines to enter this Consent Decree, in which case DPC shall have no less than 30 Days after receiving notice of such express declination to file an answer or other pleading in response to the Complaint

## XXVI.  PUBLIC COMMENT/AGENCY REVIEW

227.    The Parties agree and acknowledge that final approval by the United States and entry of this Consent Decree is subject to the procedures of 28 C.F.R. § 50.7, which provides for notice of the lodging of this Consent Decree in the Federal Register, an opportunity for public comment, and the right of the United States to withdraw or withhold consent if the comments disclose facts or considerations which indicate that this Consent Decree is inappropriate,

76

improper, or inadequate. Neither Sierra Club nor DPC shall oppose entry of this Consent Decree

by this Court or challenge any provision of this Consent Decree unless the United States has

notified Sierra Club and DPC, in writing, that the United States no longer supports entry of this

Consent Decree. Additionally, the Parties agree and acknowledge that final approval of this

Consent Decree by the Court is subject to 42 U.S.C. § 7604(c)(3), which provides that a consent

judgment in a citizen suit action must provide for review and comment by the Attorney General

and the U.S. EPA Administrator for 45 days.

### XXVII.      CONDITIONAL TERMINATION OF ENFORCEMENT UNDER CONSENT DECREE

228.      Termination as to Completed Tasks.  As soon as DPC completes a construction

project or any other requirement of this Consent Decree that is not ongoing or recurring, DPC

may, by motion to this Court, seek termination of the provision or provisions of this Consent

Decree that imposed the requirement.

229.      Conditional Termination of Enforcement Through this Consent Decree.  Subject

to the provisions of Paragraph 230, after DPC:

a.      has successfully completed construction, and has maintained operation, of all

pollution controls as required by this Consent Decree for a period of two years

and has successfully completed all actions necessary to Retire any Unit required

or elected to be Retired as required by this Consent Decree; and

b.      has obtained all the final permits and/or site-specific Wisconsin SIP revisions (i)

as required by Section XVII (Permits) of this Consent Decree and (ii) that include

as federally enforceable permit terms or Wisconsin SIP provisions, all Unit-

specific, plant-specific, and system-specific performance, operational,

maintenance, and control technology requirements established by this Consent

Decree;

then DPC may so certify these facts to the Plaintiffs and this Court. If the Plaintiffs do not object

in writing with specific reasons within 45 Days of receipt of DPC's certification, then, for any

violations of this Consent Decree that occur after the filing of notice, the Plaintiffs shall pursue

enforcement of the requirements through the applicable permits and/or other enforcement

authorities and not through this Consent Decree.

230.     Resort to Enforcement Under this Consent Decree. Notwithstanding Paragraph

229, if enforcement of a provision in this Consent Decree cannot be pursued by the United States

under the Wisconsin SIP or applicable permit(s) issued pursuant to the Act or its implementing

regulations ("CAA Permit"), or if a Consent Decree requirement was intended to be part of the

Wisconsin SIP or CAA Permit and did not become or remain part of such SIP or permit, then

such requirement may be enforced under the terms of this Consent Decree at any time.

## XXVIII.     FINAL JUDGMENT

231.     Upon approval and entry of this Consent Decree by the Court, this Consent

Decree shall constitute a final judgment between the Plaintiffs and DPC.

Signature Page for *United States of America v. Dairyland Power Cooperative* Consent Decree

FOR THE UNITED STATES DEPARTMENT OF JUSTICE

Respectfully submitted,

IGNACIA S. MORENO
Assistant Attorney General
Environment and Natural Resources
  Division
United States Department of Justice

JAMES A. LOFTON
Counsel to the Chief
Environmental Enforcement Section
Environment and Natural Resources
  Division
P.O. Box 7611
Washington, DC 20044-7611
(202) 514-2750

JASON A. DUNN
Senior Attorney
Environmental Enforcement Section
Environment and Natural Resources
  Division
P.O. Box 7611
Washington, DC 20044-7611
(202) 514-1111

79

Signature Page for *United States of America v. Dairyland Power Cooperative* Consent Decree

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

Respectfully submitted,

CYNTHIA GILES
Assistant Administrator
Office of Enforcement and
   Compliance Assurance
United States Environmental
   Protection Agency

PHILLIP A BROOKS
Director, Air Enforcement Division
United States Environmental
   Protection Agency

SABRINA ARGENTIERI
Attorney-Advisor
United States Environmental
   Protection Agency
1200 Pennsylvania Ave, N.W. (2242A)
Washington, DC 20460

80

Signature Page for *United States of America v. Dairyland Power Cooperative* Consent Decree

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

Respectfully submitted,

SUSAN HEDMAN
Regional Administrator, Region 5
United States Environmental
  Protection Agency


JANET R. CARLSON
Associate Regional Counsel
United States Environmental
  Protection Agency, Region 5
77 W. Jackson Blvd. (C-14J)
Chicago, IL  60604

Signature Page for *United States of America v. Dairyland Power Cooperative* Consent Decree

FOR SIERRA CLUB

By its counsel:

David C. Bender
McGillivray Westerberg & Bender LLC
211 S. Paterson Street, Ste 320
Madison, WI 53703

82

Signature Page for *United States of America v. Dairyland Power Cooperative* Consent Decree

FOR DAIRYLAND POWER COOPERATIVE

By: *William L. Berg*
    William Berg
    President and Chief Executive Officer
    Dairyland Power Cooperative
    3251 East Ave. S.
    La Crosse, WI 54601

# APPENDIX A
## ENVIRONMENTAL MITIGATION PROJECTS

In compliance with and in addition to the requirements in Section IX of this Consent Decree (Environmental Mitigation Projects), Dairyland shall comply with the requirements of this Appendix to ensure that the benefits of the $5,000,000 in Environmental Mitigation Projects ("Projects") are achieved.

I.      **Forest Service Mitigation**

      A.      Within 45 Days from the Date of Entry, Dairyland shall pay to the United States Forest Service the sum of $250,000 to be used in accordance with 16 U.S.C. § 579c, for the improvement, protection, or rehabilitation of lands under the administration of the Forest Service.  The Forest Service Project(s) will focus on the Chequamegon-Nicolet National Forest.  If the Chequamegon-Nicolet National Forest is not possible as a Project focus, the Project(s) shall focus on one or more of the following other areas alleged by the United States to have been impacted by emissions from Dairyland's facilities:  the Superior National Forest and/or the Ottawa National Forest.

      B.      Payment of the amount specified in the preceding paragraph shall be made to the Forest Service pursuant to payment instructions provided to Dairyland.  Notwithstanding Section I.A of this Appendix, payment of funds by Dairyland is not due until 10 Days after receipt of payment instructions, or 45 days after the Date of Entry, whichever is later.

      C.      Upon payment of the amount specified in Section I.A of this Appendix, Dairyland shall have no further responsibilities regarding the implementation of any Projects selected by the Forest Service in connection with this provision of the Consent Decree.

II.     **National Park Service Mitigation**

      A.      Within 45 Days from the Date of Entry, Dairyland shall pay to the National Park Service the sum of $250,000 to be used in accordance with 16 U.S.C.  § 19jj, for the restoration of land, watersheds, vegetation, and forests using adaptive management techniques designed to improve ecosystem health and mitigate the effects of air pollution.  The National Park Service Project(s) will focus on the Effigy Mounds National Monument, Mississippi River National Recreation Area, Saint Croix National Scenic River, and/or Apostle Islands National Lakeshore.  If the lands identified in the prior sentence are not possible as a Project focus, the Project(s) shall focus on one or more of the following other areas alleged by the United States to have been impacted by emissions from Dairyland's facilities:

1

Herbert Hoover National Historic Site, Pipestone National Monument, Indian Dunes National Lakeshore, Keweenaw National Historic Park, Grand Portage National Monument, Isle Royale National Park, and Voyageurs National Park.

B.      Payment of the amount specified in the preceding paragraph shall be made to the Natural Resource Damage and Assessment Fund managed by the United States Department of the Interior pursuant to payment instructions provided by the National Park Service to Dairyland.  Notwithstanding Section II.A of this Appendix, payment of funds by Dairyland is not due until 10 Days after receipt of payment instructions, or 45 Days after the Date of Entry, whichever is later.

C.      Upon payment of the amount specified in Section II.A of this Appendix, Dairyland shall have no further responsibilities regarding the implementation of any Projects selected by the National Park Service in connection with this provision of the Consent Decree.


III.   **Overall Schedule and Budget for Additional Environmental Mitigation Projects**

A.      Within 120 Days of the Date of Entry, as further described below, Dairyland shall submit proposed project(s) plan(s) to EPA for review and approval pursuant to XIII of the Consent Decree (Review and Approval of Submittals) for completing the remaining $4,500,000 in Environmental Mitigation Projects over a period of not more than 5 years from the Date of Plan Approval.  As set forth below, at least $2,000,000 of these Project Dollars shall be spent on the Major Solar Photovoltaic Development Project.  The remaining Project Dollars shall be spent on projects chosen from Sections V, VI, and VII of this Appendix.  EPA reserves the right to disapprove any of the Project plans should the Agency determine based on an analysis of the plans submitted by Dairyland and all the potential environmental impacts that the Project is not environmentally beneficial.  Nothing in this Consent Decree shall be construed to require that Dairyland submit plans for each of the Projects outlined in this Appendix, except with respect to the Major Solar Photovoltaic Development Project.  If Dairyland opts not to perform one of the Projects (except with respect to the Major Solar Photovoltaic Development Project, which Dairyland must complete), it will not have any obligations for such Project pursuant to this Consent Decree, including performance, reporting, or closure requirements for that Project, provided that Dairyland is otherwise in compliance with the Environmental Mitigation Project requirements of this Consent Decree.  If Dairyland subsequently opts not to perform a Project for which it has submitted a plan that has been approved by EPA (except with respect to the Major Solar Photovoltaic Development Project, which Dairyland must complete), then it will indicate withdrawal from the Project in its next biannual Environmental Mitigation Plan report pursuant to Paragraph 147.g of the Consent Decree.

2

B.    Dairyland may, at its election, consolidate the plans required by this Appendix into a single plan.

C.    The Parties agree that Dairyland is entitled to spread its payments for Environmental Mitigation Projects over the five-year period commencing upon the date of plan approval.  Dairyland is not, however, precluded from accelerating payments to better effectuate a proposed mitigation plan, provided that Dairyland shall not be entitled to any reduction in the nominal amount of the required payments by virtue of the early expenditures.

D.    All proposed Project plans shall include the following:

1.    A plan for implementing the Project;

2.    A summary-level budget for the Project;

3.    A time-line for implementation of the Project; and

4.    A description of the anticipated environmental benefits of the Project including an estimate of emission reductions (e.g., $SO_2$, $NO_x$, PM, $CO_2$) expected to be realized.

E.    Upon approval of the plan(s) required by this Appendix by EPA, Dairyland shall complete the approved Projects according to the approved plan(s).  Nothing in this Consent Decree shall be interpreted to prohibit Dairyland from completing the Projects ahead of schedule.

F.    Commencing with the first progress report due pursuant to Section XII (Periodic Reporting) of the Consent Decree, and continuing biannually thereafter until completion of the Project(s), Dairyland will include in the progress report information describing the progress of the Project and the Project Dollars expended on the Project.

G.    In accordance with the requirements of Paragraph 141 of the Consent Decree, within 60 Days following the completion of each Project, Dairyland shall submit to EPA for approval of Project closure, a Project completion report that documents:

1.    The date the Project was completed;

2.    The results and documentation of implementation of the Project, including the estimated  emission reductions or other environmental benefits achieved;

3

3.      The Project Dollars incurred by Dairyland in implementing the Project; and

4.      Certification by a Responsible Official in accordance with Paragraph 150 of the Consent Decree that the Project has been completed in full satisfaction of the requirements of the Consent Decree and this Appendix.

H.      If EPA (after consultation with the Sierra Club) concludes based on the Project completion report or subsequent information provided by Dairyland, that the Project has been performed and completed in accordance with the Consent Decree, then EPA will approve completion of the Project for purposes of the Consent Decree.

## IV.    Major Solar Photovoltaic (PV) Development Project

A.      Consistent with the requirements of Section III of this Appendix, within 120 Days of the Date of Entry, Dairyland shall submit a plan to execute a long term power purchase agreement with one or more third-party project developers (the "Project Developers") who will then develop new major solar photovoltaic (PV) installations to be located in Wisconsin, Minnesota, Illinois or Iowa.  The power purchase agreement will include a term of at least 10 years for which Dairyland commits to purchase the power generated and, if generated, acquire associated Renewable Energy Credits or Renewable Resource Credits (collectively RECs) from the solar PV installations.[1]  Dairyland shall not use and will retire all RECs generated during the first 10 years of performance (as measured from the day that power is first purchased under each power purchase agreement) (the "Initial 10 Years") in accordance with all applicable rules, and shall identify these RECs as retired in the Midwest Renewable Energy Tracking System (M-RETS) or any other tracking system designated as acceptable by the program recognizing the REC.  Dairyland shall not use the RECs generated during the Initial 10 Years of the power purchase agreement(s) for compliance with any renewable portfolio standard or for any other compliance purpose during or after the Initial 10 Years.

B.      This Project shall use at least $2 million in Project Dollars, which shall be expended within five years of the Date of Plan Approval.  For purposes of calculating the $2 million in Project Dollars, Dairyland shall only count the increment between the wholesale price of solar generated electricity (including the cost of RECs) that Dairyland is charged under the power purchase

---

1 RECs refer to a program in which credits are generated from the creation of renewable power sources, such as solar or wind developments.  RECS are known as Renewable Resource Credits in Wisconsin and Renewable Energy Credits in Minnesota, and may have another name in different states.

4

agreement(s) minus Dairyland's average daylight wholesale charge for electricity. The Project shall be considered completed for purposes of this Consent Decree after the Initial 10 Years. Dairyland may choose to continue to purchase power or otherwise continue the project(s) following the Initial 10 Years, but will no longer be bound by the terms governing Environmental Mitigation plans for this Project identified in Section IX of the Consent Decree and this Appendix, including but not limited to limitations on the use of RECs. RECs generated following the Initial 10 Years may be used for any purpose authorized by law, including but not limited to satisfying regulatory requirements or sales of RECs to help offset the additional costs of the power purchase contract.

C.    In addition to the requirements of Section III, the plan shall also satisfy the following criteria:

    1.    Each major solar PV development will have at least 500 kilowatts of capacity (Direct Current) and will be interconnected with the utility grid with appropriate metering and monitoring to track the net power output;

    2.    Dairyland will enter into a long term power purchase agreement with one or more major solar PV developers by no later than three years after the date of plan approval; and

    3.    In addition, Dairyland's plan will:

        a.    Include an anticipated schedule for issuing Request For Proposals (RFP) for major solar PV developments and an overall schedule for implementing this Project;

        b.    Describe the process that Dairyland will use to solicit bids and select appropriate development(s) to participate in the Project;

        c.    Identify the Project Developer that Dairyland proposes for the purchase agreement(s). This does not include prospective developers who would respond to a RFP but does include any proposed third party who would have a coordination or Project management role in the major PV Project;

        d.    Identify the expected capacity (kilowatts) and energy output of the major PV development(s); and

        e.    Provide that Dairyland shall biannually report the actual

5

kilowatt-hours generated each year for the Initial 10 Years in the progress report required by Paragraph 147 of the Consent Decree.

D.      In addition to the information required to be included in the report pursuant to Section III.G, above, Dairyland shall include in that report details of the major PV developments including the total capacity (kilowatts) of each system, components installed, total cost, expected energy output and environmental benefits, and the actual kilowatt-hours generated for the Initial 10 Years.

**V.      Solar Photovoltaic (PV) Panels Project**

A.      Consistent with the requirements of Section III of this Appendix, within 120 Days from the Date of Entry, Dairyland may submit to EPA for review and approval pursuant to Section XIII (Review and Approval of Submittals) of this Consent Decree a plan to install fixed flat or tracking photovoltaic (PV) panels and the associated equipment to create a grid connected (PV system) on public school buildings and buildings owned by not for profit organizations located in the Dairyland service territory or in areas surrounding the J.P.Madgett/Alma and Genoa generating stations.

B.      In addition to the requirements of Section III of this Appendix, the plan will also satisfy the following criteria:

1.      A PV Project will, at a minimum, consist of:

a.      The installation of solar panels at a single location with unobstructed solar access, producing at least 10 kilowatts direct current, but not to exceed the total annual electricity base of the building the project serves;

b.      A grid-tied inverter, appropriately sized for the capacity of the solar panels installed at the location;

c.      The appropriate solar panel mounting equipment for the particular school, government-owned building, or building owned by nonprofit groups selected, i.e., roof mount or ground mount;

d.      Wiring, conduit, and associated switchgear and metering equipment required for interconnecting the solar generator to the utility grid; and

e.    Appropriate monitoring equipment supported by kiosk-delivered educational software to enable building occupants and/or staff to monitor the total and hourly energy output of the system (kilowatt hours), environmental benefits delivered (pounds CO2 avoided), hourly ambient temperature and cell temperature (Cº), irradiance (W/M2), as well as time sensitive voltage, power and current metrics.

2.    The PV Project will be installed on the customer side of the meter and ownership of the system will be conveyed to the building owner at the site;

3.    All related environmental benefits will be retained by the system owner, including associated Renewable Energy Credits or Renewable Resource Credits (collectively RECs);

4.    Dairyland will include in its bid proposals the requirement that each PV System include a manufacturer parts warranty and a Project Service Contract, as described in Subsection V.B.5, below. Dairyland will use North American Board of Certified Energy Practitioners (NACEP) certified energy professionals to perform the installation of the PV Projects to ensure the highest quality installation and performance of the system;

5.    The plan will also include the requirement for: (a) a manufacturer parts warranty for the solar panels and invertors installed pursuant to the PV Project for the life of such equipment; and (b) a service contract (Project Service Contract) for maintenance of the Project for 25 years from the date of installation including but not limited to, annual system checkups and solar module cleaning, and normal Project component replacements, including installation of new system components as needed to maintain the Project through the termination of the contract term.  Dairyland may propose to purchase the Project Service Contract for the benefit of the entity that owns the building where the PV Project is installed (Service Contract Beneficiary) and to have the option of funding the cost of the Project Service Contract by depositing funds in an escrow account for use by such Service Contract Beneficiary solely for purposes of maintaining the PV Systems through the termination of the contract term; and

7

6.    Dairyland will select at least two public school districts with first preference given to the districts located closest to the J.P. Madgett/Alma and Genoa generating stations.

7.    In addition, Dairyland's plan will:

    a.    Include a schedule and budget for completing each phase of the small PV Project including installation and funding of the Project Service Contract for maintenance costs for 25 years following the approval of the plan;

    b.    Describe the process that Dairyland will use to notify the school districts and not for profit building owners that they are eligible to participate in the small PV Project and solicit their participation in the PV Project;

    c.    Describe the process and criteria Dairyland will use to select the schools and/or not for profit buildings where the systems will be installed, including base electricity usage, solar access availability, and other relevant criteria;

    d.    Identify any person or entity, other than Dairyland, that will be involved in the small PV Project. This does not include contractors or installers who would complete the siting analysis and/or installation of the PV systems but does include any proposed third party who would have a coordination or project management role in the small PV Project;

    e.    Identify the expected capacity (kilowatts) and energy output of each system; and

    f.    Provide that Dairyland shall biannually report the actual kilowatt-hours generated each year in the progress report required by Paragraph 146 of the Consent Decree.

C.    In addition to the information required to be included in the report pursuant to Section III.G, above, Dairyland shall include in that report the identity of the buildings where the PV systems are installed, the total capacity (kilowatts) of

each system, components installed, total cost, and expected energy output and environmental benefits.

## VI. Home Weatherization Project

A.  Consistent with the requirements of Section III of this Appendix, Dairyland may propose to EPA for review and approval pursuant to Section XIII (Review and Approval of Submittals) of this Consent Decree, a plan to fund home weatherization projects for low income residents served by Dairyland or its member electric distribution cooperatives, through not for profit community action program (CAP) agencies.  In addition, the Project may also fund a "Pay as You Go" residential weatherization program by providing loan funds to Dairyland distribution cooperatives which will then become part of a low interest revolving loan fund to help residential members finance home energy efficiency improvements.  Dairyland will participate in these programs for at least five years from approval of the plan.  The Project may use up to $500,000 in Project Dollars for purposes of satisfying the requirements of this Consent Decree.

B.  CAP agencies are non-profit organizations that serve low income residents of a multi-county region by providing a variety of services.  One of the programs typically provided by these agencies is home weatherization assistance.  These services are provided at no cost to income qualified homeowners.  Because these services reduce the use of electricity or fossil fuels, they directly reduce emissions, including $NO_x$, $SO_2$, and PM.

C.  The "Pay as You Go" Program is a program that makes available loan funds to households at all income levels. The program provides low interest loans for various types of residential energy efficiency upgrades or replacements including adding building envelope insulation, replacing heating or cooling systems and other capital intensive energy reduction projects.  This program is currently administered by a group of electric distribution cooperatives that are members of and are served by Dairyland.

D.  In its plan, Dairyland will provide an estimate of the anticipated environmental benefits including the emission reductions expected.

E.  In addition to the requirements of Section III, the plan will also satisfy the following general requirements for both CAP contributions and "Pay as You Go" program contributions:

1.  Include a schedule and budget for completing the home weatherization program;

9

2. Identify any person or entity, other than Dairyland, that will be involved in the home weatherization project, and the qualifications for such person or entity to undertake the work involved; and

3. Describe the eligible energy efficiency improvements to be offered. Dairyland will focus on improvements that are long-term in nature and designed to last at least 15 years.  Examples of long term improvements are installing energy efficient HVAC systems, heat pumps, water heaters, insulation, replacement windows and doors, siding and roofing, and Energy Star qualified appliances in existing buildings.

F. In addition to the requirements of Section III, the plan will also satisfy the following criteria for funding CAP agencies:

1. Each CAP agency will provide Dairyland with a list of home weatherization Projects that have been funded along with the expected energy savings for each Project on an annual basis. Dairyland will provide this information to EPA annually; and

2. Describe the process that Dairyland will use to distribute funds to CAP agencies.

G. In addition to the requirements of Section III, the plan will also satisfy the following criteria for funding the "Pay as You Go" program:

1. Each revolving fund loan program will provide Dairyland with a list of home weatherization Projects that have been funded along with the expected energy savings for each project on an annual basis.  Dairyland will provide this information to EPA annually;

2. Provide the operating plans for each weatherization revolving loan fund program; and

3. Describe the process and criteria Dairyland will use to distribute funds to weatherization revolving fund loan programs.

H. In addition to the information required to be included in the report pursuant to Section III.G, above, Dairyland shall include in that report a description of how the dollars were spent and the environmental benefits realized from the

expenditures including the emission reductions (e.g., $SO_2$, $NO_x$, PM, $CO_2$) expected to be realized.

**VII.     Hybrid and Plug-in Fleet Replacement Program**

A.     Consistent with the requirements of Section III of this Appendix, Dairyland may propose a plan to replace gasoline and diesel powered fleet vehicles (passenger cars, light trucks, and heavy duty service vehicles) with newly manufactured hybrid gasoline electric, hybrid diesel electric, plug-in hybrid, or plug in battery vehicles. Upgraded vehicles may be owned by Dairyland or its distribution cooperative members. The purpose of this program is to reduce emissions through reduced fuel consumption by reducing or eliminating the need to have service truck engines idle in order to power auxiliary equipment. Increased use of battery powered and hybrid vehicles results in reduced fuel usage, reduced emissions of PM, NOx, VOCs and toxics, and reduced noise. This Program plan will include, where necessary, techniques and infrastructure needed to support such Project.

B.     Definitions for Plan:

1.     "Hybrid Vehicle" means a vehicle that can generate, store, and utilize electric power to reduce the vehicle's consumption of fossil fuel.

2.     "Plug in Hybrid" means a vehicle that can be charged from an external source and can generate, store, and utilize electric power to reduce the vehicle's consumption of fossil fuel. These vehicles typically include a larger battery pack to allow an extended range of operation without the use of the gasoline or diesel engine.

3.     "Plug in Battery Vehicle" means a vehicle that does not utilize an internal combustion engine and instead relies entirely on battery power for propulsion.

C.     In addition to the requirements of Section III, the plan will also satisfy the following criteria:

1.     All vehicles proposed for inclusion in this program will be regular production models that meet all applicable engine standards, certifications or verifications; and

2.     Dairyland and its distribution cooperative members will use program funds only to the extent of the incremental costs of these

11

vehicles as compared to similar newly manufactured conventional vehicles.

3.    In addition, Dairyland's plan will:

    a.    Include a schedule and budget for completing the hybrid and plug-in fleet replacement program;

    b.    Propose a method to account for the amount of Project Dollars that will be credited for each replaced vehicle, taking into account the incremental costs of program vehicles compared to similar conventional vehicles and potential savings associated with the replacement;

    c.    Provide a method of determining net present value of the savings of program vehicles as compared to similar conventional vehicles;

    d.    Certify that the program vehicles will be retained and operated for their useful life;

    e.    Prioritize the replacement of diesel-powered vehicles in Dairyland's fleet to the greatest extent practical and available; and

    f.    Identify any person or entity, other than Dairyland and its distribution cooperatives, that will be involved in the hybrid and plug-in fleet replacement program.  This does not include vehicle manufacturers or dealers who would provide vehicles but does include any proposed third party who would have a coordination or project management role in the hybrid and plug-in fleet replacement program.

D.    With respect to costs associated with vehicles, Dairyland shall only receive credit toward Project Dollars for the incremental cost of hybrid and/or electric vehicles as compared to the cost of a newly manufactured, similar motor vehicle powered by conventional diesel or gasoline engines.  Dairyland shall also receive credit toward Project Dollars for costs associated with infrastructure needed to support such Project.

12